RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____ 3-14-05

United States District Court
District of Massachusetts

CONSERVATION LAW FOUNDATION, INC., )
                                    )
                        Plaintiff,  )
                                    )  Civil Action
        v.                          )
                                    )  No.
MITT ROMNEY, in his official capacity as )
GOVERNOR OF MASSACHUSETTS;           )  COMPLAINT
DOUGLAS I. FOY, in his official capacity as )
SECRETARY OF THE OFFICE FOR          )
COMMONWEALTH DEVELOPMENT and         )
CHAIRMAN OF THE COMMONWEALTH         )
DEVELOPMENT COORDINATING COUNCIL;    )
THE MASSACHUSETTS BAY                )
TRANSPORTATION AUTHORITY; DANIEL     )
GRABAUSKAS, in his official capacity as )
SECRETARY OF THE EXECUTIVE OFFICE    )
OF TRANSPORTATION and CHAIRMAN OF    )
THE MASSACHUSETTS BAY                )
TRANSPORTATION AUTHORITY; MICHAEL    )
H. MULHERN, in his official capacity as )
GENERAL MANAGER OF THE               )
MASSACHUSETTS BAY TRANSPORTATION     )
AUTHORITY; THE MASSACHUSETTS         )
TURNPIKE AUTHORITY; MATTHEW J.       )
AMORELLO, in his official capacity as )
CHAIRMAN OF THE MASSACHUSETTS        )
TURNPIKE AUTHORITY; JOHN COGLIANO,   )
in his official capacity as COMMISSIONER OF )
THE MASSACHUSETTS HIGHWAY            )
DEPARTMENT; and ROBERT W. GOLLEDGE,  )
in his official capacity as COMMISSIONER OF )
THE DEPARTMENT OF ENVIRONMENTAL      )
PROTECTION,                          )
                                    )
                        Defendants. )

05 - 10487 NG

MAGISTRATE JUDGE _____

## INTRODUCTION

1.    The Conservation Law Foundation ("CLF") seeks declaratory, injunctive and other relief in this action with respect to actions and failures to act of various officials

of the Commonwealth of Massachusetts ("Massachusetts") in violation of the Federal
Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq.

2.      The defendants have failed and continue to fail to implement air quality
emission standards and limitations in the form of public transportation improvements and
measures that Massachusetts has committed to undertake on a prescribed schedule
pursuant to the terms of its CAA state implementation plan ("SIP"). These enforceable
standards and limitations were required, in large part, to offset or otherwise mitigate the
significant air quality impacts of the Central Artery/Tunnel Project ("CA/T Project").

3.      The CA/T Project is a massive, nearly $15 billion transportation project
that significantly expands highway capacity in downtown Boston by adding travel lanes
and vehicular capacity to the formerly six-lane Central Artery (Interstate 93) and by
doubling the tunnel capacity in the metropolitan Boston area with the addition of the
four-lane Ted Williams Tunnel across Boston Harbor.

4.      To offset or otherwise mitigate the negative air quality and public health
impacts of this expanded arterial and tunnel capacity, Massachusetts committed to a
number of federally-enforceable emission standards and limitations in the form of public
transportation improvements and other transportation measures. While the highway
portion of the CA/T Project is now nearly complete, many of the required transit projects
are now significantly and unreasonably delayed. Other of these required transit projects
are significantly behind schedule and, upon information and belief, cannot be completed
by the prescribed SIP deadline. By failing to satisfy these SIP transit commitments,
defendants are in violation of the CAA.

2

5.    By this action, plaintiff CLF seeks judicial relief to compel defendants to complete the transit projects specified in the Massachusetts SIP on a judicially-enforceable schedule and to provide sufficient mitigation for the environmental degradation experienced from delays associated with these projects. CLF also seeks other judicial relief to which it is entitled.

## PARTIES

### Plaintiff

6.    CLF is a non-profit membership organization dedicated to the use of law, science, and economics to improve resource management, environmental quality and public health throughout New England. CLF's principal place of business is located at 62 Summer Street, Boston, Massachusetts 02110. CLF has a membership of approximately 5,000 individuals throughout New England. Many of CLF's members reside in the metropolitan Boston region.

7.    CLF's organizational goals include protecting and conserving the environment of Massachusetts and the public health of its members and other Massachusetts residents by reducing air pollution in metropolitan Boston as well as elsewhere in the state.

8.    CLF has had a significant history in advocating and fighting for clean air in the metropolitan Boston area and Massachusetts on behalf of its members. CLF has frequently been granted standing in federal litigation in the United States District Court for the District of Massachusetts and in other jurisdictions on behalf of its adversely affected members.

9.      CLF has an extensive history of involvement in the specific air pollution issues that are at issue in this action. On behalf of its adversely affected members, CLF participated extensively in the regulatory proceedings that led to the development and promulgation of the Massachusetts SIP with respect to the CA/T Project.  On behalf of those same members, CLF made continuous and extensive efforts to ensure that the transportation control measures set forth in the Massachusetts SIP with respect to the CA/T Project were implemented on schedule and according to their terms.

10.     CLF has been involved or attempted to be involved on behalf of its adversely affected members in numerous state permit proceedings, administrative proceedings, public hearings, and public comment proceedings with respect to the timely implementation of the Massachusetts SIP requirements associated with the CA/T Project.

11.     CLF brings this action on behalf of its adversely affected members to enforce the emission standards and limitations of the Massachusetts SIP.  Many CLF members reside, work, or otherwise spend time in parts of eastern Massachusetts where unlawfully high levels of ozone pollution result from emissions from motor vehicle traffic in metropolitan Boston.

12.     The Massachusetts SIP was approved by the United States Environmental Protection Agency ("EPA") in order to ensure, inter alia, that the hazardous ozone levels in metropolitan Boston would be reduced to levels that did not cause or contribute to injury or risks of physical harm to people through the implementation of the SIP's emission standards and limitations. As a result of the delays alleged in this action, CLF members who breathe the air while residing, working or spending time in metropolitan Boston suffer and will continue to suffer actual physical harm to their bodies and an

increased risk of physical harm from their exposure to unhealthful ozone levels. These members are also suffering and will continue to suffer negative impacts on their quality of life as a result of this continuing harm and risk of harm. The SIP requirements that CLF seeks to enforce in this action were specifically developed and approved by the EPA for the purpose of reducing the exposure of people in the metropolitan Boston area to ozone.

13.    CLF also brings this action on behalf of its members who reside, work or otherwise spend time in the Boston metropolitan region who are adversely affected and will continue to be adversely affected by the delays in the implementation of required public transit improvements required under the Massachusetts SIP. These members would use and depend on the public transportation projects set forth in the SIP if they were constructed and were operational as required in the SIP. The delays and failures to implement the requirements of the SIP are causing these CLF members specific injury in the forms of additional expense and time in delays spent commuting to work or to other destinations in metropolitan Boston. These injuries would be reduced or eliminated if the emission standards and limitations in the Massachusetts SIP were implemented on a timely basis as required by the CAA.

Defendants

14.    Defendant Mitt Romney is the Governor of Massachusetts.  The Governor is the chief executive officer of Massachusetts and has the ultimate responsibility for ensuring that the state is in compliance with the SIP adopted by Massachusetts and approved by the EPA.  States have primary responsibility for assuring air quality under the Clean Air Act and must promulgate and implement SIPs to that end.

15.    Defendant Douglas I. Foy is the Secretary of the Office for Commonwealth Development and Chair of the Commonwealth Development Coordinating Council.  Mr. Foy has responsibility for overseeing Massachusetts' transportation and environmental agencies. He is charged with protecting natural resources and supporting a range of convenient and affordable transportation choices. He is also required to coordinate and make recommendations regarding capital planning and to develop long-term statewide transportation planning.

16.    Defendant Massachusetts Bay Transportation Authority ("MBTA") is an independent transit authority.  The MBTA must carry out most of the public transportation projects at issue here.

17.    Defendant Daniel A. Grabauskas is the Secretary of the Executive Office of Transportation ("EOT") and Chairman of the MBTA.  EOT was created in 2004 as part of a governmental reorganization plan and, upon information and belief, has assumed all the duties and responsibilities of the former Executive Office of Transportation and Construction ("EOTC") including specifically EOTC's responsibilities under the Massachusetts SIP. EOTC is specifically named in the Massachusetts SIP as the agency responsible for the transit requirements at issue.

18.    Defendant Michael H. Mulhern is the General Manager of the MBTA. Mr. Mulhern has authority over and responsibility for the planning and budgeting processes of the agency, which must actually carry out most of the public transportation requirements at issue here.

19.    Defendant Massachusetts Turnpike Authority ("MTA") is an independent authority.  In 1997, Massachusetts enacted the Metropolitan Highway System Act,

6

M.G.L. 81A, which transferred authority over the CA/T Project from the Massachusetts Highway Department ("MHD") to the MTA. That legislation specifically provides that all CA/T Project-related mitigation commitments will be allocated between and satisfied by MHD and MTA.

20.    Defendant Matthew J. Amorello is the Chairman of the MTA. The MTA received authority over the CA/T Project pursuant to the Metropolitan Highway System Act, M.G.L. 81A, which transferred authority over the CA/T Project from the Massachusetts Highway Department ("MHD") to the MTA and provided that all CA/T Project-related mitigation commitments will be allocated between and satisfied by MHD and MTA.

21.    Defendant John Cogliano is the Commissioner of MHD, the agency that had complete authority of the CA/T Project until 1997. Pursuant to the Metropolitan Highway System Act, M.G.L. 81, § 12, which transferred some authority over the CA/T Project from MHD to MTA, the two agencies were directed to allocate responsibility for satisfying all CA/T Project-related commitments between them.

22.    Defendant Robert W. Golledge is the Commissioner of the Department of Environmental Protection ("DEP"). DEP is a signatory on the Administrative Consent Order regarding Massachusetts' public transportation obligations under the CAA. The SIP was promulgated pursuant to DEP's authority and DEP has duties and obligations with respect to the provisions of the SIP regarding Massachusetts' public transportation obligations. DEP has taken action that may be at issue in this proceeding, and given DEP's roles and responsibilities, Commissioner Golledge is a necessary party for appropriate remedial action.

## JURISDICTION AND VENUE

23.     The United States District Court has jurisdiction over this action pursuant to 42 U.S.C. § 7604, governing citizen suits under the Clean Air Act.

24.     On January 12, 2005, notice of the CLF's intent to commence this action alleging the defendants to be in violation of emission standards or limitations under the CAA was duly served on the defendants by certified mail in accordance with Section 304(b) of the Clean Air Act, 42 U.S.C. § 7604(b), and its implementing regulations. 40 C.F.R. Part 54. A true and correct copy of that notice is attached hereto as Exhibit 1.

25.     Sixty (60) days have passed between the service of CLF's notice referenced above and the filing of this complaint.

26.     Neither the EPA nor the Commonwealth of Massachusetts has commenced or is diligently prosecuting a civil action against the defendants for violations identified in CLF's CAA notice in a United States or Massachusetts court.

27.     Venue in this action is proper in the District of Massachusetts in that all the defendants reside in Massachusetts, a substantial part of the events or omissions giving rise to the claims stated herein have occurred in this district, and this action is not founded on diversity of citizenship.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Air Act

28.     The federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, is the principal federal statute enacted to protect the citizens of the United States from the public health and welfare threats associated with air pollution.

29.    Under the CAA, the Administrator of the EPA has established National Ambient Air Quality Standards ("NAAQS") for a number of air pollutants, including ozone, at levels necessary to protect the public health and welfare.

30.    Under the CAA, individual states must develop and incorporate enforceable emission control strategies into regulatory programs known as "state implementation plans." A SIP must provide for implementation, maintenance and enforcement of the NAAQS. The requirements and commitments set forth in a state SIP become binding as a matter of federal law on the states.

31.    The EPA has a process by which it designates geographical areas where the ambient air quality exceeds the NAAQS as "non-attainment areas." In states that have been designated as "non-attainment" for one or more of the NAAQS, the SIP must provide for attainment of the NAAQS as expeditiously as practicable. The CAA set a deadline for NAAQS attainment but authorized EPA to extend that deadline under certain circumstances.

32.    Massachusetts has not attained the NAAQS for ozone. Massachusetts has been designated as in "serious non-attainment" of the one-hour ozone standard and "moderate non-attainment" of the eight-hour ozone standard. Massachusetts was originally required to come into attainment with the NAAQS for ozone by 1999. Upon information and belief, this deadline was extended to 2003 and later to 2007.

33.    Ground-level ozone forms in the atmosphere when volatile organic compounds and nitrogen oxide emissions, known as ozone "precursors," react in the presence of heat and sunlight. Emissions from automobiles significantly contribute to high ozone levels. Ozone is the major constituent of smog and a powerful respiratory

irritant which, at relatively low levels of exposure, causes reduced lung function and the deterioration of lung tissue, and which has been linked to increased susceptibility to respiratory infection.

34.    Ozone is particularly harmful to children, to elderly people, and to people with pre-existing respiratory conditions such as asthma, bronchitis and emphysema. Ozone causes long-term, potentially permanent lung damage beginning in early years of life and contributes to more serious effects with increasing exposure. Symptoms resulting from ozone exposure include eye irritation, headaches, coughing, chest discomfort, shortness of breath and difficulty in breathing.

Relevant History of the Massachusetts SIP

35.    The CA/T Project expanded highway capacity, doubling harbor tunnel capacity and enlarging the formerly six-lane Central Artery (Interstate 93) into a ten-lane highway.  As a condition of federal approval of the CA/T Project, Massachusetts made binding commitments to complete a number of public transportation improvement projects to counter the air quality impacts of expanded highway capacity in the Boston metropolitan area. These commitments became federally enforceable emission standards or limitations through Massachusetts' approved SIP.

36.    Several of the public transportation improvements designed to mitigate air quality impacts of the CA/T Project were made binding through certification of the tunnel ventilation system used for the CA/T Project.  In early 1991, the Department of Public Works, now MHD, submitted a "preconstruction certification" for the CA/T Project to DEP pursuant to a state regulation governing "Certification of Tunnel Ventilation Systems in the Metropolitan Boston Air Pollution Control District" codified at 310 CMR

7.38. A true and correct copy of 310 CMR 7.38 is attached as Exhibit 2. This regulation requires transportation agencies to make specified certifications regarding air quality impacts to DEP prior to beginning construction of certain highway projects, establishes the procedure for seeking DEP's acceptance of preconstruction certification, and authorizes DEP to accept, reject or grant conditional acceptance of a certification.

37.    DEP submitted 310 CMR 7.38 to EPA, and EPA approved the regulation as part of the Massachusetts SIP under the CAA.

38.    MHD's preconstruction certification (the "Vent Stack Permit"), issued pursuant to 310 CMR 7.38, included a set of proposed mitigation commitments, including public transportation commitments. Accepting these proposed commitments in the Vent Stack Permit, DEP expressly conditioned the construction and eventual operation of the CA/T Project on the continued progress and final implementation of mitigation commitments included in the Vent Stack Permit. A true and correct copy of the Vent Stack Permit is attached hereto as Exhibit 3.

39.    The Vent Stack Permit was amended on September 1, 2000. A true and correct copy of the Amended Vent Stack Permit is attached hereto as Exhibit 4.

40.    Many of the public transportation requirements in the Vent Stack Permit and certain additional public transportation requirements are codified directly in "U Transit System Improvements," 310 CMR 7.36 (the "Transit Regulation"). The Transit Regulation is part of the EPA-approved SIP. A true and correct copy of 310 CMR 7.36 is attached hereto as Exhibit 5.

41.    The public transportation requirements and commitments in the Transit Regulation and in the Vent Stack Permit, which are specifically incorporated here by

11

reference to 310 CMR 7.36 and 7.38 and to the Vent Stack Permit, constitute "emission standards or limitations" subject to enforcement pursuant to the citizen suit jurisdiction created by the CAA.

42.    The Vent Stack Permit includes procedures for addressing delays in project completion. These procedures require that, if implementation of a specific transportation requirement is delayed, an interim measure should be implemented to offset that delay. Specifically, the Vent Stack Permit requires that if a project cannot be completed by the specified deadline, EOT must provide notice to DEP "and within sixty (60) days of said notice, provide an alternative mitigation measure and/or schedule which achieves a reduction in vehicle miles traveled which is equal to, or greater than, the measure which could not be implemented."

43.    The Transit Regulation also provides a mandatory procedure in the case of project delay. The Transit Regulation requires that sixty days prior to any delay in project completion, notification must be given, including an explanation of reasons for the delay, the measures being taken to reduce the delay and a new proposed alternative project completion deadline. A substitute project must be proposed, according to the Transit Regulation, for any project expected to be delayed more than three years beyond the deadline established in the Transit Regulation.

44.    While the CA/T Project is nearly complete and open to expanded vehicle traffic, several of the public transportation measures in effect under the SIP through the Vent Stack Permit and Transit Regulation have not been complied with as required by the SIP. The urban public transportation requirements would improve air quality in the areas

where the traffic increases and air quality impacts of the construction and operation of the CA/T Project are greatest: in the Boston metropolitan area.

45.    On September 1, 2000, DEP and the Executive Office of Transportation and Construction, the agency which became EOT, negotiated an Administrative Consent Order # ACO-00-7001 (the "ACO"). A true and correct copy of the ACO is attached hereto as Exhibit 6. The ACO purported to address delay in completion of the public transportation requirements contained in the Transit Regulation and Vent Stack Permit. In negotiating the ACO, however, EOTC and DEP failed to comply with the prescribed provisions of the Vent Stack Permit itself and the Transit Regulation regarding delay in project completion. See paragraphs 42 and 43, supra.

46.    The ACO was subsequently amended in 2002 (the "Amended ACO") and 2005 (the "Second Amended ACO"). True and correct copies of the Amended ACO and the Second Amended ACO are attached as Exhibits 7 and 8 respectively. The Amended ACO and Second Amended ACO did not comply with the prescribed procedures for addressing delay in project completion specified in the Transit Regulation and Vent Stack Permit in effect under the SIP.

47.    The ACO, Amended ACO and Second Amended ACO are in the form of contractual agreements between DEP and EOT. They have not been reviewed or approved by the EPA as a modification of the Massachusetts SIP with respect to the specific emission standards and limitations set forth in the Transit Regulation or the Vent Stack Permit.

48.    Because EOT and DEP failed to comply with the procedural requirements of the Vent Stack Permit and Transit Regulation for addressing noncompliance with the

public transportation commitments in the SIP, the ACOs are not valid modifications of the specific requirements of the Transit Regulation and Vent Stack Permit in effect under the SIP.

49.    The exclusive procedure for SIP modification is set out at 40 C.F.R. § 51. EPA has not approved any changes to the emission standard or limitation provisions of the SIP relevant to the Vent Stack Permit or the Transit Regulation through this procedure.

COUNT ONE:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to add rolling stock of 46 cars to the Orange Line.

50.    Paragraphs 1-49 are incorporated herein by reference and pleaded as if fully set forth.

51.    The Vent Stack Permit requires that the defendants add 46 cars to the rolling stock of the MBTA's Orange Line by December 31, 1995. The Amended Vent Stack Permit extended the deadline for this requirement to December 31, 2000.

52.    The commitment to purchase and use 46 additional cars of rolling stock on the Orange Line is an emission standard or limitation in effect under the SIP for purposes of the CAA.

53.    Defendants did not purchase or add 46 additional cars for the Orange Line by December 31, 2000.

54.    Such failures to act represent a violation of an emission standard or limitation in effect under the SIP and constitute a continuing violation of the CAA.

COUNT TWO:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to modernize and lengthen MBTA Blue Line platforms.

14

55.    Paragraphs 1-49 are incorporated herein by reference and pleaded as if fully set forth.

56.    The Transit Regulation and the Vent Stack Permit require that all of the platforms on the MBTA's Blue Line be modernized and lengthened. The Transit Regulation requires that this project be completed by December 31, 1998. The Vent Stack Permit requires that this project be completed by December 31, 2000.

57.    The commitment to modernize and lengthen all the platforms on the Blue Line is an emission standard or limitation in effect under the SIP for purposes of the CAA.

58.    Defendants failed to modernize and lengthen all the platforms on the Blue Line by either December 31, 1998 or by December 31, 2000. Defendants continue to fail to achieve compliance with this SIP requirement.

59.    Such failures to act violate an emission standard or limitation in effect under the SIP and constitute a continuing violation of the CAA.

COUNT THREE:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to restore the Arborway Line.

60.    Paragraphs 1-49 are incorporated herein by reference and pleaded as if fully set forth.

61.    The Transit Regulation requires that the Arborway Line on the MBTA's Green Line be restored to streetcar or trolley service by December 31, 1997.

62.    The Arborway Line restoration project is an emission standard or limitation in effect under the SIP.

63.    Defendants have failed to restore the Arborway Line by December 31,
1997.

64.    Such failures to act violate an emission standard or limitation in effect
under the SIP and constitute a continuing violation of the CAA.

COUNT FOUR:  Defendants are in violation of an enforceable emission standard
or limitation in effect under the SIP for failure to complete the Old Colony
Greenbush Line.

65.    Paragraphs 1-49 are incorporated herein by reference and pleaded as if
fully set forth.

66.    The Transit Regulation and the Vent Stack Permit require that the
defendants build and place the Old Colony Greenbush Line in service.  The Transit
Regulation requires that this project be completed by December 31, 1996 and the Vent
Stack Permit requires that it be completed by December 31, 1995.

67.    The requirement to complete the Old Colony Greenbush Line by
December 31, 1996 or December 31, 1995 is an emission standard or limitation in effect
under the SIP.

68.    Defendants failed to complete the Old Colony Greenbush Line on
schedule and continue to fail to comply with this SIP requirement.

69.    Such failures to act violate an emission standard or limitation in effect
under the SIP and constitute a continuing violation of the CAA.

COUNT FIVE:  Defendants are in violation of an enforceable emission standard
or limitation in effect under the SIP for failure to take steps necessary to meet the
completion deadline for the Red-Blue Connector.

70.    Paragraphs 1-49 are incorporated herein by reference and pleaded as if
fully set forth.

71.     The Transit Regulation and the Vent Stack Permit require the Defendants to complete a connection from the MBTA's Blue Line at Bowdoin Station to the MBTA's Red Line at Charles Station (the "Red-Blue Connector"). The Vent Stack Permit requires that the Red-Blue Connector be complete by December 31, 2000. That deadline was extended in the amended Vent Stack Permit to December 31, 2011. The Transit Regulation also requires that this project be complete by December 31, 2011.

72.     The requirement to complete the Red-Blue Connector by 2011, including by necessary implication all conditions precedent to ensure that such obligation is met in a timely manner such as project planning, securing project funding, project design, obtaining environmental permits and approvals, land acquisition, and construction, is an emission standard or limitation under the SIP.

73.     Upon information and belief, no funding has been programmed for the design, planning or construction of this project through 2010. The MBTA's 2005 Capital Investment Program, which authorizes funds for capital investments through 2010, does not include authorization of any funds for the Red-Blue Connector. Upon information and belief, defendants have not performed any substantial work with respect to the project design, obtaining environmental permits and approvals, the construction bidding process, land acquisition or construction with respect to the Red-Blue Connector.

74.     Upon information and belief, as a result of defendants' failure to program project funds, to undertake design, planning, and environmental reviews, and to prepare the project for construction, it is impossible for the Red-Blue Connector to be completed by December 31, 2011.

75.     Defendants have failed to take those actions necessary to ensure that the Red-Blue Connector is completed on schedule.

76.     Such failures to act violate an emission standard or limitation in effect under the SIP and constitute a continuing violation of the CAA.

COUNT SIX:  Defendants are in violation of an enforceable emission standards or limitations in effect under the SIP for failure to take steps necessary to meet the completion deadline for the Green Line extension to Medford Hillside.

77.     Paragraphs 1-49 are incorporated herein by reference and pleaded as if fully set forth.

78.     The Transit Regulation and the Vent Stack Permit require the defendants to take all necessary steps to extend the MBTA's Green Line to Medford Hillside ("Green Line Extension"). The Vent Stack Permit requires that the Green Line Extension be completed by December 31, 2010. The Amended Vent Stack Permit and Transit Regulation require that the Green Line Extension be completed by December 31, 2011.

79.     The requirement to complete the Green Line Extension by December 31, 2011, including by necessary implication all the conditions precedent to ensure that such obligation is met such as project planning, securing project funding, project design, obtaining environmental permits and approvals, land acquisition, and construction, is an emission standard or limitation under the SIP.

80.     Upon information and belief, no funding has been programmed for the construction of this project through 2010. The MBTA's Capital Investment Program, which authorizes funds for capital investments through 2010, does not include any funds to construct this project. Upon information and belief, defendants have not performed any substantial work with respect to project design, obtaining environmental permits and

approvals, the construction bidding process, or land acquisition or construction with respect to the Green Line Extension.

81.    Upon information and belief, as a result of defendant's failure to program project funds, to undertake design and planning, to obtain environmental reviews and approvals, and to prepare the project for construction it is not possible for the Green Line Extension to be completed by December 31, 2011.

82.    Defendants have failed to take those actions necessary to ensure that the Green Line Extension will be completed on schedule.

83.    Such failures to act violate an emission standard or limitation in effect under the SIP and constitute a continuing violation of the CAA.

COUNT SEVEN:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to provide adequate interim mitigation for delay in completion of Washington Street Replacement Service as required by the Vent Stack Permit.

84.    Paragraphs 1-49 are incorporated herein by reference and pleaded as if fully set forth.

85.    The Vent Stack Permit requires that alternative mitigation projects must be provided that achieve "Vehicle Miles Traveled" reductions equal to or greater than any measures that cannot be completed according to the schedule contained in the Vent Stack Permit.

86.    The Vent Stack Permit requirement that alternate mitigation projects be identified and implemented for project delays is an emission standard or limitation in effect under the SIP.

87.    The deadline for the Washington Street Replacement Service project required by the Vent Stack Permit was December 31, 1994. The Amended Vent Stack Permit extended this compliance date to December 31, 1999.

88.    Washington Street Replacement Service was not completed until the Silver Line Phase I was opened in July, 2002, providing "bus rapid transit" service along Washington Street, almost 30 months after the SIP deadline. Interim mitigation measures have not been provided that achieve equal or greater reductions in "Vehicle Miles Traveled" to mitigate or offset the emission impacts of this delay.

89.    The requirement to undertake a project to mitigate the delays on implementation of the Washington Street Replacement Service is an emission standard or limitation in effect under the SIP.

90.    Defendants have failed to take those actions necessary to ensure that an equivalent mitigation project was completed on schedule and continue to fail to comply with this SIP requirement.

91.    Such failures to act violate an emission standard or limitation in effect under the SIP and constitute a continuing violation of the CAA.

COUNT EIGHT: Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to provide adequate interim mitigation for delay in completion of the South Boston Transitway as required by the Vent Stack Permit.

92.    Paragraphs 1-49, 85 and 86 are incorporated herein by reference and pleaded as if fully set forth.

93.    The deadline for completing the South Boston Transitway is December 31, 1998 in the Vent Stack Permit and December 31, 2001 in the Amended Vent Stack Permit.

94.    The South Boston Transitway was not completed until the Silver Line Phase II was opened in December 2004, providing "bus rapid transit" service to South Boston.

95.    Interim mitigation measures have not been provided that achieve equal or greater reductions in Vehicle Miles Traveled to mitigate or offset the emissions impacts of this three-year delay.

96.    The requirement to undertake a project to mitigate the delays on implementation of the South Boston Transitway is an emission standard or limitation in effect under the SIP.

97.    Defendants have failed to take those actions necessary to ensure that an equivalent mitigation project was completed on schedule and continue to fail to comply with this SIP requirement.

98.    Such failures to act violate an emission standard or limitation in effect under the SIP and constitute a continuing violation of the CAA.

COUNT NINE:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to provide adequate interim mitigation for delay in purchase of 46 cars for the Orange Line as required by the Vent Stack Permit.

99.    Paragraphs 1-49, 85 and 86 are incorporated herein by reference and pleaded as if fully set forth.

100.    Defendants have failed to provide adequate interim mitigation to offset the air quality impacts of delayed purchase of 46 cars for the Orange Line.  The deadline for the purchase of 46 Orange Line Cars was December 31, 1995 in the Vent Stack Permit and December 31, 2000 in the Amended Vent Stack Permit.  Defendants have not purchased 46 cars for the Orange Line.

101.   Interim mitigation measures have not been provided that achieve equal or greater reductions in Vehicle Miles Traveled to mitigate the emissions impacts of this delay.

102.   The requirement to undertake a project to mitigate the delays on purchasing the Orange Line cars is an emission standard or limitation in effect under the SIP.

103.   Defendants have failed to take those actions necessary to ensure that an equivalent mitigation project was completed on schedule and continue to fail to comply with this SIP requirement.

104.   Such failures to act violate an emission standard or limitation in effect under the SIP and constitute a continuing violation of the CAA.

COUNT TEN:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to provide adequate interim mitigation for delay in completion of Blue Line Platform Lengthening as required by the Vent Stack Permit.

105.   Paragraphs 1-49, 85 and 86 are incorporated herein by reference and pleaded as if fully set forth.

106.   Upon information and belief, defendants have failed to provide interim mitigation to offset the air quality impacts of delayed completion of the Blue Line platform lengthening project.  The deadline for Blue Line platform lengthening is December 31, 2000 in the Vent Stack Permit and in the Amended Vent Stack Permit.

107.   Blue Line platform lengthening has not been completed.

22

108.    Interim mitigation measures have not been provided that achieve equal or greater reductions in Vehicle Miles Traveled to mitigate the emission impacts of this delay.

109.    The requirement to undertake a project to mitigate the delays on lengthening the Blue Line platforms is an emission standard or limitation in effect under the SIP.

110.    Defendants have failed to take those actions necessary to ensure that an equivalent mitigation project was completed on schedule and continue to fail to comply with this SIP requirement.

111.    Such failures to act violate an emission standard or limitation in effect under the SIP and constitute a continuing violation of the CAA.

> COUNT ELEVEN:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to provide adequate interim mitigation for delay in completion of restoration of the Old Colony Greenbush Line as required by the Vent Stack Permit.

112.    Paragraphs 1-49, 85 and 86 are incorporated herein by reference and are pleaded as if fully set forth.

113.    Defendants have failed to provide adequate interim mitigation to offset the air quality impacts of delayed completion of the Old Colony Greenbush Line.  The deadline for completion of the Old Colony Greenbush Line was December 31, 1995 in the Vent Stack Permit.

114.    Interim mitigation measures have not been provided that achieve equal or greater reductions in Vehicle Miles Traveled to mitigate the emission impacts of this delay.

23

115.    The requirement to undertake a project to mitigate the delays on
completion of the Old Colony Greenbush Line is an emission standard or limitation in
effect under the SIP.

116.    Defendants have failed to take those actions necessary to ensure that an
equivalent mitigation project was completed on schedule and continue to fail to comply
with this SIP requirement.

117.    Such failures to act violate an emission standard or limitation in effect
under the SIP and constitute a continuing violation of the CAA.

COUNT TWELVE:  Defendants are in violation of an enforceable emission
standard or limitation in effect under the SIP for failure to provide adequate
interim mitigation for delay in completion of the Red-Blue Connector as required
by the Vent Stack Permit.

118.    Paragraphs 1-49, 85 and 86 are incorporated herein by reference and
pleaded as if fully set forth.

119.    Defendants have failed to provide adequate interim mitigation to offset the
air quality impacts of delayed completion of the Red-Blue Connector.  The deadline for
the Red-Blue Connector in the Vent Stack Permit was December 31, 2000. This deadline
was changed to December 31, 2011 and defendants are not on schedule to complete the
project even by that date.

120.    Interim mitigation measures have not been provided that achieve equal or
greater reductions in Vehicle Miles Traveled to mitigate the emission impacts of this
delay in completion of the Red-Blue Connector from December 31, 2000.

121.    The requirement to undertake a project to mitigate the delay of the Red-
Blue Connector from December 31, 2000 is an emission standard or limitation in effect
under the SIP.

122.    Defendants have failed to take those actions necessary to ensure that an equivalent mitigation project was completed on schedule and continue to fail to comply with this SIP requirement.

123.    Such failures to act violate an emission standard or limitation in effect under the SIP and constitute a continuing violation of the CAA.

COUNT THIRTEEN:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to provide adequate interim mitigation for delay in completion of Blue Line Platform Lengthening and Modernization as required by the Transit Regulation.

124.    Paragraphs 1-49 are incorporated herein by reference and pleaded as if fully set forth.

125.    The Transit Regulation requires substitute interim projects for transportation projects that are delayed more than three years beyond the deadline established in the Transit Regulation.

126.    The Transit Regulation requirement to implement substitute interim projects for projects that are delayed more than three years is an emission standard or limitation in effect under the SIP.

127.    Defendants have not provided adequate interim mitigation for the Blue Line Platform Lengthening and Modernization project, which has been delayed more than three years beyond the deadline in the Transit Regulation.

128.    The Transit Regulation requires that Blue Line Platform Lengthening and Modernization be complete by December 31, 1998.  This project still has not been completed.

129.    The failure to provide interim mitigation to offset the more than three-year delay in completion of Blue Line Platform Lengthening and Modernization after the

deadline in the Transit Regulation is a violation of an emission standard or limitation in effect under the SIP and constitutes a continuing violation of the CAA.

COUNT FOURTEEN:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to provide adequate interim mitigation for delay in completion of the Old Colony Greenbush Line as required by the Transit Regulation.

130.    Paragraphs 1-49, 125 and 126 are incorporated herein by reference and pleaded as if fully set forth.

131.    Defendants have failed to provide adequate interim mitigation required in the Transit Regulation to offset the air quality impacts caused by delay in completion of the Old Colony Greenbush Line, which has been delayed more than three years beyond the deadline in the Transit Regulation.

132.    The Transit Regulation requires that the Old Colony Greenbush Line be complete by December 31, 1996.  This project still has not been completed.

133.    The failure to provide interim mitigation to offset the more than three-year delay in completion of the Old Colony Greenbush Line after the deadline in the Transit Regulation is a violation of an emission standard or limitation in effect under the SIP and constitutes a continuing violation of the CAA.

COUNT FIFTEEN:  Defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to provide adequate interim mitigation for delay in Restoration of the Arborway Line as required by the Transit Regulation.

134.    Paragraphs 1-49, 125 and 126 are incorporated herein by reference and pleaded as if fully set forth.

135.    Defendants have failed to provide adequate interim mitigation required in the Transit Regulation to offset the air quality impacts caused by delay in restoration of

the Arborway Line, which has been delayed more than three years beyond the deadline in
the Transit Regulation.

136.    The Transit Regulation requires that Arborway Restoration be complete
by December 31, 1997.  This project still has not been completed.

137.    The failure to provide interim mitigation to offset the more than three-year
delay in completion of Arborway Restoration after the deadline in the Transit Regulation
is a violation of an emission standard or limitation in effect under the SIP and constitutes
a continuing violation of the CAA.

> COUNT SIXTEEN:  In the alternative, to the extent that the ACO and amended
> ACOs modify the enforceable emission standards or limitations in effect under
> the SIP in the Transit Regulation, defendants are in violation of an enforceable
> emission standard or limitation in effect under the SIP for failure to restore the
> Arborway Line or provide a schedule of completion for the Arborway Line.

138.    Paragraphs 1-49 are incorporated herein by reference and pleaded as if
fully set forth.

139.    In the alternative, if the ACO, Amended ACO or Second Amended ACO
operate to modify, change, or otherwise amend the Massachusetts SIP such that the
specific requirements and commitments set forth in the ACOs represent emission
standards or limitations in effect under the CAA or the SIP, defendants are in violation of
those provisions as well.

140.    The ACO requires that defendants provide a schedule for the completion
of the Arborway Restoration project, including benchmarks, milestones and action items.

141.    The failure of defendants to provide a schedule of completion as required
by the ACO is a violation of an enforceable emission standard or limitation in effect
under the SIP and is a continuing violation of the CAA.

COUNT SEVENTEEN:  In the alternative, to the extent that the ACO and amended ACOs modify the enforceable emission standards or limitations in effect under the SIP in the Transit Regulation and Vent Stack Permit, defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to complete or take substantial steps to complete Rail Service to T.F. Green Airport.

142.    Paragraphs 1-49 and 139 are incorporated herein by reference and pleaded as if fully set forth.

143.    Defendants have failed to complete Rail Service to T.F. Green Airport in Rhode Island, a project identified in the ACO to provide interim mitigation for delay in completion of requirements of the Transit Regulation and Vent Stack Permit. No substantial steps have been taken to complete this interim mitigation project.

144.    The failure of defendants to complete rail service to T.F.Green Airport as required by the ACO is a violation of an enforceable emission standard or limitation in effect under the SIP and is a continuing violation of the CAA.

COUNT EIGHTEEN:  In the alternative, to the extent that the ACO and amended ACOs modify the enforceable emission standards or limitations in effect under the SIP in the Transit Regulation and Vent Stack Permit, defendants are in violation of an enforceable emission standard or limitation in effect under the SIP for failure to promote signalization technology to give priority to mass transit vehicles in greater Boston.

145.    Paragraphs 1-49 and 139 are incorporated herein by reference and pleaded as if fully set forth.

146.    Defendants have failed to promote signalization technology to give priority to mass transit vehicles in Greater Boston, a project identified in the ACO to provide interim mitigation for delay in completion of requirements of the Transit Regulation and Vent Stack Permit.  No substantial steps have been taken to complete this interim mitigation project.

147.    The failure of defendants to promote signalization technology as required

by the ACO is a violation of an enforceable emission standard or limitation in effect

under the SIP and is a continuing violation of the CAA.

> COUNT NINETEEN: In the alternative, to the extent that the ACO and amended
> ACOs modify the enforceable emission standards or limitations in effect under
> the SIP in the Transit Regulation and Vent Stack Permit, defendants are in
> violation of an enforceable emission standard or limitation in effect under the SIP
> for failure to secure federal funding for Silver Line Phase III or provide an
> alternative urban transit investment.

148.    Paragraphs 1-49 and 139 are incorporated herein by reference and pleaded

as if fully set forth.

149.    As an interim mitigation for delay in completion of requirements of the

Transit Regulation and Vent Stack Permit, the ACO requires that federal funding be

secured for Silver Line Phase III and provides that if such funding is not secured by 2005,

an alternative urban transit investment must be undertaken annually.

150.    Federal funding has not been secured for Silver Line Phase III, and no

urban transit investment has been identified or undertaken to address this failure.

151.    Defendants' failure to secure federal funding by December 31, 2004 or

identify and undertake an alternative urban transit investment as required by the ACO is a

violation of an enforceable emission standard or limitation in effect under the SIP and is a

continuing violation of the CAA.

> COUNT TWENTY: In the alternative, to the extent that the ACO and amended
> ACOs modify the enforceable emission standards or limitations in effect under
> the SIP in the Transit Regulation and Vent Stack Permit, defendants are in
> violation of an enforceable emission standard or limitation in effect under the SIP
> for failure to prioritize for funding the projects contained in the ACO.

152.    Paragraphs 1-49 and 139 are incorporated herein by reference and pleaded

as if fully set forth.

153.   Defendants have failed to prioritize the commitments contained in the ACO for funding, a measure identified in the ACO to provide interim mitigation for delay in completion of requirements of the Transit Regulation and Vent Stack Permit. The commitments in the ACO have not all been prioritized for funding.

154.   Defendants' failure to prioritize the commitments contained in the ACO as required by the ACO is a violation of an enforceable emission standard or limitation in effect under the SIP and is a continuing violation of the CAA.

WHEREFORE, the plaintiffs respectfully request the Court to:

1. Adjudge and declare that the defendants individually and collectively have violated and continue to violate the Clean Air Act due to their failure to carry out their respective obligations and responsibilities to implement and complete emission standards and limitations in the Massachusetts SIP according to its terms.

2. Enter a preliminary and permanent injunction establishing a specific, detailed and enforceable timetable for defendants to comply with all applicable emission standards and limitations in the Massachusetts SIP.

3. Order the defendants to pay appropriate civil penalties pursuant to 42 U.S.C. § 7604(a).

4. Retain jurisdiction over this matter until such time as defendants have fully complied with their duties, obligations and commitments under Massachusetts' SIP and the Clean Air Act with respect to the transportation projects required pursuant to the Transit Regulation and the Vent Stack Permit.

5. Award Conservation Law Foundation its costs of litigation, including reasonable attorneys' and expert witness fees.

6. Grant Conservation Law Foundation such further and additional relief as the Court may deem just and proper.

Respectfully submitted on this 14th day of March, 2005.


CONSERVATION LAW FOUNDATION, INC.,
Plaintiff,

By Its Attorneys,


Peter Shelley
BBO No. 544334
Conservation Law Foundation
62 Summer Street
Boston, Massachusetts 02110
617-850-1754


Carrie Schneider
BBO No. 660442
Conservation Law Foundation
62 Summer Street
Boston, Massachusetts 02110
617-350-0990

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Conservation Law Foundation | Mitt Romney, in his official capacity as Governor of Massachusetts, et al. |

| (b)  County of Residence of First Listed Plaintiff  Suffolk | County of Residence of First Listed Defendant  Suffolk |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c)  Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Peter Shelley and Carrie Schneider, Conservation Law Foundation, 62 Summer St., Boston, MA  02110; (617) 350-0990 | 05-10487 NG |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 892 Economic Stabilization Act<br>☒ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district (specify)

☐ 6  Multidistrict Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. 7401, et seq.

Brief description of cause:
Citizen suit to enforce transportation obligations pursuant to CAA

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ preliminary/permanent injunctive, civil penalties

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)

JUDGE _____

DOCKET NUMBER _____

DATE  03/14/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #  _____  AMOUNT  _____  APPLYING IFP  _____  JUDGE  _____  MAG. JUDGE  _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) ___Conservation Law Foundation v. Mitt Romney, in his official capacity as Governor of Massachusetts

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

☑  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
         740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

☐  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
         315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
         380, 385, 450, 891.

☐  IV.   220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
         690, 810, 861-865, 870, 871, 875, 900.

☐  V.    150, 152, 153.

05 - 10487 NG

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                          YES ☐      NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                                          YES ☐      NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                          YES ☐      NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                          YES ☐      NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                          YES ☑      NO ☐

   A.    If yes, in which division do all of the non-governmental parties reside?

         Eastern Division ☑          Central Division ☐          Western Division ☐

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

         Eastern Division ☐          Central Division ☐          Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                          YES ☐      NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _ Peter Shelley and Carrie Schneider
ADDRESS _ Conservation Law Foundation, 62 Summer St., Boston, MA  02110
TELEPHONE NO. (617) 350-0990

(CategoryForm.wpd - 2/15/05)

**Exhibit 1**



# CONSERVATION LAW FOUNDATION

January 12, 2005

**Via Certified and First Class Mail**

The Hon. Mitt Romney, Governor
Commonwealth of Massachusetts
The State House, Room 360
Boston, Massachusetts 02133

Michael O. Leavitt, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

Douglas I. Foy, Secretary
Office for Commonwealth Development
Chairman, Commonwealth Development
Coordinating Council
100 Cambridge St., Suite 1010
Boston, MA 02114

Daniel A. Grabauskas, Secretary
Executive Office of Transportation
10 Park Plaza, Suite 3170
Boston, Massachusetts 02116

Michael H. Mulhern, General Manager
Massachusetts Bay Transportation Authority
10 Park Plaza
Boston, MA 02116

Matthew J. Amorello, Chairman
Massachusetts Turnpike Authority
10 Park Plaza, Suite 4160
Boston, Massachusetts 02116

John Cogliano, Commissioner
Massachusetts Highway Department
10 Park Plaza, Suite 3510
Boston, Massachusetts 02116

Craig P. Coy, Chief Executive Officer
Massachusetts Port Authority
One Harborside Drive, Suite 200S
East Boston, MA 02128

Ellen Roy Herzfelder, Secretary
Executive Office of Environmental Affairs
100 Cambridge St., 9th Floor
Boston, Massachusetts 02114

Robert W. Golledge, Commissioner
Department of Environmental Protection
One Winter Street, 2nd Floor
Boston, Massachusetts 02108

Re: Notice of Intent to Sue under 42 U.S.C. § 7604

Dear Governor Romney, Administrator Leavitt, Secretary and Chairman Foy, Secretary Grabauskas, General Manager Mulhern, Chairman Amorello, Commissioner Cogliano, Mr. Coy, Secretary Herzfelder, and Commissioner Golledge,:

This letter constitutes the 60-day notice requirement, pursuant to Section 304(b) of the Clean Air Act, 42 U.S.C. § 7604(b), and 40 C.F.R. Part 52, that the Conservation Law Foundation ("CLF"), on behalf of

62 Summer Street, Boston, Massachusetts 02110-1016 • Phone 617-350-0990 • Fax 617-350-4030 • www.clf.org

MAINE: 14 Maine Street, Suite 200, Brunswick, Maine 04011-2026 • Phone 207-729-7733 • Fax 207-729-7373
NEW HAMPSHIRE: 27 North Main Street, Concord, New Hampshire 03301-4930 • Phone 603-225-3060 • Fax 603-225-3059
RHODE ISLAND: 55 Dorrance Street, Providence, Rhode Island 02903-2221 • Phone 401-351-1102 • Fax 401-351-1130
VERMONT: 15 East State Street, Suite 4, Montpelier, Vermont 05602-3010 • Phone 802-223-5992 • Fax 802-223-0060

PRINTED ON RECYCLED PAPER 

Conservation Law Foundation

itself and its members, intends to file a citizens suit in the United States District Court for the District of Massachusetts pursuant to Section 304(a)(1) of the Act. We intend to name the following as defendants (hereafter collectively referred to as "the Commonwealth"):

1. Mitt Romney, in his official capacity as the Governor of the Commonwealth of Massachusetts,
2. Douglas I. Foy, in his official capacity as Secretary of the Office for Commonwealth Development and Chairman of the Commonwealth Development Coordinating Council,
3. Daniel A. Grabauskas, in his official capacity as Secretary of the Massachusetts Executive Office of Transportation ("EOT"),
4. Michael H. Mulhern, in his official capacity as the General Manager of the Massachusetts Bay Transportation Authority,
5. Matthew J. Amorello, in his official capacity as Chairman of the Massachusetts Turnpike Authority,
6. John Cogliano, in his official capacity as Commissioner of the Massachusetts Highway Department ("MHD"),
7. Craig P. Coy, in his official capacity as Chief Executive Officer of the Massachusetts Port Authority,
8. Ellen Roy Herzfelder, in her official capacity as Secretary of the Executive Office of Environmental Affairs, and
9. Robert Golledge, in his official capacity as Commissioner of Massachusetts Department of Environmental Protection,

For the reasons stated below, the Commonwealth has failed to complete certain public transportation capital improvement projects to mitigate the adverse air quality impacts of the Central Artery/Tunnel Project ("CA/T Project" or "Project") in continuing violation of the State Implementation Plan as codified in the Federal Clean Air Act, 42 U.S.C. § 7401 et seq. This suit will seek declaratory and injunctive relief as well as civil penalties for these violations.

**IDENTIFICATION OF THE PLAINTIFF**

Founded in 1966, CLF is a nonprofit corporation, member-supported organization and operates advocacy centers in Boston, Massachusetts; Montpelier, Vermont; Concord, New Hampshire; Rockland, Maine; and Providence, Rhode Island. CLF's corporate headquarters is 62 Summer Street, Boston, MA 02110. CLF works on behalf of its membership and with other environmental and community-based organizations and individuals to achieve its mission. CLF will file suit on behalf of itself and its members' interests, which are being adversely affected by the Commonwealth's continuing failure to implement the provisions of the State Implementation Plan.

**BACKGROUND**

The CA/T Project is a major highway project, especially serving those driving in and out as well as through the City of Boston. Individuals living in Boston and nearby communities have experienced and will continue to experience a host of adverse air quality impacts from the Project. In order to mitigate the air quality impacts of the CA/T Project and to ensure that this significant project included a balance of benefits for lowering emissions in the Metropolitan Boston Air Pollution Control District, an area that is experiencing violations of the National Ambient Air Quality Standards, a list of capital transit projects were required as part of the CA/T Project. While the highway portion of the CA/T Project has been completed, many of these transit projects ("the Transit Commitments") have been neglected. In particular, the Commonwealth has disproportionately failed to complete or make appropriate progress on

Conservation Law Foundation

the Transit Commitments that presented the most benefits for the residents and commuters in the urban core, i.e., those transit improvements that were to be completed within the Route 128 corridor.

## VIOLATION OF THE FEDERAL CLEAN AIR ACT

Failing to complete the Transit Commitments required to offset the adverse air quality impacts of the CA/T Project, the Commonwealth has violated their duties under the Federal Clean Air Act, public transportation regulations incorporated into the State Implementation Plan (310 C.M.R. 7.36), the Conditional Acceptance of the Preconstruction Certification issued by the Massachusetts Department of Environmental Protection under its ventilation stack regulation (310 C.M.R. 7.38) for the CA/T Project, the Amended Conditional Acceptance of the Preconstruction Certification issued by the Massachusetts Department of Environmental Protection ("DEP") under the ventilation stack regulation (310 C.M.R. 7.38) and the Administrative Consent Order between DEP and EOT which was incorporated by reference into the Amended Conditional Acceptance of the Preconstruction Certification.    The Transit Commitments constitute an emission standard or limitation pursuant to the Clean Air Act and/or represent elements of orders issued by the Administrator and/or the State with respect to such a standard or limitation.

The Commonwealth's failure to comply with the Transit Commitments in a timely manner is having serious and ongoing adverse air quality, health and quality of life impacts on Commonwealth residents. In the urban core, where the adverse air quality impacts of the CA/T Project itself are felt most profoundly, the failure to provide promised transit projects to mitigate the impacts from the highway project is an environmental injustice. The urban core has experienced the harmful impacts of construction from the CA/T Project, and now, as the expanded roadway is filled in with even more cars, the urban core is experiencing the harmful adverse impacts of greater traffic congestion. While transit projects that have been completed, such as commuter rail expansion, are important means of improving statewide air quality, the transit projects necessary to relieve air quality impacts are not being completed in many of the areas where the impacts of the highway portion of the CA/T Project have been experienced most profoundly.

The Commonwealth has delayed and postponed the Transit Commitments, repeatedly failing to meet its legal deadlines.    This behavior is a clear violation of the Federal Clean Air Act and the State Implementation Plan ("SIP"), and a disservice to those who live, work, and play in the Commonwealth, especially those residents within the Metropolitan Boston Air Pollution Control District. Not only is mandatory mitigation for air quality impacts not taking place, but also, through the extreme disproportionate investment in highway rather than transit projects, the state is encouraging and exacerbating the patterns of living and development that will lead to further congestion and resulting decreased air quality improvements. The promise of the balanced transportation improvements bargained for through the SIP, CA/T Project permitting and subsequent negotiation process is being defeated by the Commonwealth's neglect of the Transit Commitments.

## STATUS OF THE TRANSIT COMMITMENTS

The failure to make good on the Transit Commitments is a series of broken promises. First, in accordance with the Federal Clean Air Act mandate, the Commonwealth created a SIP to meet National Ambient Air Quality Standards. The SIP includes a list of specific transit projects and deadlines for completing the projects. Several of the projects listed in the SIP were not completed by the specified deadlines and remain uncompleted or are not being invested in now such that it is highly unlikely they will be completed on time. Secondly, the SIP also mandates a process for Certification of Tunnel Ventilation Systems in the Metropolitan Boston Area Pollution Control District. The certification for the CA/T

Conservation Law Foundation

Project, in accordance with the SIP requirement, imposed additional transit projects as mitigation for adverse air quality impacts. The CA/T Project received certification pursuant to that mandate. Many of those projects were not completed by the deadlines set in the permitting process and remain uncompleted. Finally, as a result of the failure to comply with the transit project deadlines imposed directly in the SIP and through the tunnel ventilation permitting process pursuant to the SIP, an updated set of commitments was imposed by order in September of 2000. These commitments were imposed through an Amended Tunnel Ventilation System Permit and an Administrative Consent Order incorporated by reference into the Amended Tunnel Ventilation System Permit. Additionally, several deadline extensions were granted for certain Transit Commitments by DEP. Five years following this latest enactment of transit project requirements, the Administrative Consent Order and Amended Tunnel Ventilation System Permit, deadlines again are not being met and a majority of projects remain uncompleted. An Amended Administrative Consent Order signed in May of 2002 to clarify bus requirements also has not been complied with.

Deadlines have lapsed on the following outstanding Transit Commitments:

- **Complete a Draft Environmental impact Report and Draft Environmental Impact Statement for the Urban Ring.** While a Draft Environmental Impact Report was submitted *on the deadline day,* a draft Environmental Impact Statement has not been submitted. The Federal government requires that a Draft and Final Environmental Impact Statement be prepared; Draft and Final Environmental Impact Reports are required to comply with state law. Completion of the Draft Environmental Impact Statement is extremely important as this is one of the prerequisites to receiving federal funding for the Urban Ring.
- **Silver Line Phase I: Washington Street Replacement Service.** Silver Line Phase I is required to provide replacement service for the elevated Orange Line on Washington Street. The current Silver Line does not provide the same level of rapid transit service as the elevated Orange Line. This new line, a bus rapid transit line, is currently not providing the speed, consistency and quality of the former service on Washington Street.
- **Silver Line Phase II: South Boston Transitway and Airport Extension.** This project, which provides regular bus rapid transit service from South Station to the airport terminals, was due to be completed by December 31, 2004 and has not been completed. Currently, some service is being provided only one day a week. This is inadequate.
- **Silver Line Phase III: Substitution project requirement for failure to gain funding by 2005.** The Administrative Consent Order requires that if funding for Phase III of the Silver Line is not secured by 2005, other urban transportation investments must be undertaken. No substitute projects have been identified despite the failure to secure federal funding for Silver Line Phase III.
- **Orange Line: 18 Additional Cars and Signal System Improvements.** To improve Orange Line service, 18 additional cars must be purchased and the Orange Line signal system must be improved. This project was due to be completed by December 31, 2004 and has not been completed.
- **Blue Line Platform Lengthening.** Blue Line station platforms must be lengthened to accommodate 6-car trains. This project was due to be completed by December 31, 2004 and has not been completed.
- **Arborway Restoration.** This project, the restoration of Green Line service along the Arborway Line, was due to be completed in 1997. In 2001, DEP ruled that this project is feasible and required a schedule for project completion by December 31, 2001. No schedule for completion has been released.
- **Construction Equipment Retrofit Program: Massachusetts Highway Department.** Massachusetts Highway Department has not implemented a construction equipment retrofit

Conservation Law Foundation

program to retrofit equipment with emission control technologies such as oxidation catalysts and particulate filters. This was required in 2000.

- **Greenbush: Old Colony Line.** This project was due to be completed by December 31, 1996 and has not been completed.
- **Upgrading the bus fleet.** This commitment to purchase new buses, retrofit existing buses with pollution control equipment and retire all existing buses that can not be retrofitted was due to be completed on December 31, 2004 and has not been completed.

The following Transit Commitments, which require ongoing efforts of EOT, have not been complied with:

- **TF Green Rail Service.** The Commonwealth is required to provide regional rail service to TF Green Airport in Rhode Island in cooperation with the Rhode Island Department of Transportation. Service has not been provided and there has been insufficient progress on this project.
- **Promote Signalization Technology.** The Commonwealth is required to promote signalization technology to give priority to mass transit vehicles over automobiles within the metropolitan-Boston area. This program has not been implemented and there is no schedule for completion.
- **Funding Prioritization.** All of the projects in the Administrative Consent Order must be prioritized for funding and the Commonwealth has not done so.

Additionally, the Commonwealth has committed to (1) **connecting the Red and Blue Lines**, and (2) **extending the Green Line to Medford Hillside**, both by December 31, 2011. Insufficient effort has been made on these commitments. The failure to make significant advances on these projects makes it likely that these commitments also will not be completed in a timely manner. Neglect of these major transit projects is a continuing violation of the spirit and intent of the legal documents imposing the Transit Commitments. It is also a violation of the requirement in the ACO that these projects be prioritized for funding. No funding has been dedicated to constructing these projects.

Conservation Law Foundation

## CONCLUSION

On information and belief, the Commonwealth does not intend to implement many of the above-referenced projects, notwithstanding its clear legal and equitable obligation to do so. Residents of the Commonwealth, especially urban residents, have endured the adverse air quality impacts of the CA/T Project for far too long, while the measures required to mitigate those impacts have been neglected and postponed. The Commonwealth has a responsibility to develop a new schedule for completion of these overdue projects, guarantee that funding will be forthcoming, and immediately implement additional mitigation measures to make up for the delay completing the remaining Transit Commitments. CLF will also seek civil penalties pursuant to the Federal Clean Air Act for the Commonwealth's ongoing violation of the transit commitments and as a deterrent to future non-compliance. CLF intends to file suit under 42 U.S.C. §7604 in the United States District Court for the District of Massachusetts in sixty days based on the violations alleged above.

CONSERVATION LAW FOUNDATION, INC.
On behalf of itself and its adversely affected members

By its Attorneys:

Peter Shelley, Esq.
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

T. F. Scott Darling, III, Esq.
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

Carrie Schneider, Esq.
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

## Conservation Law Foundation

cc:    Robert W. Varney, Regional Administrator, U.S. Environmental Protection Agency, Region 1
       Thomas F. Reilly, Attorney General, Commonwealth of Massachusetts
       The Hon. Thomas M. Menino, Mayor, City of Boston
       Senate President Robert E. Travaglini
       Salvatore F. DiMasi, Speaker, Massachusetts House of Representatives
       Representative Joseph Wagner, Chair, Joint Committee on Transportation
       Senator Steven A. Baddour, Chair, Joint Committee on Transportation
       Donald L. Carcieri, Governor of Rhode Island
       Joseph A. Curtatone, Mayor of the City of Somerville
       Michael G. McGlynn, Mayor of the City of Medford
       Thomas G. Ambrosino, Mayor of the City of Revere
       David M. Madden, Mayor of the Town of Weymouth
       Jay Ash, City Manager of the City of Chelsea
       Richard J. Kelliher, Town Administrator of the Town of Brookline
       Charles J. Cristello, Town Administrator of the Town of Hingham
       Michael Buckley, Acting Town Manager of Cohasset
       Richard Agnew, Town Administrator of the Town of Scituate

**Exhibit 2**

(3) Preconstruction Department Certification Process.

    (a) Any proponent of a project subject to this section is required to submit such information sufficient for the Department to review the certification. Such information shall include, but is not limited to, the following:

        1. an analysis of the existing and projected non-methane hydrocarbon emissions from the project area, including the emissions from the tunnel ventilation system, the project roadway and the roadway network in the project area;

        2. a comparative analysis which quantifies the air quality impact within the project area predicted to occur after the project is built and the no-build alternative;

        3. information concerning ventilation building heights and locations, conceptual site plan, design criteria for the proposed ventilation equipment and project roadway, standard operating procedures and standard maintenance procedures for the tunnel ventilation system;

        4. an analysis of the projected vehicle miles traveled, average vehicle speeds and vehicle hours that are expected to occur within the project area when the project is completed compared with the projected vehicle miles traveled, projected average vehicle speeds, and projected vehicle hours travelled under the no-build alternative; and

        5. an identification and analysis of feasible pollution prevention measures designed to reduce vehicle miles travelled including identification of the available short and long-term measures, commitments to implement said measures, and a schedule for implementing said measures.

    (b) The Department shall within 30 days of receipt of a certification required by 310 CMR 7.38(2), make a determination whether all information necessary for review of said certification has been submitted. Upon making this determination, the Department shall notify the project proponent. The Department shall review the certification and shall, after notice and public hearing, accept or reject said certification in writing no later than 90 days after the Department determines that all information necessary to review the certification has been submitted. No construction on a tunnel ventilation system or project roadway shall commence until the certification has been accepted. The Department may impose such conditions on any acceptance of a certification issued pursuant to this subsection as it deems are necessary to meet the criteria of 310 CMR 7.38(2)(a)1-3.

(4) Operating Certification.

(a) Except as provided herein, no person shall operate any tunnel ventilation system or open for general public use any project roadway which is served by a tunnel ventilation system subject to this regulation, without receiving written acceptance of its certification to do so from the Department as provided for in 310 CMR 7.38(3). Any person who has received written acceptance of certification to construct a tunnel ventilation system pursuant to 310 CMR 7.38(3) may commence operation of said tunnel ventilation system and open the project roadway to general public use for a period not to exceed eighteen (18) months, provided that said person submits to the Department an operating certification. Said operating certification submission shall be no earlier than twelve (12) nor later than fifteen (15) months after the commencement of full operation of said tunnel ventilation system or opening of the project roadway for general public use. Any operating certification shall demonstrate that the operation of the tunnel ventilation system shall, at a minimum, be in strict accordance with the certification criteria set forth in 310 CMR 7.38(2)(a)1-3 and the certification accepted by the Department pursuant to 310 CMR 7.38(3) as demonstrated through actual measured emissions and traffic data.

(b) In addition to the demonstration of compliance with the certification criteria set forth in 310 CMR 7.28(2)(a)1-3 and the certification accepted by the Department pursuant to 310 CMR 7.38(3), the operating certificate submittal shall include a contingency plan consisting of measures which could be implemented in cases of exceedence of the emission limitations in the certification. Said contingency plan shall identify available contingency measures including, but not limited to, alternative tunnel ventilation system operations and maintenance, and transportation control measures; a commitment for implementing said measures; a schedule for implementing measures on a days-to-full effectiveness basis; and an analysis of the daily air quality impact of the measures on the emissions from the tunnel ventilation system and within the project area.

(c) Should a project contain one or more project roadways served by tunnel ventilation systems, an operating certification must be submitted and accepted for individual project roadways in accordance with this section where individual project roadways are opened for public use on different dates.

(d) Any operating certification accepted by the Department pursuant to this subsection shall remain in effect for five (5) years from the date of acceptance and shall contain such conditions as the Department deems necessary to meet the certification criteria established in 310 CMR 7.38(2)(a)1-3. Any operating certification accepted by the Department pursuant to this subsection shall be subject to renewal upon application to the Department. The Department shall apply the same criteria which apply to the acceptance of pre-construction certification and the initial operating certification to the renewal of an operating

certification. The requirement to obtain an operating certification, or renewal thereof, shall be in addition to the certification required in 310 CMR 7.38(2).

(5) Operating Certification Department Process. The Department shall, within 30 days of receipt of an initial operating certification or renewal of an operating certification required by 310 CMR 7.38(4), make a determination whether all information necessary for review of said certification has been submitted. Upon making this determination, the Department shall notify the project proponent. The Department shall review the certification and shall, after notice and public hearing, accept or reject said certification in writing no later than 90 days after the Department determines that all information necessary to review the certification has been submitted. The Department may impose such conditions on any acceptance of a certification issued pursuant to this subsection as it deems are necessary to meet the criteria of 310 CMR 7.38(2)(a)1-3 and of the certification accepted pursuant to 310 CMR 7.38(3).

(6) Mitigation Plan Review and Acceptance.

(a) If the Department finds, based upon a review of information submitted by the operator in support of any operating certification, and such other information as the Department has available to it, that one or more of the criteria set forth in 310 CMR 7.38(2)(a)1-3 or established in the acceptance of the certification pursuant to 310 CMR 7.38(3)-(5) are being violated, or are likely to be violated within the period for which the operating certification is valid, the operator of the tunnel ventilation system shall:

1. Implement the measures identified in the contingency plan submitted and accepted as part of the initial operating certificate pursuant to 310 CMR 7.38(4), and if necessary,

2. Within four (4) months after being notified of such a finding, submit to the Department for review and approval a mitigation plan which identifies specific measures the operator intends to implement to bring the tunnel ventilation system and associated project area into compliance with criteria set forth in 310 CMR 7.38(2)(a)1-3 and the conditions of the Departments acceptance of the certification set forth in 310 CMR 7.38(3)-(5). The mitigation plan shall at minimum contain the following:

a. a study that identifies the factors which are causing or contributing to the violation identified in any notice by the Department issued under this subsection;

b. identification and an affirmative demonstration of specific measures which will result in compliance with the criteria in 310 CMR 7.38(2)(a)1-3, and the Departments acceptance of the certification issued pursuant to 310 CMR 7.38(3)-(5).

c. a demonstration of adequate funding mechanisms for implementation of said measures; and

d. a schedule for implementing said measures.

(b) A mitigation plan submitted pursuant to this section shall include examination of measures which address the operation of the ventilation system as well as examination of measures which address operation of the tunnel roadway and roadway network within the project area. The latter shall include, but not be limited to:

1. improvements in public transit,

2. programs to increase the use of high occupancy vehicles,

3. restriction of additional roads or lanes to high-occupancy vehicles,

4. employer-based transportation demand management plans,

5. expansion of fringe and transportation corridor parking facilities,

6. programs to limit or restrict vehicle use in downtown areas or other areas of high emission concentration particularly during periods of peak use,

7. ridesharing programs, and

8. other measures to shift demand to non-automotive modes of travel or to increase vehicle occupancy rates.

(c) The Department shall, within 30 days of receipt of the mitigation plan, make a determination that all information necessary for review of said plan has been submitted. Upon making this determination, the Department shall notify the project proponent. The Department shall review the mitigation plan and shall, after notice and public hearing, accept, or reject said plan in writing no later than 90 days after the Department determines that all information necessary to review the plan has been submitted. The Department may impose such conditions on any acceptance of the plan prepared pursuant to this subsection as it deems are necessary to meet the criteria of 310 CMR 7.38(2)(a)1-3 and of the certification accepted pursuant to 310 CMR 7.38(3)-(5). The terms of the accepted plan shall be incorporated into the operating certification for the applicable renewal period.

(7) Review of Operations. If at any time the Department finds that one or more of the criteria set forth in 310 CMR 7.38(2)(a)1-3 or the criteria established in the acceptance of certification issued pursuant to 310 CMR 7.38(3)-(5) is not being met, the Department may order the operator to implement the contingency measures and to submit a

310 CMR 7.38  Page - 5

mitigation plan as set forth in 310 CMR 7.38(6) to bring the operation of the tunnel ventilation system into compliance with said criteria. Any plan submission made pursuant to 310 CMR 7.38(7) shall contain the same elements as required pursuant to 310 CMR 7.38(5) and (6) as well as such other information as the Department may require.

(8) Compliance Monitoring.

(a) Any person who constructs and operates a tunnel ventilation system on or after January 1, 1991 shall comply with the following monitoring requirements:

1. Emission monitoring. Any person who constructs and operates a tunnel ventilation system which is subject to the requirements of 310 CMR 7.38 shall, prior to commencing operation of the tunnel ventilation system or opening the project roadway for public use, install continuous emission monitors and recorders which shall continuously monitor the air contaminants listed in the Department's acceptance of the certification. Said monitors and recorders shall comply with EPA's performance and siting requirements set forth in 40 CFR part 60, Appendix B. Equipment specifications, calibration and operating procedures for such monitors and recorders shall be submitted to the Department demonstrating such compliance.

2. Traffic monitoring. Any person who constructs and operates a tunnel ventilation system which is subject to the requirements of 310 CMR 7.38 shall install, operate and maintain traffic monitoring equipment within the project area, the numbers and locations of which shall be determined in consultation with the Department.

(9) Record Keeping and Reporting.

(a) Any person who constructs and operates a tunnel ventilation system on or after January 1, 1991 shall comply with the following record keeping and reporting requirements:

1. All records and data from the continuous emissions monitors, recorders and traffic monitors shall be maintained for a period of five (5) years. The most recent 2 years of data shall be readily available for Department inspection.

2. Emissions Reporting. For the first year of operations monthly reports shall be filed with the Department no later than thirty (30) days following the end of the preceding calendar month. Said monthly reports shall contain a summary of continuous monitoring data showing any excursions from allowable emission limitations contained in the Department's acceptance of the certification. In the event any of the reported data shows an excursion of the emission limitations set forth in the acceptance of certification, a written

explanation of any excursion shall be included. Evidence of each calibration event on the monitoring devices shall be included in such monthly reports.

3. Traffic Reporting. For the first year of operation monthly reports shall be filed with the Department no later than thirty (30) days following the end of the preceding calendar month. Said monthly reports shall contain a summary of average daily and peak hour counts of vehicle miles travelled as well as average daily and peak hour vehicle speeds and vehicle hours travelled as identified through the traffic monitoring network established pursuant to 310 CMR 7.38(8).

4. Tunnel Ventilation System Maintenance. For the first year of operations monthly reports shall be filed with the Department no later than thirty (30) days following the end of the preceding calendar month. Said monthly reports shall contain a summary of routine maintenance checks performed, repairs of ventilation equipment, amount of time during which ventilation equipment was not operating in accordance with standard operating procedures and measures taken to remedy this situation.

(b) After the first year of operation, the reports required by 310 CMR 7.38(9) shall be submitted to the Department on a quarterly basis, with the first such quarterly report being due no later than 30 days after the end of the quarter and every three months thereafter.

(10) Public Participation. The purpose of the public hearings provided for in 310 CMR 7.38 shall be to allow any person to make their views known to the Department. Such a hearing shall not be adjudicatory in nature, but shall be in the nature of a public forum for the presentation of any comment which may be relevant to the consideration of a request for acceptance of preconstruction certification, operating certification, renewal of operating certification or acceptance of a mitigation plan. Any decision related to the review and acceptance or rejection of a preconstruction certification; review, acceptance or rejection of a request for operating certification; review, acceptance or rejection of the renewal of an operating certification; or review, acceptance or rejection of a mitigation plan in accordance with the provisions of 310 CMR 7.38, is not an adjudicatory proceeding within the meaning of M.G.L. c. 30A.

**Exhibit 3**

TR Webs 5/book
DEP's Vent
Stack Regulation
Conditional
acceptar

Commonwealth of Massachusetts
Executive Office of Environmental Affairs

# Department of
# Environmental Protection

Daniel S. Greenbaum
Commissioner

July 8, 1991

Peter M. Zuk, Director
I-93/I-90 Central Artery/Third
  Harbor Tunnel Project
One South Station
Boston, MA  02110

> Re:  310 CMR 7.38
>      Conditional Acceptance of Preconstruction
>      Certification of the Central
>      Artery/Third Harbor Tunnel Project

Dear Mr. Zuk:

The Massachusetts Department of Environmental Protection
(hereafter the "Department" or "DEP"), in accordance with 310 CMR
7.38, has received a request from the Massachusetts Department of
Public Works ("DPW") that DEP accept DPW's preconstruction
certification that the Central Artery/Third Harbor Tunnel Project
meets the requirements of 310 CMR 7.38.  This request, and
accompanying information as listed in Attachment A, was received
by the Department on February 26, March 13, and March 22, 1991.
DPW's certification request was found to be administratively
complete by the Department on March 27, 1991.  On May 7, 1991,
the Department conducted a public hearing on the preconstruction
certification to receive comments pursuant to 310 CMR 7.38(11).

The Department has reviewed the information submitted by
DPW, and the information presented at the public hearing and
during the public comment process.  The Department hereby accepts
the certification subject to the conditions set forth below.

It should be noted that the commencement of construction is
not contingent on the completion of all these conditions, because
the completion dates for many of the mitigation measures extend
well into the 1990s, and in some cases past the year 2000.
However, continued progress and final implementation of the
measures set out below, in accordance with the specified
timetables, _is_ a condition for construction and eventual
operation of the project.  In addition, failure of DPW to comply
with the conditions set forth herein may also result in
enforcement action by the Department pursuant to M.G.L. c. 111, §

ATTACHMENT 1

2

142B, c. 21A, §16 or other applicable law.

I.   A Final Certificate for this project pursuant to the
Massachusetts Environmental Policy Act, M.G.L. c. 30, §61 et
seq., was issued on January 2, 1991, by the Secretary of
Environmental Affairs.   Should the Secretary at any time
determine that a supplemental Environmental Impact Report (EIR)
must be filed because of a project change, then a supplementary
certification must also be made to the Department, to be
processed in accordance with 310 CMR 7.38(3).   Any such
supplementary certification shall be submitted to the DEP upon
issuance of a certificate of the final supplemental EIR by the
Secretary.

II.   The DPW shall implement the following mitigation measures.
Pursuant to 310 CMR 7.38(3)(a)5, DEP finds that these measures
are necessary to mitigate potential adverse air quality impacts
from the project, and to meet the criteria for project
certification.   Each of the mitigation measures identified below
must be implemented in accordance with the deadline so indicated.
All of the measures required in this conditional certification
were identified in the certification support materials submitted
by DPW pursuant to 310 CMR 7.38.   The Department recognizes that
many of these measures may be beyond the direct control of the
DPW.   In the event that DPW finds that one or more of these
measures cannot be implemented on the schedule provided herein,
the DPW shall notify the DEP and, within sixty (60) days of said
notice, provide an alternative mitigation measure and/or schedule
which achieves a reduction in vehicle miles traveled which is
equal to, or greater than, the measure which could not be
implemented.   The mitigation measures upon which the Department
is conditioning its acceptance of DPW's certification are as
follows:

A.   Public Transportation Measures

    1.   Develop a comprehensive master plan for
         public transit, including consideration of
         maximizing use of alternative fuels and the
         overall efficiency of the Massachusetts Bay
         Transportation Authority (MBTA) System.   This
         plan shall be submitted to the DEP no later
         than June 30, 1993.

    2.   Complete the Washington Street Replacement Transit
         Service by December 31, 1994.

    3.   Complete the South Boston Transitway by December 31,
         1998.

    4.   Complete the circumferential transit study and
         implement bus connections linking existing radial

3

transit lines via a circumferential bus system by December 31, 2000.

5.  Complete new bus terminals in the South Station Transportation Center by December 31, 1992, and the new Lynn Transit Station by December 31, 1991. Purchase 400 new buses which shall placed in service by December 31, 1992 - to expand peak hour capacity to 12,000 additional passengers in each direction.

6.  Of the planned 15,000 - 40,000 parking spaces to be built at rapid transit and commuter rail stations by December 31, 1995, no fewer than 15,000 parking spaces shall be built by that date.

7.  Expand the MBTA Blue Line platform to accommodate six (6) car trains by December 31, 2000.

8.  Extend the MBTA Blue Line (Bowdoin) to provide a connection at the MBTA Red Line (Charles Street Station) by December 31, 2000.

9.  Extend the MBTA Green Line through Somerville by December 31, 2010.

10. Provide handicapped-accessibility at Andrew Square MBTA station by December 31, 1993.

11. Add rolling stock on the MBTA Red and Orange Lines by December 31, 1995 (at least 86 cars on the Red Line and 46 cars on the Orange Line).

B.  Measures To Increase Commuter Rail Ridership:

12. Restore commuter rail service to the Old Colony Railroad Line, with the initial phase completed by December 31, 1993 (including a terminus at MBTA Braintree Red Line Station.) Extend into South Station by December 31, 1995.

13. Extend commuter rail service between North Station, Ipswich and Newburyport (including two new stations with commuter parking facilities) by December 31, 1993.

14. Complete by December 31, 1995 the feasibility study of extending the MBTA Framingham commuter rail line to Worcester, and, if the extension is found to be feasible proceed with implementation.

15. Complete on-going rail station improvements to North Station, South Station, and Lynn Station, including

4

rail link between North and South Station and submit to
DEP by December 31, 1992.  If such service proves
feasible, DPW shall coordinate with EOTC and others to
implement this service.

C.  Water Transportation Measures

17.  Establish and subsidize connections between docking
facilities at Lovejoy Wharf and Logan Airport, South
Boston, Charlestown, and a downtown Boston location by
December 31, 1993.

18.  Any future remote commuter boat locations are to
include pedestrian and bicycle access, as well as
adjacent parking facilities.

19.  Construct two new commuter boat docking facilities in
the Fort Point Channel, one at the Boston Edison
substation site and the second, near North Station at
Lovejoy Wharf by December 31, 1995.

20.  Undertake a study of water shuttle service to the North
Shore to be completed and submitted to the DEP by
December 31, 1991.  If such service proves feasible,
DPW shall coordinate with EOTC and others to implement
this service.

D.  Transportation Management Measures

DPW has identified other measures to be implemented to
reduce VMT which include the increased use of ride sharing
strategies, designation of certain auto-free zones,
commercial vehicle controls, growth management schemes and
traffic flow management techniques.  The Department also
finds that the implementation of these measures is necessary
to ensure that air quality is protected and the requirements
of 310 CMR 7.38(2) are met.  These specific measures are as
follows:

21.  A continued commitment to support ride-sharing and van-
pooling programs such as CARAVAN.

22.  DPW shall apply its best efforts to promote legally
enforceable parking control measures including parking
freezes or their equivalent for appropriate areas of
which at minimum include the Cities of Cambridge and
Boston.

Said parking freeze(s) shall impose a firm limit
of the total number of parking spaces in the
geographical area to which the freeze applies.  Each
such limit shall be calculated to ensure the attainment

5

of level of service and air quality objectives.  In
order to attain acceptable levels of service and meet
air quality objectives, said parking freezes shall
include as necessary some or all of the following
requirements:

1.   permitted facilities of new or existing spaces to
     establish aggressive employer based transportation
     demand management programs;

2.   pricing structures to discourage long term single
     occupancy vehicle provide incentives for high
     occupancy vehicle (HOV) parking;

3.   new permitted facilities shall be built to
     accommodate height requirements of van pool
     vehicles and shall provide secured bicycle
     storage.

23.  Commercial vehicle controls for the South Boston Haul
     Road shall be in place upon completion of the Haul Road
     in 1992.  This dedicated highway will provide
     commercial vehicles with a new route through South
     Boston which avoids local streets.

24.  Support improvements in traffic flow at the Weston and
     Allston/Brighton toll plazas being undertaken by the
     Massachusetts Turnpike Authority.  These improvements
     include a program of special HOV toll booths and full
     head-of-queue privileges, specially demarcated lanes
     leading to such toll booths at all appropriate
     interchanges and the provision of electronic
     identification systems.  EOTC, together with the
     Massachusetts Turnpike Authority, will complete a study
     by May 30, 1992 to establish the best mechanism to
     improve the quality and reliability of HOV flow on the
     Turnpike between Route 128 and Boston.

E.   High Occupancy Vehicle (HOV) Program

25.  By December 31, 1991, the existing HOV southbound lane
     on Interstate 93 (I-93) shall be extended from its
     existing northern most point, north toward Interstate
     95/Route 128 to the northern most point appropriate to
     maximize the use of the lane.  DPW shall also provide
     that the permanent design of any Charles River Crossing
     which is part of the Central Artery/Third Harbor Tunnel
     Project, shall include an HOV lane extending down the
     exit ramp to Nashua Street with a head of queue
     enforcement point at the intersection of the I-93 ramp
     and Nashua Street.

6

26. By December 31, 1991, DPW shall establish roadway threshold standards representing roadway operations during the average weekday peak hour for the following roadway segments:

    1. I-93 northbound and southbound between I-90 and Rte. 3 in Braintree.

    2. I-90 east bound and west bound between I-93 and I-95 (Rte. 128),

    3. I-93 northbound between the Charles River Crossing and I-95 (Rte. 128).

27. For the purpose of this section, the Roadway Threshold Standards shall be calculated to represent an average weekday peak hour trip time increased by five percent from the average 1991 weekday peak hour trip times in minutes.

28. By January 1, 1992, DPW shall submit to DEP a report which documents the baseline roadway conditions and Roadway Threshold Standards for the aforementioned roadway segments. Said report shall contain traffic monitoring data and trip time records as necessary to support the Roadway Threshold Standards. Beginning January 1, 1992, DPW shall monitor the roadway segments monthly to ensure that average peak hour trip times do not exceed the Roadway Threshold Standards. In the event said standards are exceeded for three consecutive months, DPW shall notify DEP in writing of the exceedance(s) and shall implement HOV measures for the effected roadway.

29. By October 1, 1991 or within 30 days of implementation of an HOV facility, EOTC shall submit performance standards for each HOV facility or HOV lane. Performance standards shall be the average peak hour travel time (in minutes) for each individual HOV lane. Acceptable performance standards shall be set to maintain HOV trip time at 80-85% of the average peak hour trip time for single occupancy vehicles.

30. By December 31, 1991, EOTC must submit an HOV promotion program and plan, and an enforcement program plan to DEP.

7

III.   All representations made by DPW in the certification information as listed in Attachment A to this conditional acceptance are made part of the acceptance and shall be implemented by the DPW.

IV.  All submissions to DEP required under this conditional acceptance of certification shall be sent to:

> Director
> Division of Air Quality Control
> Department of Environmental Protection
> One Winter Street
> Boston, MA  02108

> Very truly yours,
>
> Barbara A. Kwetz
> Director

Attachment
BAK:dep

**Exhibit 4**



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
ONE WINTER STREET, BOSTON, MA 02108  617-292-5500

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

September 1, 2000

Michael P. Lewis, Acting Project Director
Central Artery/Tunnel Project
Massachusetts Turnpike Authority
185 Kneeland Street
Boston, MA  02111

**Re:    DEP Determination on the Amended Preconstruction Certification
         of the Central Artery/Third Harbor Tunnel Project Under 310 CMR 7.38**

Dear Mr. Lewis:

    The Massachusetts Department of Environmental Protection (DEP) received a request
from the Massachusetts Turnpike Authority (MTA) for approval of an amended Preconstruction
Certification of the Central Artery/Third Harbor Tunnel (CA/T) Project pursuant to 310 CMR
7.38. This request was received by DEP on January 7, 1999. MTA's request included a technical
support document prepared by the Massachusetts Highway Department (MHD) and the
Executive Office of Transportation and Construction (EOTC). MTA's request was found to be
administratively complete by DEP on February 26, 1999. On March 30, 1999 DEP conducted a
public hearing on the amended Preconstruction Certification to receive comments pursuant to
310 CMR 7.38 (11). This letter is DEP's decision on MTA's request and is based on the
technical support document, public comments received on DEP's April 29, 1999 proposed
decisions, and an Administrative Consent Order (Consent Order) signed by DEP and EOTC on
September 1, 2000 (attached). This Consent Order is hereby incorporated by reference into this
decision.

    DEP has reviewed the information submitted by MTA, MHD and EOTC and the
information presented at the public hearing and during the public comment process. DEP hereby
accepts the amended certification, with certain conditions pursuant to 310 CMR 7.38(3)(b).
These conditions are consistent with the Final Supplemental Environmental Impact Report
(FSEIR) for the CA/T project and the Secretary's Certificate on the FSEIR. This letter sets out
DEP's decision and provides DEP's determination on the amended Preconstruction Certification.

This information is available in alternate format by calling our ADA Coordinator at (617) 574-6872.

DEP on the World Wide Web: http://www.state.ma.us/dep
♻ Printed on Recycled Paper

DEP recognizes the efforts of the transportation agencies, particularly the Massachusetts Bay Transportation Authority (MBTA), to expand the transit system of the Commonwealth. Since DEP's conditional acceptance of the Preconstruction Certification in 1991, many of the transportation and air quality mitigation commitments of the CA/T project have been completed. These commitments are requirements of the July 8, 1991 Conditional Acceptance of Preconstruction Certification (the "Conditional Acceptance"), 310 CMR 7.36, Transit System Improvements, and 310 CMR 7.37, High Occupancy Vehicle Lanes. Many of the specific CA/T project requirements are included in both the Conditional Acceptance of Preconstruction Certification and 310 CMR 7.36 or 7.37; however, some of the dates are inconsistent. DEP, by this determination, is reconciling project deadlines that are inconsistent between the July 8, 1991 Conditional Acceptance of Preconstruction Certification and 310 CMR 7.36 and 7.37.[1] However, this reconciliation of dates only applies to projects that have either been delayed or are not due until a future date.

In addition, it should be noted that the Department recognizes, through this determination, that the CA/T project has been delayed from 1999 to 2004. Therefore, due dates for certain mitigation projects have been revised to reflect this in this determination. VMT offsets will be required only after these revised due dates.

## Determination on the Amended Preconstruction Certification

In the January 7, 1999 proposed amendment to the Preconstruction Certification, you refer to the substitution provisions of the July 8, 1991 Conditional Acceptance of Preconstruction Certification and the requirement for alternative mitigation measures if a project(s) cannot be implemented or is delayed. In fact, certain transportation projects included in this determination on the amended Preconstruction Certification have not been completed and will be delayed beyond the required due dates set out below. Therefore, based on noncompliance with the required due dates, DEP requires EOTC to implement measures that achieve equal or greater VMT benefits for the delay and/or substitution of the following projects: Washington Street Replacement Transit Service; the purchase of 200 additional buses; the MBTA Blue Line platform expansion; rolling stock on the MBTA Orange Line (46 cars); and the Greenbush Line of the Old Colony Railroad.

EOTC shall implement the substitute projects and commitments according to the schedules contained in Section IV. 8. of the September 1, 2000 Consent Order, and shall submit, by October 31, 2000, detailed project descriptions to the Department for approval. Such descriptions shall include benchmarks, milestones and interim actions, with projected completion dates, and the agency or division responsible for each action. A "project," shall be defined by the most recent filing under the Massachusetts Environmental Policy Act (M.G.L. c. 30 § 61-21A) (MEPA), if the project was filed with MEPA.

By December 1, 2000, EOTC shall submit to the Department a certification, signed by a senior management official, that the substitute projects required in paragraph IV.8.of the attached Consent Order, will achieve equal or greater VMT benefits than the project(s) included in the

---

[1] 310 CMR 7.36 and 7.37 were adopted by DEP in December 1991 subsequent to DEP's issuance of the July 8, 1991 Conditional Acceptance of Preconstruction Certification. For the purpose of this determination on the amended Preconstruction Certification, DEP adopts the dates in 310 CMR 7.36 and 7.37.

Conditional Acceptance and in this determination on the Amended Preconstruction Certification which are delayed or will not be completed. The substitute projects are required under the Consent Order, even if their VMT benefits, in the aggregate, are greater than the benefits of the projects delayed or not completed. However, to the extent that the benefits of the substitute projects are greater than those of projects delayed or not completed, those additional benefits are available to EOTC for the purpose of offsetting lost VMT reductions for future projects that are delayed or require substitution.

The commencement of construction of the tunnel ventilation system for the CA/T project was not contingent on the completion of all the conditions contained herein, because the completion dates for many of the mitigation measures extended well into the 1990s, and in some cases past the year 2000. However, continued progress and final implementation of the measures set out below, in accordance with the specified timetables, is a condition for construction and eventual operation of the project. Failure of MTA or EOTC to comply with the conditions set forth herein may also result in enforcement action by DEP pursuant to M.G.L. c. 111, § 142B, c. 21A, § 16 or other applicable law.

A Final Certificate for the CA/T project was issued on January 2, 1991, by the Secretary of Environmental Affairs pursuant to the Massachusetts Environmental Policy Act (MEPA), M.G.L. c. 30, § 61 et seq. DEP is not making any recommendation to the Secretary at this time as to whether the amendments to the July 8, 1991 Conditional Acceptance of Preconstruction Certification trigger a notice of project change for the CA/T project under the MEPA regulations, 301 CMR 11.00. Should the Secretary at any time determine that a supplemental Environmental Impact Report (EIR) is required due to a project change, then a supplementary certification must also be made to DEP in accordance with 310 CMR 7.38(3). The supplementary certification shall be submitted to DEP upon issuance of a certificate on the final supplemental EIR by the Secretary.

EOTC shall implement the mitigation measures contained in this document. Pursuant to 310 CMR 7.38(3)(a)5, DEP finds that these measures are necessary to mitigate potential adverse air quality impacts from the CA/T project and to meet the criteria for project certification. Each of the mitigation measures identified below must be implemented in accordance with the indicated deadlines.

If EOTC finds that one or more of these measures cannot be implemented or will be delayed beyond the required due date, then EOTC shall notify DEP and, within sixty (60) days of said notice, provide an alternative mitigation measure and a schedule that achieves a reduction in vehicle miles traveled (VMT) equal to or greater than the measure which could not be implemented.

The mitigation measures upon which DEP conditions its acceptance of the amended Preconstruction Certification are listed below. As described above, certain project due dates below have been revised to reconcile the inconsistency between due dates in the 1991 Conditional Acceptance and 310 CMR 7.36 and to account for the delay of the CA/T project from 1999 to 2004. Some of the projects below have been completed and the status is noted as complete.

DEP's Determination on the Amended Preconstruction Certification        September 1, 2000

A.    **Public Transportation Measures**

1. Develop a comprehensive master plan for public transit, including consideration of maximizing use of alternative fuels and the overall efficiency of the MBTA System. This plan shall be submitted to DEP no later than June 30, 1993. (completed)

2. Complete the Washington Street Replacement Transit Service by December 31, 1999.[2]

3. Complete the South Boston Transitway by December 31, 2001 (see footnote 2).

4. Complete the circumferential transit study and implement bus connections linking existing radial transit lines via a circumferential bus system by December 31, 2000. (completed)

5. Complete new bus terminals in the South Station Transportation Center by December 31, 1992, and the new Lynn Transit Station by December 31, 1991. (completed)

6. Purchase 200 advanced design lift-equipped buses to replace older buses in the existing bus fleet by December 31, 1992. (completed)  Purchase 200 additional buses by December 31, 1997 to expand peak hour capacity to accommodate up to 12,000 additional passengers in each direction.[3] (see footnote 2.)

7. Of the planned 15,000 - 40,000 parking spaces to be built at rapid transit and commuter rail stations by December 31, 1995, no fewer than 15,000 parking spaces shall be built by that date. (completed)

8. Expand the MBTA Blue Line platform to accommodate six car trains by December 31, 1998 (see footnote 2).

9. Extend the MBTA Blue Line (Bowdoin) to provide a connection at the MBTA Red Line (Charles Street Station) by December 31, 2011.

10. Extend the MBTA Green Line through Somerville by December 31, 2011.

11. Provide handicapped-accessibility at Andrew Square MBTA station by December 31, 1993. (completed)

12. Add rolling stock on the MBTA Red and Orange Lines by December 31, 2000 (at least 86 cars on the Red Line and 46 cars on the Orange Line). (See footnote 2.) (Red Line completed)

B.  **Measures to Increase Commuter Rail Ridership**

13. Restore commuter rail service to the Old Colony Railroad Line, with the initial phase completed by December 31, 1996 (including a terminus at MBTA Braintree Red Line Station.) Extend into South Station by December 31, 1996 (see footnote 2). (Plymouth and Middleboro Lines completed)

14. Extend commuter rail service between North Station, Ipswich and Newburyport (including two new stations with commuter parking facilities) by December 31, 1993. (completed)

15. Complete by December 31, 1995 the feasibility study of extending the MBTA Framingham commuter rail line to Worcester, and, if the extension is found to be feasible, proceed with implementation. (completed)

---

[2] This measure will not be completed by the required due date as listed. Requirements for substitution and/or offsets, as applicable, for are contained in the September 1, 2000 Consent Order.
[3] DEP is interpreting and applying the FSEIR commitment to 200 replacement buses plus 200 additional buses (non-diesel) to expand peak hour capacity.

16. Complete on-going station improvements to North Station, South Station, and Lynn Station, including rail link between North and South Station and submit to DEP by December 31, 1992. If such service proves feasible, EOTC shall coordinate with others to implement this service. (North, South, and Lynn Station improvements completed; North and South Station rail link is undergoing study and environmental review apart from CA/T project.)

## C. Water Transportation Measures

17. Establish and subsidize connections between docking facilities at Lovejoy Wharf and Logan Airport, South Boston, Charlestown and a downtown Boston location by December 31, 1993. (completed with the exception downtown Boston location for which DEP approved and extension until January 1, 2001 in accordance with Chapter 91 permit.)
18. Any future remote commuter boat locations are to include pedestrian and bicycle access, as well as adjacent parking facilities.
19. Construct two new commuter boat docking facilities in the Fort Point Channel, one at the Boston Edison substation site and the second, near North Station at Lovejoy Wharf by December 31, 1995. (Lovejoy Wharf facility completed. DEP approved an extension until January 1, 2001 in accordance with Chapter 91 permit.)
20. Undertake a study of water shuttle service to the North Shore to be completed and submitted to the DEP by December 31, 1991. If such service proves feasible, EOTC shall coordinate with others to implement this service. (completed)

## D. Transportation Management Measures

EOTC has identified other measures to be implemented to reduce VMT that include the increased use of ride sharing strategies, designation of certain auto-free zones, commercial vehicle controls, growth management schemes and traffic flow management techniques. DEP also finds that the implementation of these measures is necessary to ensure that air quality is protected and the requirements of 310 CMR 7.38(2) are met. These specific measures are as follows:

21. A continued commitment to support ridesharing and vanpooling programs such as CARAVAN for Commuters Inc.
22. EOTC shall apply its best efforts to promote legally enforceable parking freezes or their equivalent for appropriate areas, which at minimum include the Cities of Cambridge and Boston.[4]  Said parking freezes shall impose a firm limit on the total number of parking spaces in the geographical area which the freeze applies. Such limits shall be calculated to ensure the attainment of level of service and air quality objectives. In order to attain acceptable level of service and meet air quality objectives, said parking freezes shall include as necessary some or all of the following requirements:

---

[4] The South Boston Parking Freeze, 310 CMR 7.33, was adopted by DEP on April 9, 1993 and was approved by the Environmental Protection Agency (EPA) as a revision to the Massachusetts State Implementation Plan (SIP). The City of Cambridge Vehicle Trip Reduction Program, 310 CMR 60.04, was adopted by DEP on December 26, 1997 and has been submitted to EPA as a proposed revision to the SIP.

- Permitted parking facilities with new or existing spaces shall establish aggressive employer-based transportation demand programs;
- Pricing structures to discourage long-term single occupancy vehicles and provide incentives for high occupancy vehicle (HOV) parking;
- New permitted facilities shall be built to accommodate height requirements of van pool vehicles and shall provide secure bicycle storage.

23. Commercial vehicle controls for the South Boston Haul Road shall be in place upon completion of the Haul Road in 1992. This dedicated highway will provide commercial vehicles with a new route through South Boston that avoids local streets.

24. Support improvements in the traffic flow at the Weston and Allston/Brighton toll plazas being undertaken by the MTA. These improvements include a program of special HOV toll booths and full head-of-queue privileges, specially demarcated lanes leading to such toll booths and full head of queue enforcement point at the intersection of electronic identification systems. EOTC, together with the MTA, will complete a study by May 30, 1992 to establish the best mechanism to improve the quality and reliability of HOV flow on the Turnpike between Route 128 and Boston.[5]

## E.  High Occupancy Vehicle (HOV) Program

25. By December 31, 1991, the existing HOV southbound lane on Interstate 93 (I-93) shall be extended from its existing northernmost point, north toward Interstate 95/Route 128 to the northernmost point appropriate to maximize the use of the lane. MHD shall also provide that the permanent design of any Charles River Crossing which is part of the CA/T Project shall include an HOV lane extending down the exit ramp to Nashua Street with a head of queue enforcement point at the intersection of the I-93 ramp and Nashua Street. (completed; Southern terminus of the existing HOV lane remains approximate to it original location as a result of the Charles River Crossing design change in 1994)

26. By December 31, 1991, MHD/MTA shall establish roadway threshold standards representing roadway operations during the average weekday peak hour for the following roadway segments: (completed)
    - I-93 northbound and southbound between I-90 and Rte. 3 in Braintree.
    - I-90 eastbound and westbound between I-93 and I-95 (Rte. 128.)
    - I-93 northbound between the Charles River Crossing and I-95 (Rte. 128.)

27. For the purpose of this section, the Roadway Threshold Standards shall be calculated to represent an average weekday peak hour trip time increased by 35 percent from the average 1991 weekday peak hour trip times in minutes. (completed)

28. By January 1, 1992, MHD/MTA shall submit to DEP a report that documents the baseline roadway conditions and Roadway Threshold Standards for the aforementioned roadway segments. Said report shall contain traffic monitoring data and trip time records as necessary to support the Roadway Threshold Standards. Beginning January 1, 1992, MHD/MTA shall monitor the roadway segments monthly to ensure that average peak hour trip times do not exceed the Roadway Threshold Standards. In the event that said standards are exceeded for three consecutive months,

---

[5] DEP approved a substitute HOV project for the Massachusetts Turnpike in 1998 where the MTA is required to complete 2100 park and ride spaces in lieu of an HOV lane on the Massachusetts Turnpike by December 21, 2002.

MHD/MTA shall notify DEP in writing of the exceedance(s) and shall implement HOV measures for the affected roadway. (completed)

29. At the time a new HOV lane opens or at the time an existing HOV lane is extended, MHD/MTA shall monitor HOV lane performance as measured by trip times during peak periods of travel to ensure HOV performance standards are being met. HOV lane roadway performance monitoring shall be conducted monthly for the first two years of new HOV lane operation or extension of an existing HOV lane. The monitoring frequency after the initial two-year period shall be conducted on a quarterly basis. Reporting to DEP is required if performance standards are violated 75 percent of the travel time runs for a given monitoring period. HOV lane roadway performance must, at a minimum, meet a LOS C and result in an average HOV trip time of at least one minute per mile less than average trip times on adjacent general purpose traffic lanes during peak hours of travel as defined in the 310 CMR 7.37.

30. By December 31, 1991, MHD/MTA must submit an HOV promotion program and plan, and an enforcement program plan to DEP. (completed)

All representations made by MTA, EOTC and MHD in the certification information are made part of this acceptance and shall be implemented by the MTA, EOTC, MHD and the MBTA.

Very truly yours,

Edward P. Kunce
Deputy Commissioner

Attachment

Cc:    Bob Durand, EOEA Secretary
       Andrew Natsios, MTA Executive Director
       Kevin Sullivan, EOTC Secretary
       Robert Prince, General Manager MBTA

**Exhibit 5**

COMMONWEALTH OF MASSACHUSETTS

DEPARTMENT OF ENVIRONMENTAL PROTECTION

**310 CMR 7.00    AIR POLLUTION CONTROL REGULATIONS**

**310 CMR 7.36    U TRANSIT SYSTEM IMPROVEMENTS**

7.36:  U  Transit System Improvements

(1) Applicability.  310 CMR 7.36 shall apply to the Executive Office of Transportation and Construction, hereafter referred to as EOTC.

(2) Transit System Improvement Projects.  EOTC shall plan and construct and render available for public use, transit system improvement projects including the following projects in accordance with the schedules set forth in this section:

(a) Before December 31, 1992 construction of the following facilities shall be completed and opened to full public use:

1. Lynn Central Square Station and Parking Garage

2. North Station high platforms and new tracks

3. Lynn Transit Station Bus Terminal

(b) Before December 31, 1994 construction of the following facilities shall be completed and opened to full public use:

1. South Station Bus Terminal

2. South Station Track #12

3. Ipswich Commuter Rail Line extension to Newburyport

(c) Before December 31, 1996 construction of the following facilities shall be complete and opened to full public use:

1. Old Colony Commuter Rail Line Extension

2. Framingham Commuter Rail line extension to Worcester

3. 10,000 Park and Ride and Commuter Rail Station parking spaces system-wide outside of the Boston core area as defined by a report to be submitted to

the Department by EOTC which identifies the location, size and market area of each facility constructed to satisfy this requirement. Said report will be submitted three months prior to the deadline for this project.

(d) Before December 31, 1997 construction of the following facility shall be completed and opened to full public use:

    1. Green Line Arborway Restoration

(e) Before December 31, 1998 construction of the following facility shall be completed and shall be opened to full public use:

    1. Blue line platform lengthening and modernization

(f) Before December 31, 1999 construction of the following facilities shall be completed and opened to full public use:

    1. 10,000 Park and Ride and Commuter Rail Station Parking spaces system-wide outside of the Boston Core Area in addition to those spaces developed pursuant to 310 CMR 7.36(2)(c)3. as defined by a report to be submitted to the Department by EOTC which identifies the location, size and market area of each facility constructed to satisfy this requirement. Said report will be submitted three months prior to the deadline for this project.

(g) Before December 31, 2001 construction of the following facility shall be completed and opened to full public use:

    1. South Boston Piers Electric Bus Service

(h) Before December 31, 2011 construction of the following facilities shall be completed and shall be opened to full public use:

    1. Green Line extension to Ball Square/Tufts University

    2. Blue Line connection from Bowdoin Station to the Red Line at Charles Station.

(3) Project Delays and Project Deadline Extensions.

(a) Should projects listed in 310 CMR 7.36(2) be delayed in their implementation, EOTC shall notify the Department of the delay at the earliest opportunity, but in no case later than 60 days prior to the deadlines established in 310 CMR 7.36(2), said notification to include:

    1. Explanation of the reasons behind the delay;

2. Identification of measures being taken to reduce the delay; and

3. A proposed alternative deadline for completion of the project.

(b) Within 60 days of receiving a complete notification of project delays, the Department will confirm the new project schedule in writing to EOTC.

(c) A substitute project shall be investigated and proposed for project which is expected to be delayed more than three years beyond the deadline established in 310 CMR 7.36(2).

(4) Substitute Transit System Improvement Projects.

(a) EOTC may substitute other transit improvement projects in place of those listed in 310 CMR 7.36. To replace a project EOTC must demonstrate to the Department that a specific project listed in 310 CMR 7.36 is infeasible due to associated adverse engineering, environmental or economic impacts. An alternative project may be substituted in the following manner:

1. EOTC must petition the Department to accept a substitution project, said petition to include a demonstration that the alternative project achieves equal or greater emission reductions of nonmethane hydrocarbons (NMHC), carbon monoxide (CO) and nitrogen oxides (NOx) and would provide a greater improvement in air quality for CO and NOx in the area where the required project was to have been implemented, in both the short and long term.

2. Within 60 days of receipt of a complete petition and demonstration for project substitution, the Department shall review the proposed substitution and shall take action either approving or denying the proposed substitution in writing.

3. Within 90 days of receipt of a complete petition and demonstration for project substitution, the Department shall file a copy of the petition, supporting documentation and Department action with U.S. EPA, Region I.

(5) Project Review and Consultation. Beginning January 1, 1992, EOTC shall consult on a quarterly basis with the Massachusetts Department of Public Works, the Massachusetts Bay Transit Authority, the Metropolitan Area Planning Commission, the U.S. Environmental Protection Agency and the Department on the process of planning, directing, constructing or making transit system improvements required by 310 CMR 7.36.

(6) Transit System Improvement Studies.

(a) Before December 31, 1991, EOTC shall draft and issue for public comment an initial study of transit improvement strategies which are in addition to those specified by this regulation, with the intent of incorporating the findings of said study in the Program for Mass Transportation.

(b) Development of the Program for Mass Transportation shall, in addition to the requirements of 310 CMR 7.36(6)(a), include for each strategy identified in 310 CMR 7.36(6)(a), an analysis of the following:

1. An analysis of funding implications and a comprehensive funding plan for transit projects and programs.

2. Estimates of transit project impacts on cities and towns.

3. Discussion of public education efforts that will be undertaken in implementing transit projects.

(c) Before December 31, 1991, EOTC shall draft and issue for public comment, studies of other transportation system improvements including but not limited to:

1. A study of the feasibility of using toll pricing to regulate single occupant vehicle trips to Logan Airport.

2. A study of the feasibility of relocating some of the existing Summer Tunnel Toll booth to Route 1A.

3. A study of the feasibility of providing water shuttle service between Boston and communities on the North shore.

4. A study of transit system improvements which could be made in addition to those improvements listed in 310 CMR 7.36(2).

5. A study on the feasibility of constructing a rail connection between South Station and Logan Airport.

6. Expanding the size and number of suburban locations of Logan airport express service parking and transit facilities.

7. Expanding the high occupancy vehicle lanes and services within the boundaries of Logan Airport.

(d) Before December 31, 1994, EOTC shall draft and issue for public comment a study of transit system improvements including but not limited to:

1. Connecting circumferential transit facilities and radial transit services.

310 CMR 7.36  Page - 4

2. Improving travel time and upgrading rail service to New York City, NY; Worcester, MA; Springfield, MA; Hartford, CT and Portland, ME.

3. Indexing transit fares so as to encourage maximum use of transit facilities.

(e) The studies identified in 310 CMR 7.36(6)(a) through (e) shall contain an analysis of the technical feasibility of each measure, an estimate of the time and cost involved in implementing the measure and an estimate of the potential air quality impacts of the measure. After providing an opportunity for final comment and consultation with other members of the Metropolitan Planning Organization and the Department, the studies shall be released as final reports and submitted to the Department by no later than March 30 of the year following the deadline of the draft study. The final reports shall contain a recommendation and schedule for further action to be taken in regard to the measures contained in the studies.

(7) Record Keeping and Reporting. Before March 1 of each year, beginning in 1992, EOTC shall submit a status report to the Department detailing ETOC's progress toward compliance with each provision of this regulation. In addition, the report shall contain an estimate of the changes in transit system ridership in eastern Massachusetts in the context of each of the transit system improvements implemented. Copies of said report shall be submitted to the members of the Metropolitan Planning Organization and any interested persons.

**Exhibit 6**



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION

| | |
|---|---|
| In the Matter of: ) | Administrative Consent Order |
| The Executive Office of ) | Number: ACO-BO-00-7001 |
| Transportation and Construction ) | |
| ) | |

## I.   THE PARTIES

1.   The Department of Environmental Protection ("Department") is a duly constituted
agency of the Commonwealth of Massachusetts pursuant to M.G.L. c. 21A, §7, with a
principal office at One Winter Street, Boston, Massachusetts. The Department's
authority to issue this Administrative Consent Order is conferred by M.G.L. c.111,
section 142B, 310 CMR 7.00 et seq., and specifically 310 CMR 7.36 and 7.38.

2.   The Executive Office of Transportation and Construction ("EOTC") is a duly constituted
agency of the Commonwealth of Massachusetts pursuant to M.G.L. c. 6A with a
principal office at Ten Park Plaza, Boston, Massachusetts. EOTC is responsible for
ensuring compliance with 310 CMR 7.36 and 7.38.

## II.   STATEMENT OF FACTS AND LAW

1.   The Department is responsible for the implementation and enforcement of M.G.L. c. 111
§§ 142A – 142E and the regulations promulgated thereunder at 310 CMR 7.00.

2.   EOTC and its agencies and authorities are responsible for constructing, administering,
and maintaining public transportation and highway infrastructure for the Commonwealth
of Massachusetts, including the Central Artery/Tunnel Project ("CA/T"), pursuant to
authority under M.G.L. c.81, c. 81A, c.161A, and c.6A section 19.

Tunnel Vents Preconstruction Certification

3.   Regulations at 310 CMR 7.38 regulate Tunnel Ventilation Systems in the Boston Air
Pollution Control District and apply to the construction and operation of any tunnel
ventilation system for highway projects, including the CA/T.

4.   310 CMR 7.38 (2), Preconstruction Certification, requires a preconstruction certification
to demonstrate that any tunnel ventilation system, project roadway and roadway network
within the project area, when operated in strict accordance with its design, standard
operation and standard maintenance procedure, will not:

(a)     cause or exacerbate a violation of any National Ambient Air Quality Standard, as set forth at 40 CFR 50, or a Massachusetts Ambient Air Quality Standard as set forth at 310 CMR 6.00; or

(b)     cause or exacerbate a violation of the Department's one hour $NO_2$ guideline of $320mg/m^3$; or

(c)     result in an actual or projected increase in the total amount of non-methane hydrocarbons measured within the project area when compared with the no-build alternative.

5.     310 CMR 7.38 (3), Preconstruction Department Certification Process, at paragraph (a)5., requires an identification and analysis of feasible pollution prevention measures designed to reduce vehicle miles traveled (VMT) including identification of the available short- and long-term measures, commitments to implement said measures, and a schedule for implementing said measures. 310 CMR 7.38 (3)(b) allows the Department to impose conditions on any acceptance of a certification as it deems are necessary to meet the criteria of 310 CMR 7.38(2).

6.     On February 26, March 13, and March 27, 1991, the Massachusetts Department of Public Works (now the "Massachusetts Highway Department") submitted to the Department a preconstruction certification for the CA/T project.

7.     On July 8, 1991, the Department conditionally accepted the preconstruction certification for the CA/T project and required the measures submitted pursuant to 310 CMR 7.38(3)(a)(5) to mitigate potential adverse air quality impacts from the project and to meet the criteria for project certification. These mitigation measures include public transportation measures, measures to increase commuter rail ridership, water transportation measures, transportation management measures and a high occupancy vehicle program. The Department's acceptance required that, if any of the mitigation measures could not be implemented on the schedule in the acceptance, an alternative mitigation measure be implemented which achieves a reduction in VMT equal to, or greater than, the measure which could not be implemented.

8.     Certain transportation projects included in the July 8, 1991 Conditional Acceptance of Preconstruction Certification ("Conditional Acceptance") have been completed. These projects include: the Comprehensive Master Plan for Transit (PMT); the circumferential transit study and implementation of bus connections linking existing radial transit lines; new bus terminals in the South Station Transportation Center; the Lynn Transit Station; the purchase of 200 replacement buses; 15,000 park and ride spaces; ADA accessibility at Andrew Station; rolling stock on the MBTA Red Line, the Plymouth and Middleboro Lines of the Old Colony Railroad; the Ipswich to Newburyport Commuter Rail extension; and the Worcester Commuter Rail extension.

9.     Certain transportation projects included in the July 8, 1991 Conditional Acceptance have not been completed and will be delayed beyond the required due dates in the conditional acceptance. These projects include: the Washington Street Replacement Transit Service (due December 31, 1994); the South Boston Transitway (due December 31, 1998); the

purchase of 200 additional buses (due December 31, 1992); the MBTA Blue Line platform expansion to accommodate six car trains (due December 31, 2000); rolling stock on the MBTA Orange Line (46 cars) (due December 31, 1995); and the restoration of Commuter Rail service on the Greenbush Line of the Old Colony Railroad (due December 31, 1995).

## Transit System Improvements

10.   Regulations at 310 CMR 7.36, Transit System Improvements, require EOTC to plan, construct and render available for public use certain transit system improvements in accordance with specified schedules.

11.   310 CMR 7.36(3), Project Delays and Project Deadline Extensions, provides that where a project will be delayed in its implementation for up to three years, EOTC shall so notify the Department and set out the grounds for the delay. The notification shall include: explanation of the reasons behind the delay; identification of measures being taken to reduce the delay; and a proposed alternative deadline for completion of the project. 7.36(3)(c) provides that "a substitute project shall be investigated and proposed for [a] project which is expected to be delayed more than three years beyond the deadline established in 310 CMR 7.36(2)."

12.   310 CMR 7.36 (4), Substitution Transit System Improvement Projects, allows EOTC to substitute other transit projects if a specified project is infeasible due to adverse engineering, environmental or economic impacts. Such substitute projects must achieve equal or greater emission reductions of NMHC, CO and NOx and provide a greater improvement in air quality for CO and NOx in the area where the required project was to have been implemented in both the short- and long-term.

13.   Certain transportation projects required by 310 CMR 7.36 have been completed. These projects include: Lynn Central Square Station and Parking Garage; North Station high platforms and new tracks; Lynn Transit Station Bus Terminal; South Station Bus Terminal; South Station Track #12; Ipswich Commuter Rail extension to Newburyport; Old Colony Commuter Rail line extension (Plymouth and Middleboro lines); Framingham Commuter Rail line extension to Worcester; and 17,600 of a total of 20,000 Park and Ride and Commuter Rail parking spaces.

14.   Certain transportation projects required by 310 CMR 7.36 will not be completed within three (3) years, and will therefore require project substitution and/or interim air quality offsets pursuant to 310 CMR 7.36 (4). These projects include: the Blue Line Platform Lengthening and Modernization; the Greenbush Line of Old Colony Commuter Rail extension; and the Green Line Arborway Restoration.

## Procedural status

15.   On January 7, 1999, the Massachusetts Turnpike Authority, Central Artery/Tunnel Project submitted a proposed amendment to the February 26, March 13, and March 27,

1991 Ventilation Certification to the Department, seeking to substitute, delay, or eliminate certain of the above transportation projects required by the July 8, 1991 Conditional Acceptance. The Department issued a proposed Conditional Acceptance of the requested amendment, on April 26, 1999.

16. Also on January 7, 1999, pursuant to 310 CMR 7.36 (3), EOTC petitioned the Department for project delays. These projects include: the South Boston Transitway; 2,400 of a total of 20,000 Park and Ride Parking Spaces; the Old Colony Commuter Rail Greenbush Line (delay previously granted by the Department to 12/31/99); and the Arborway Restoration (delay previously granted by the Department to 12/31/00).

17. Also on January 7, 1999, pursuant to 310 CMR 7.36 (4), EOTC petitioned the Department for project substitution for the Arborway Restoration. EOTC has petitioned that the restoration of light-rail service in the Arborway corridor is infeasible and has proposed to substitute a combination of additional park and ride parking spaces and a system of articulated, 60' buses fueled by compressed natural gas.

18. Also on January 7, 1999, pursuant to 310 CMR 7.36 (4), EOTC petitioned the Department for interim substitution for the Blue Line Platform Lengthening and Modernization Project because the project will be delayed beyond the three-year extension allowed under 310 CMR 7.36 (3)(a).

19. A public hearing on these submittals was held on March 29, 1999.

20. In letters dated April 26, 1999, the Department proposed to accept the project delays for the South Boston Transitway, 2400 Park and Ride Parking Spaces and the Blue Line Platform Lengthening and Modernization Project. The Department also proposed to not accept EOTC's petition for interim substitution for the Blue Line Platform Lengthening and Modernization Project because the petition did not include a quantification of the air quality benefits of the original project and the proposed substitute. The Department also proposed to require further information to support the determination of infeasibility for restoration of light-rail service in the Arborway corridor, and to require air quality offsets with quantification for the proposed substitute transit service for the Arborway corridor. The Department also proposed to not accept further delay of the Old Colony Commuter Rail Greenbush Line until interim substitutions are proposed.

21. A public meeting was held on these proposed Department actions on May 20, 1999.

## III.   RECONCILIATION AND ADJUSTMENT OF DATES

Several transportation projects are included in both the July 8, 1991 Conditional Acceptance and 310 CMR 7.36, but the completion dates for the projects are different. In addition, when the Department issued the Conditional Acceptance, it was anticipated that the Central Artery/Tunnel Project would be completed in 1999; the anticipated completion date is now 2004. To reconcile the differences between the Conditional Acceptance and 310 CMR 7.36 and allow for the change in the completion date of the project, and for purposes of determining whether additional VMT reductions, project



substitutions or interim air quality offsets are required, the Department hereby reconciles and adjusts certain dates, as follows:

1.   The Department hereby, with this Consent Order, reconciles project deadlines that are inconsistent between the July 8, 1991 Conditional Acceptance, and 310 CMR 7.36. However, this reconciliation of dates applies only to projects that have either been delayed or are not due until a future date.  Because 310 CMR 7.36 is a regulation of general applicability rather than an administrative determination and because it was promulgated after the Conditional Acceptance was issued, the Department hereby adopts the dates incorporated in 310 CMR 7.36 as the dates by which projects required by both the July 8, 1991 Conditional Acceptance and 310 CMR 7.36 were to have been constructed and open for full public use.

Completion dates for the following projects, as reconciled, are:

> South Boston Transitway – December 31, 2001;
> Blue Line Platform Lengthening and Modernization – December 31, 1998;
> Greenbush Line of the Old Colony Railroad– December 31, 1996;
> Green Line Extension to Ball Square/Tufts University – December 31, 2011; and
> Blue Line Connection from Bowdoin to the Red Line at Charles – December 31, 2011.

2.   In addition, the Department hereby revises project deadlines for projects required by the July 8, 1991 Conditional Acceptance to take account of the delay of the completion date of the project from 1999 to 2004.  However, in cases where projects are required by the Transit Improvements regulation as well as the Conditional Acceptance, projects may be delayed without a requirement for substitution only for three years. VMT offsets will be required for projects whose due dates are later than those listed below.

> Washington Street Replacement Transit Service - December 31, 1999;
> South Boston Transitway - December 31, 2004;
> the purchase of 200 additional buses - December 31, 1997;
> MBTA Blue Line platform expansion - December 31, 2001;
> Rolling stock on the MBTA Orange Line (46 cars) - December 31, 2000;
> Greenbush Line of the Old Colony Railroad - December 31, 1999;
> Green Line Extension to Ball Square/Tufts University - December 31, 2011; and
> Blue Line Connection from Bowdoin to the Red Line at Charles - December 31, 2011.

## IV.   DISPOSITION AND ORDER

1.   As a result of discussions which have taken place between the Department and EOTC, and without adjudication of, admission to, or agreement about any fact or law set forth above, the parties have agreed to negotiate this Administrative Consent Order (hereinafter "Consent Order"), rather than expend the time and resources necessary to adjudicate this matter.

2.   Nothing in this Consent Order shall be construed as, or operate as, barring, diminishing, adjudicating, or in any way affecting 1) any legal or equitable right of the Department to issue any future Order with respect to EOTC's compliance with this Consent Order or 2) any other claim, action, suit, cause of action, or demand which the Department may initiate with respect to any subject matter not covered by this Consent Order.

3.   EOTC consents to the issuance of this Consent Order and admits to the jurisdiction and authority of the Department to issue such Consent Order. EOTC understands and hereby waives any right to appeal this Consent Order to Superior Court, or an administrative hearing before the Department, a tentative decision, judicial review, rehearing, re-argument and reconsideration of the issuance and/or the terms of this Consent Order, and to notice of any rights of review. This waiver does not extend to any other order issued by the Department or any other claim, action, suit, cause of action or demand which the Department or any other person may initiate with respect to the subject matter of this Consent Order.

4.   In addition to being an administrative consent order, this is the notice of noncompliance issued pursuant to M.G.L. c. 21A, §16 and 310 CMR 5.00 et seq.

5.   The activities performed pursuant to this Consent Order shall be performed in accordance with all applicable federal, state and local laws, regulations and approvals.

6.   This Consent Order shall apply to and be binding upon EOTC and its agents or assigns. EOTC agrees to provide a signed copy of this Consent Order to any agent or assign.

7.   EOTC shall not violate this Consent Order and shall not allow its agents, assigns or contractors to violate this Consent Order.

Tunnel Vents Preconstruction Certification

8.   EOTC shall implement the following projects and commitments according to the schedules below, and shall submit, within 60 days of the effective date of this Consent Order, detailed project descriptions to the Department for approval. Such descriptions shall include benchmarks, milestones and interim actions, with projected completion dates, and the agency or division responsible for each action. A "project," shall be defined by the most recent filing under the Massachusetts Environmental Policy Act (M.G.L. c. 30 § 61-21A) (MEPA), prior to the date of this Consent Order, if the project was filed with MEPA.

A.      Urban Transit Measures to Add Capacity and Service in the Urban Transit System

- Complete a Major Investment Study (MIS) and file an Environmental Notification Form (ENF) for the Urban Ring by June 30, 2001. File the final Environmental Impact Report within three years of this Consent Order. Alternatively, file an Expanded ENF based upon the recommendations of the MIS and request a Special



Review Procedure. with the first phased review document to be filed within three years of this Consent Order. In either case. the ENF shall identify a list of the low-cost measures as Phase I of the project, and that list and a schedule for implementation shall be submitted to DEP following the completion of MEPA review of Phase I.

- Complete the Silver Line transit service (EOEA #6826/11707) as follows:
  Section A: Complete the South Boston Piers Transitway from South Station to South Boston including transit access to the new convention center by December 31, 2003.
  Section B: Complete the first phase of the Washington Street transit service from Dudley Square to Downtown Crossing by December 31, 2001. Operate alternative fuel buses from Dudley Square to Downtown Crossing by December 31, 2002.
  Section C: Complete preliminary design for the connection between Section A and Section B of the Silverline transit service (tunnel between South Station, Boylston Street and the New England Medical Center) sufficient under current standards for an application for federal funding by December 31, 2004. Complete the connection between Section A and Section B by December 31, 2010 or on a schedule consistent with federal funding. EOTC shall submit to DEP by December 31 of each year a status report on the preliminary design and efforts to secure adequate federal and/or state capital funds for this project.

  If federal funding is not secured for Section C by 2005 and if, as a result, the tunnel section will not be completed by 2010, EOTC shall, on a yearly basis for each year that federal funding is not secured for Section C, undertake other urban transportation investments and enhancements which would not otherwise have occurred until a later date. These investments and enhancements may be chosen from, but are not necessarily limited to, the projects in MBTA's finance plan. Expenditures on these transportation enhancements and investments shall be equal to the required state match (at a minimum 20% of total project costs) for the Silver Line project. The list of transportation enhancements and investments planned for implementation shall be included in the status report required for Section C of the Silver Line.

  If federal funding is not secured for Section C by 2008 and if, as a result, EOTC determines that the tunnel section will not be completed by 2010 or thereafter, EOTC shall, after convening a public process, commit the required state match for this towards the implementation of new, urban transportation investments and enhancements that will add capacity to the system and/or improve service over and above the targets in the current Service Plan. In light of the significant comment received about access to development on the South Boston Waterfront, priority should be given to urban projects that enhance access to the South Boston Waterfront from the Washington Street Corridor. These funds cannot be applied to other projects required by this Consent Order, 310 CMR 7.36 or 310 CMR 7.38.

- Provide for free transfers from the Silver Line transit service to the MBTA rapid transit system and the Green Line. as the Silver Line transit service becomes operational.

- Implement signal improvements on the Orange Line and provide 18 additional Orange Line cars to increase capacity by December 31, 2004. EOTC agrees to submit an analysis demonstrating that this project will achieve equivalent VMT benefits as providing 46 additional cars on the Orange Line to DEP within 120 days of this Consent Order.
- Implement bus service improvements designed to increase peak period bus ridership by 12,000 riders from 1992 levels by December 31, 2000.
- EOTC will promote the use of signalization technology to give priority to mass transit vehicles over automobiles within the metropolitan-Boston area.

B.               Measures to Improve Air Quality in the Urban Core

- EOTC agrees to significantly reduce emissions of the MBTA fleet by purchasing 358 alternative fuel buses to operate in the Metro-Boston region in accordance with the following schedule and requirements:

  1. up to 180, but no fewer than 124 buses, on or before December 2002, and a purchase order for these buses shall be placed on or before December 2000;
  2. up to 120 buses on or before December 2003, and a purchase order for these buses shall be placed on or before December 2001; and
  3. the remaining buses on or before February 2004, and a purchase order for these buses shall be placed on or before December 2002.

DEP recognizes that the purchase schedule for 358 alternative fuel buses is based, in part, on the ability to provide maintenance facilities to house the alternative fuel vehicles. Therefore, the above referenced timeline may be accelerated or delayed based upon the availability of the new maintenance facilities; however EOTC will complete the purchase of the 358 required buses no later than February 2004.

EOTC agrees that no more than forty-four (44) of the buses referenced above will be used for either the Washington Street Replacement Service, South Boston Transitway or Arborway Replacement Service; the remaining buses will replace 40-foot diesel buses operating on metro-Boston routes.

EOTC agrees to submit an analysis demonstrating that the measures implemented for the MBTA bus fleet achieve equivalent VMT and/or air quality benefit as providing 200 additional low emission buses. VMT and/or air quality benefits generated by projects or substitute projects in the July 8, 1991 Conditional Acceptance of Preconstruction Certification (e.g., buses for Sections A and B of the Silver Line transit service) may not be included in the calculation of VMT and/or air quality benefits generated by this purchase of alternative fuel vehicles.

- Retrofitting all remaining in-service diesel buses with emission control equipment such as catalysts and particulate traps by December 31, 2000.

- Insofar as possible, operate lowest emission buses in the fleet in transit dependent, urban areas with highest usage and ridership as the buses enter the MBTA bus fleet. Alternatively fueled buses will operate on routes out of MBTA garages that are constructed or converted to service such buses.

### C. Transit Infrastructure Investment to Add Capacity and Increase Ridership

- Complete four new stations (Ashland, Grafton, Southborough, and Westborough) on the Worcester Commuter Rail Line (EOEA #9154) by December 31, 2004.
- As a joint project with the Massachusetts Port Authority, complete an extension of the South Boston Transitway through the Ted Williams Tunnel to the individual airline terminals at Logan Airport by June 30, 2004.

### D. Regional Transit Service Improvements to Maintain Capacity and Increase Ridership

- In cooperation with the Rhode Island Department of Transportation, provide regional rail service between Boston and TF Green Airport in Rhode Island.

### E. Measures to Reduce Air Pollution from Diesel Construction Equipment

- Expand the construction equipment retrofit program for the CA/T project.
- Implement a construction equipment retrofit program and retrofit equipment with emission control technologies such as oxidation catalysts and particulate filters for large MHD and MBTA funded construction projects.

9. Within 90 days of the effective date of this consent order, EOTC, shall submit to the Department a certification, signed by a senior management official, that the substitute projects required above in paragraph V.8., will achieve equal or greater VMT benefits than the project(s) included in the July 8, 1991 Conditional Acceptance of Preconstruction Certification for the CA/T project which are delayed or will not be completed.

## Transit System Improvements

10. Pursuant to 310 CMR 7.36 (3), the Department will accept EOTC's petitions for delay for the following projects: the South Boston Transitway (delay from 12/31/01 to 12/31/03); 2,400 Park and Ride and Commuter Rail parking spaces (delay from 12/31/99 to 12/31/01); and the Blue Line Platform Lengthening and Modernization (delay from 12/31/98 to 12/31/01). EOTC agrees to submit updated petitions for delay to DEP within 30 days of this Consent Order for the South Boston Transitway and 2,400 Park and Ride and Commuter Rail Parking Spaces.

11. Based on information provided by EOTC and pursuant to 310 CMR 7.36 (4), the Department finds that the following projects will not be completed by the end of the three (3) year delay period and will require project substitution and/or interim air quality

9

offsets: the Blue Line Platform Lengthening and Modernization (for delay post 12/31/01); the Old Colony Greenbush Line (for delay post 12/31/99); and the Arborway Restoration (for delay post 12/31/00.)

12.    Within 90 days of the effective date of this Consent Order, EOTC shall provide to the Department a detailed description of projects which will be implemented to achieve interim air quality offsets, as required by 310 CMR 7.36 (4), for the Old Colony Commuter Rail Greenbush Line. EOTC shall include a quantitative analysis which demonstrates that 310 CMR 7.36 (4)(a)1. has been met. This analysis will be performed in addition to the certification required in paragraph 11 above. EOTC and the Department agree to work with the US Environmental Protection Agency to allow flexibility in determining the scope and geographic area of interim air quality offsets required by 310 CMR 7.36 (4).

13.    EOTC has proposed the following interim project substitutions for the Blue Line Platform Lengthening and Modernization Project: Ted Williams Tunnel Bus Service Phase I; Ted Williams Tunnel Bus Service Phase II; and certain FY98 Service Plan changes that relate to bus routes serving the North Shore. (For a description of these proposed substitutions, see Appendix to January 7, 1999 Blue Line Platform Lengthening and Modernization Project Status Update and Petition for Interim Substitution.) The original project was neither analyzed for its air quality benefits nor assigned an air quality benefit when 310 CMR 7.36 was adopted. Instead, EOTC and the Department recognized that platform lengthening and modernization would have a generally positive impact on air quality because they would attract additional riders to public transit. The interim project substitutions that EOTC proposes will have a generally positive impact on air quality for the same reason.

14.    Pursuant to 310 CMR 7.36 (4)(a)1., the Department finds that EOTC has not yet demonstrated that the Arborway Restoration is infeasible. Within 150 days of the effective date of this Consent Order, EOTC shall conduct a public and community involvement process for the purpose of scoping and reviewing a revised infeasibility determination and, if necessary, a proposed alternative project for the Arborway Restoration Project. If the project is found infeasible by EOTC upon conclusion of this process, then within 60 days of EOTC's finding of infeasibility, EOTC shall submit said determination along with a detailed description of a substitute project to the Department for review pursuant to 310 CMR 7.36(4). Prior to submission of a proposed alternative project to the Department, EOTC shall conduct a public and community involvement process to solicit public comment on the proposed substitute project.

If the project is not found infeasible, then a schedule for completion of the project, that includes benchmarks, milestones and action items, shall be provided to the Department and shall be subject to approval by the Department.

15.    For the purpose of tracking progress towards project completion, EOTC shall submit periodic reports to the Department on the status of each project which is not yet completed, and which is required under this Consent Order, 310 CMR 7.36 or the DEP



determination issued pursuant to 310 CMR 7.38(2) and (3). The status report shall include all projects regardless of deadlines and shall include progress on benchmarks, milestones and interim actions for each project, as submitted pursuant to paragraph 8 above. The status report shall be submitted to the Department within 60 days of the effective date of this Consent Order and on or by June 30 of each year thereafter until all commitments are completed.

16.  EOTC shall include and shall prioritize for funding through its recommendations to the appropriate entities and to the extent allowed by state and federal laws the projects agreed to in this Consent Order in the MBTA Capital Improvement Plan, the current long-term Transportation Plan for the Boston Region or other applicable region, and in the appropriate Transportation Improvement Program.

## V.   FORCE MAJEURE

1. .  Paragraph 2 of this Section applies only to events contained in this order which are not subject to either the delay or substitution provisions contained in 310 CMR 7.36(3) and (4) (Transit improvements regulation), or the Conditional Acceptance of Preconstruction Certification issued by the Department on July 8, 1991. Events contained in this consent order which are governed by the delay or substitution provisions in 310 CMR 7.36 (3) and (4) or the Department's July 8, 1991 decision will continue to be subject to only those provisions.

2.  If any event occurs which delays or will delay the performance dates established by this Consent Order, which event was beyond the control and without the fault of EOTC and any entity it controls, including its contractors and consultants, and which event could not have been prevented or avoided by the exercise of due care, foresight, or due diligence on the part of EOTC or any entity it controls, including its contractors and consultants, EOTC shall immediately, and in any event within fifteen (15) days of such occurrence, notify the Department in writing of the anticipated length of the delay, the cause of the delay and the steps or measures to be taken to prevent or minimize the delay, including a timetable by which EOTC intends to implement such steps or measures.

3.  If the Department does not respond to a notification made pursuant to paragraph 2 of this section within 30 days of receipt, the contents of the notification may be considered approved by the Department, and EOTC shall implement such steps or measures as it has set out in said notification.

4.  If EOTC notifies the Department of the occurrence of an event which delays or will delay a performance date established by this Consent Order, and if EOTC otherwise complies with the requirements of paragraph 1 of this section, and if the Department determines, pursuant to its discretion, that the delay has been or will be caused by circumstances beyond the control and without the fault of EOTC, or any entity it controls, including its contractors and consultants, and cannot or could not have been overcome by the exercise of due diligence, due care or foresight, the Department shall extend the time for performance of the action that is delayed by the event for a period of time equal to the length of the delay.

## VI.    STATUTORY AND ADMINISTRATIVE PENALTIES

The Department is authorized to assess statutory penalties for violation of this CONSENT ORDER for an amount up to $25,000 per day, pursuant to M.G.L. c.111, section 142B, and to assess Civil Administrative Penalties for violation of this CONSENT ORDER, pursuant to M.G.L. c.21A, section 16, and 310 CMR 5.00, for an amount up to $25,000 per day.

## VII.    NON WAIVER

Failure on the part of the Department to complain of action or non-action on the part of EOTC shall not constitute a waiver by the Department of any of its rights hereunder. Furthermore, no waiver by the Department of any provision herein shall be construed as a waiver of any other provision herein.

## VIII.    SEVERABILITY

If any term or provision of this Consent Order, or the application thereof, to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Consent Order, and the application thereof, shall not be affected thereby, and each remaining term and provision shall be valid and enforceable to the fullest extent permitted by law.

## IX.    EFFECTIVE DATE

This Consent Order shall be effective on the date of the last signature set forth below. Each undersigned representative hereby certifies that he/she is fully authorized to enter into the terms and conditions of this Consent Order and to legally bind the party on whose behalf such representative is signing to this Consent Order.

_Edward W. Pince_    Date: _15ept 00_

_Ken J. Allan_    Date: _7/1/00_

12

**Exhibit 7**

COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION

|  |  |
|---|---|
| In the Matter of: ) <br> The Executive Office of ) <br> Transportation and Construction ) <br> ) | Amended Administrative Consent Order <br> Number: ACO-BO-00-7001-Amendment #1 |

## I.    THE PARTIES

1.    The Department of Environmental Protection ("Department") is a duly constituted agency of the Commonwealth of Massachusetts pursuant to M.G.L. c. 21A, §7, with a principal office at One Winter Street, Boston, Massachusetts. The Department's authority to issue this Administrative Consent Order is conferred by M.G.L. c.111, section 142B, 310 CMR 7.00 et seq., and specifically 310 CMR 7.36 and 7.38.

2.    The Executive Office of Transportation and Construction ("EOTC") is a duly constituted agency of the Commonwealth of Massachusetts pursuant to M.G.L. c. 6A with a principal office at Ten Park Plaza, Boston, Massachusetts. EOTC is responsible for ensuring compliance with 310 CMR 7.36 and 7.38.

## II.    STATEMENT OF FACTS AND LAW

1.    The Department is responsible for the implementation and enforcement of M.G.L. c. 111 §§ 142A – 142E and the regulations promulgated thereunder at 310 CMR 7.00.

2.    EOTC and its agencies and authorities are responsible for constructing, administering, and maintaining public transportation and highway infrastructure for the Commonwealth of Massachusetts, including the Central Artery/Tunnel Project ("CA/T"), pursuant to authority under M.G.L. c.81, c. 81A, c.161A, and c.6A section 19.

3.    On September 1, 2000, the Department and EOTC signed Administrative Consent Order Number: ACO-BO-00-7001 (the ACO), which includes certain measures EOTC agreed to implement to improve air quality in the urban core. Among these measures was a commitment to retrofit all remaining in-service diesel buses by December 31, 2000 (i.e., diesel buses that would not be taken out of service and replaced with alternative fuel buses) with emission control equipment such as catalysts and particulate traps.

4.    While the ACO had been negotiated in good faith, the provisions for bus retrofit are capable of differing interpretations since neither equipment specifications nor emissions standards were incorporated.

## III.   DISPOSITION AND ORDER

1.   As a result of discussions, which have taken place between the Department and EOTC, the parties have agreed to this Amendment to the ACO.

2.   This paragraph replaces §IV.8.B. of the ACO and any other commitment in any document generated with respect to the ACO that required EOTC to retrofit all remaining in-service diesel buses by December 31, 2000 with emission control equipment such as catalysts and particulate traps. EOTC, through the MBTA, shall:

   A.   As of the date of execution of this Amendment to the ACO, fuel all of the MBTA diesel bus fleet with Ultra Low Sulfur Diesel (ULSD) No. 1 fuel with a maximum sulfur content of 30 parts per million;

   B.   Install Engelhard DPX Diesel Particulate Filters Part #B 108050 (DPFs), or Johnson Matthey CRT Continuous Regenerating Technology Part #CRT 2091 (CRTs), or retrofit equipment, which has been demonstrated to reduce particulate matter emissions by as much as or more than the DPFs or CRTs, in all 400 of the model year 1994/1995 Nova buses according to the following schedule:

   - A total of 70 retrofitted buses with DPFs or CRTs by no later than December 31, 2002;
   - A total of 180 (including the previous 70) retrofitted buses with DPFs or CRTs by no later than July 1, 2003; and
   - A total of 400 (including the previous 180) retrofitted buses with DPFs or CRTs by no later than July 1, 2004.

   C.   Accelerate the schedule for engine upgrades to the model year 1994/1995 Nova buses to ensure that all of these engines are upgraded with Detroit Diesel Reliabilt Engines (Part #R23528850A) by no later than July 1, 2004.

   D.   Replace all 200 model year 1989 buses in accordance with the MBTA's 1998 Bus Fleet Management and Development Plan by no later than December 31, 2004. The parties agree that this constitutes a reasonable schedule to plan for and order buses such that the buses are operating in the MBTA fleet by no later than December 31, 2004. The parties also agree that the December 31, 2004 deadline does not preclude the MBTA's selection of any clean bus technology.

   E.   EOTC, through the MBTA, shall implement an emissions monitoring and maintenance plan for the diesel buses subject to this amendment to the ACO to maintain the emission control equipment of the retrofit buses, according to the requirements of this paragraph. EOTC shall, through the MBTA, in the June 30, 2002 status report required by §IV, p.15 of the ACO, include a section identifying (A) a draft maintenance plan for the emissions reduction equipment and (B) the steps necessary to develop a system for monitoring emissions from diesel buses.

EOTC, through the MBTA, shall submit to the Department for approval a final emissions monitoring and maintenance plan by no later than October 31, 2002. All subsequent status reports submitted pursuant to §IV, p.15 of the ACO shall report the results of the emissions monitoring and maintenance plan.

## IV. STATUTORY AND ADMINISTRATIVE PENALTIES

The Department is authorized to assess statutory penalties for violation of this Amendment to the ACO for an amount up to $25,000 per day, pursuant to M.G.L. c.111, section 142B, and to assess Civil Administrative Penalties for violation of this Amendment to the ACO, pursuant to M.G.L. c.21A, section 16, and 310 CMR 5.00, for an amount up to $25,000 per day.

## V. NON WAIVER

Failure on the part of the Department to complain of action or non-action on the part of EOTC shall not constitute a waiver by the Department of any of its rights hereunder. Furthermore, no waiver by the Department of any provision herein shall be construed as a waiver of any other provision herein.

## VI. SEVERABILITY

If any term or provision of this Amendment to the ACO, or the application thereof, to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Amendment to the ACO, and the application thereof, shall not be affected thereby, and each remaining term and provision shall be valid and enforceable to the fullest extent permitted by law.

## VII. SAVINGS CLAUSE

With the exception of section IV.8.B. of the ACO replaced herein by section III.2., this Amendment shall not in any way alter or waive the remaining provisions of the original ACO signed September 1, 2000, which shall remain in force.

## VIII. EFFECTIVE DATE

The Amendment to the ACO shall be effective on the date of the last signature set forth below. Each undersigned representative hereby certifies that he/she is fully authorized to enter into the terms and conditions of this Amendment to the ACO and to legally bind the party on whose behalf such representative is signing to this Amendment to the ACO.

_M.M.M_ _____ Date: 5.17.02

_Edward M. Yunne_ Date: 17 May 02

_J. H. S._ Date: 5-23-02

3

**Exhibit 8**

COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION

| | |
|---|---|
| In the Matter of: ) | Amended Administrative Consent Order |
| The Executive Office of ) | Number: ACO-BO-00-7001-Amendment #2 |
| Transportation ) | |
| ) | |

## I.    THE PARTIES

1.  The Department of Environmental Protection ("Department") is a duly constituted agency of the Commonwealth of Massachusetts pursuant to M.G.L. c. 21A, §7, with a principal office at One Winter Street, Boston, Massachusetts. The Department's authority to issue this Administrative Consent Order is conferred by M.G.L. c.111, section 142B, 310 CMR 7.00 et seq., and specifically 310 CMR 7.36 and 7.38.

2.  The Executive Office of Transportation ("EOT") is a duly constituted agency of the Commonwealth of Massachusetts pursuant to M.G.L. c. 6A with a principal office at Ten Park Plaza, Boston, Massachusetts. EOT and its agencies and authorities are responsible for ensuring compliance with 310 CMR 7.36 and 7.38.

## II.    STATEMENT OF FACTS AND LAW

1.  The Department is responsible for the implementation and enforcement of the Massachusetts Clean Air Act, M.G.L. c. 111 §§ 142A – 142E and the regulations promulgated thereunder at 310 CMR 7.00.

2.  EOT and its agencies and authorities are responsible for constructing, administering, and maintaining public transportation and highway infrastructure for the Commonwealth of Massachusetts, including the Central Artery/Tunnel Project ("CA/T"), pursuant to authority under M.G.L. c.81, c.161A, and c.6A section 19.

3.  On September 1, 2000, the Department and EOT signed Administrative Consent Order Number: ACO-BO-00-7001 (the ACO), which includes projects and/or actions EOT agreed to implement. The ACO document was also a notice of noncompliance pursuant to M.G.L. c. 21A, §16 and 310 CMR 5.00 et seq. The ACO resolved violations of various public transit commitments required either directly by 310 CMR 7.36, or as conditions of an approval granted by the Department pursuant to 310 CMR 7.38, and resolved issues raised by a lawsuit filed by the Massachusetts Attorney General to enforce the Massachusetts Clean Air Act. The ACO was amended (See ACO-BO-00-71001-Amendment #1) on May 17, 2002 to clarify the provisions for the diesel retrofit of MBTA buses. In addition, after opportunity for public comment, DEP approved, in

separate correspondence, project delays for Silver Line Phase 1, compressed natural gas buses, Silver Line Phase II, and the Urban Ring DEIR/EIS.

4. Certain projects or actions have been delayed or are incomplete in violation of the ACO. Some violations are subject to statutory penalties for an amount up to $25,000 per day pursuant to M.G.L. c.111, section 142B, and Civil Administrative Penalties for an amount up to $25,000 per day pursuant to M.G.L. c.21A. §16 and 310 CMR 5.00 et seq; some violations are subject to penalties up to $1,000 per day.

5. On November 29, 2004 the Department issued a Notice of Enforcement Conference asserting violations of the ACO as follows:

   A. Silver Line Phase II – Service to Logan Airport was not in place by the required due date of 12/31/04

   B. Orange Line – 18 Additional Cars were not in service by the required due date of 12/31/04.

   C. Blue Line Platform Lengthening – Orient Heights, Maverick, State, and Government Center Stations did not accommodate six-car trains by the required due date of 12/31/04.

   D. Blue Line/Red Line Connector – This project was not prioritized for funding in the Boston Regional Transportation Plan and the MBTA Capital Investment Program.

   E. Green Line Extension to Medford Hills – This project was not prioritized for funding in the Boston Regional Transportation Plan and the MBTA Capital Investment Program.

   F. Arborway Green Line Restoration – A schedule for design and construction of this project was not submitted by the required due date of 12/31/01.

   G. MHD Construction Retrofit Program - The 2004 ACO annual report did not contain adequate information to determine EOT's compliance with this requirement.

6. On January 7, 10, 12, and 14, 2005, the Department and EOT met in an enforcement conference and agreed to the following:

   A. It is in the public interest that EOT continues to work diligently to implement the transit commitments included herein to reduce vehicle miles traveled and air pollution, because delays in implementation directly affect air quality.

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

    B. EOT and MBTA have acted in good faith. completing a significant number of the obligations required in the ACO, as detailed in Attachment A.

    C. The funding, design. construction. and scheduling of large public transportation projects are complex and have many uncertainties and sometimes depend on agencies or events outside of EOT's control, which may lead to unintended delays.

    D. For certain of the projects required by the ACO, further exploration and data collection indicates that completing the project as anticipated would result in fiscally unsound decisions. Reconsideration and evaluation of options to achieve the projects can be time consuming.

    E. EOT has not always effectively communicated with the Department regarding delays and noncompliance.

    F. EOT is in violation of certain requirements of the ACO as further detailed below.

7. Based upon information provided by EOT, the Department makes the following Findings of Fact:

    A. Silver Line Phase II and Service to Logan Airport

The notice of enforcement conference asserted that Silver Line Phase II was incomplete. On June 17, 2004. the Department approved an extension of the Silver Line Phase II project to December 31. 2004. EOT did complete the project as described in Section IV.8.A of the ACO on December 17. 2004. in advance of the December 31, 2004 deadline.

However, service to Logan Airport, with ridership estimated at 11.5% of the total Silver Line ridership. is only partially completed. Section IV. 8. C. of the ACO required EOT, as a joint project with the Massachusetts Port Authority ("Massport"). to complete an extension of the South Boston Transit way through the Ted Williams Tunnel to the individual airline terminals at Logan Airport by June 30, 2004.

Implementation of service to Logan Airport was complicated by the events of September 11, 2001. Massport's focus on the challenges following those events resulted in a delay in the MBTA and Massport reaching an agreement regarding access and vehicle needs. The MBTA and Massport entered into an Interagency Service Agreement on December 30. 2004. As of January 2. 2005, partial service to Logan Airport is in place with bus service to Logan from South Station on Sunday nights from 4-10 pm, during this peak weekend traffic period.

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

### B. Orange Line – 18 Additional Cars

Section IV. 8. A. of the ACO required EOT to implement signal improvements on the Orange Line and to provide 18 additional Orange Line cars to increase capacity by December 31, 2004. The signal improvements were operational by 12/31/04.

The additional 18 cars have not been provided. The primary option identified by EOT for providing the additional Orange Line cars was the conversion of Blue Line cars, which would be made available due to a planned upgrading of the Blue Line Fleet. Over several months in 2002 into early 2003, the MBTA spent $2 million on a study to determine the cost and infrastructure requirements of converting Blue Line cars for use on the Orange Line. The study indicated that the conversion of 18 cars would cost $1 million per car for only eight-years of operation; the same number of new cars is estimated to cost $2 million per car if programmed for purchase in 2015 when the useful life of the current cars expires. New cars purchased in 2015 are expected to last an average of 35 years.

Upon review of the results of the conversion study and in an effort to make a sound fiscal decision, the MBTA halted the conversion project and initiated an infrastructure study to evaluate what changes to the system (track, platforms, tunnels, bridges, maintenance facilities, etc) will be needed to accommodate new Orange Line trains. That study should be completed by May 1, 2005. Upon completion of the infrastructure study, the MBTA will determine the cost and schedule for procuring an entire new Orange Line fleet, as well as the cost and schedule for making infrastructure upgrades to accommodate the new fleet. The costs for the fleet and the infrastructure improvements will be programmed into the appropriate MBTA Capital Improvement Plan (CIP), a five-year rolling, fiscally constrained financial plan, to meet the 2015 service date.

### C. Blue Line Platform Lengthening

Sections IV. 10. and 11. of the ACO accepted EOT's January 7, 1999 petition for delay of the Blue Line Platform Lengthening and Modernization Project from December 31, 1998 to December 31, 2001 and required a substitute project after the maximum three-year delay allowed for this project under 310 CMR 7.36. The acceptance of the delay established new dates for the completion of platform lengthening to accommodate six-car trains (by December 31, 2004) and station modernization with all stations to be modernized by December 31, 2008.

The Blue Line platform lengthening and modernization were not specifically quantified for their air quality benefit in the State Implementation Plan or in the ACO. However, it was agreed, and the Department continues to agree, that the project will have a positive impact on air quality due to improved, modernized stations and greater train capacity, both of which will promote additional ridership. EOT is providing an interim substitute project for the Blue Line. That substitution, which

includes a series of bus service improvements on the north shore via the Ted Williams Tunnel, was timely implemented and the services will remain in place for the duration of the project delay.

To complete this requirement by December 31, 2004, EOT was required to have all ten stations lengthened and six-car trains operating at each station. EOT has completely installed new six-car platforms at Wonderland, Revere Beach, Suffolk Down, Wood Island, Airport and Aquarium Stations. Orient Heights, Maverick and Government Center Stations can accommodate six-car trains in their current condition, and require only minor modifications to accommodate additional passengers.

The State Street Station lengthening is incomplete. The delay on State Street Station is due, in part, to the difficulty in negotiating with the owner for an easement and access to the property at 60 State Street. To address this difficulty, the MBTA Board of Directors approved an order of taking for an underground easement and access to the building in September 2004. This taking allows the MBTA and its contractor to have access to the area as of February 7, 2005.

The MBTA contracted with Siemens to manufacture Blue Line vehicles. Siemens' major sub-contractor went out of business in late 2002. Siemens has replaced this sub-contractor, but the change resulted in vehicle delivery being delayed by about 18 months.

## D.  Blue Line/Red Line Connector and Green Line Extension to Medford Hills – Funding Prioritization

EOT is in compliance with the ACO requirement to prioritize these projects for funding. In order for a transportation project to be prioritized for funding, it must survive several reviews, which occur in overlapping time cycles, by various entities and be included in certain federally required plans. Specifically, these two projects were first included in the 1994 Program for Mass Transit (PMT). Then, in 2000, EOT recommended for inclusion and the Boston MPO included, funding for the Blue Line/Red Line Connector and the Green Line Extension to Medford Hills in the fiscally constrained Regional Transportation Plan (RTP). At EOT's recommendation this prioritization for funding was continued by the Boston MPO in the 2003 update of the 2000 RTP and in the 2003 updated MBTA PMT. In addition, planning for these projects has been programmed in the MBTA Capital Investment Program ("CIP").

The Blue Line/Red Line Connector and the Green Line Extension to Medford Hills are included in the public process described below in Section III, F.

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

### E. Arborway Green Line Restoration

On November 7, 2001, DEP issued a finding that EOT had not demonstrated that the Arborway Green Line Restoration Project was infeasible under 310 CMR 7.36 and required that a schedule for design and construction of the project be provided to the Department by December 31, 2001. This schedule has not been provided; the MBTA's reason for not providing this schedule is that critical path items must be resolved before committing to a specific schedule. These items include development of a surface level operating plan that satisfactorily addresses the major public safety concerns raised by the City of Boston, resolution with the City of Boston, residents and business owners of surface design elements such as station accessibility, intersection improvements, roadway network changes, street parking, development of a construction management plan to ensure existing green line and roadway network remains operational during construction, while minimizing impacts on businesses and residents, development of a Green Line operations plan that adequately addresses operational capacity constraints in the Green Line tunnel. As an interim substitute, the MBTA is operating the Route 39 bus service at four-minute headways with 60 foot compressed natural gas buses.

On November 17, 2004, the Department and EOT agreed to enter into a joint public process to reevaluate and to make decisions on the three remaining transit projects, including the Arborway Green Line Restoration, taking into account new project selection criteria, while ensuring that equal or greater air quality benefits are achieved, as detailed below in Section III, F.

### F. MHD Construction Retrofit Program

The Massachusetts Highway Department ("MHD") was required to include construction equipment retrofit requirements into all of its large contracts advertised after 9/1/00. MHD has not implemented this requirement. In addition, MHD incorrectly stated that it had implemented this requirement in the 2003 and 2004 Annual Reports.

### G. Urban Ring DEIR/EIS

EOT filed the Urban Ring DEIR on November 30, 2004. The ACO required that both the DEIR and EIS be filed by the extension deadline of November 30, 2004. However, because the Federal Transit Administration ("FTA") required additional information in the EIS as of January 2003 and MEPA concluded that submission of the EIS was not required at the same time as the DEIR for MEPA purposes, EOT filed the DEIR on time and delayed only the EIS. Because of the late change in federal requirements the Department agrees that EOT is in compliance with this requirement.

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

In a letter dated June 17, 2004, the Department approved an extension of the Urban Ring DEIR/EIS to November 30, 2004. EOT requested the extensions due to the fact that certain elements required by the Federal Transit Administration ("FTA") for the federal environmental review document were taking longer and were more complicated than previously anticipated. Specifically, the FTA required the MBTA to re-evaluate the procedure for measuring Transportation User Benefit and cost effectiveness. This work is performed by using the regional domain-forecasting model maintained by the Central Transportation Planning Staff ("CTPS"). This requirement applied to the Silver Line specifically, but because the same methodology is used on Urban Ring, the requirement applied to that project as well. Since that time CTPS and MBTA have made substantial progress in satisfying the FTA's requirements, but significant work is required to take the methodology and rerun the ridership-forecasting model and then take those results and integrate them into the federal environmental document.

EOT attempted to balance the requirement of the ACO and the need to provide the appropriate information in the federal environmental document by separating the state DEIR from the federal EIS. The issues addressed in the federal EIS involve calculating user benefit and cost effectiveness, which are critical factors for the FTA when deciding which projects across the country to fund and how to rank these projects. EOT asserts that these issues do not address the environmental impact of the project, these issues will not affect the adequacy of the DEIR. Although EOT did not request an amendment of the ACO to delay the EIS, the Department agrees that the additional requirements will not impact the state DEIR.

## III.  DISPOSITION AND ORDER

1. As a result of discussions which have taken place between the Department and EOT, and without adjudication of, admission to, or agreement about any fact or law set forth above, the parties have agreed that it is in the public interest to enter into this Amendment (hereinafter "Consent order") to the ACO, rather than expend the time and resources necessary to adjudicate this matter.

2. Nothing in this Consent Order shall be construed as, or operate as, barring, diminishing, adjudicating, or in any way affecting 1) any legal or equitable right of the Department to issue any future Order with respect to EOT's compliance with this Consent Order or 2) any other claim, action, suit, cause of action, or demand which the Department may initiate with respect to any subject matter not covered by this Consent Order.

3. EOT consents to the issuance of this Consent Order and admits to the jurisdiction and authority of the Department to issue such Consent Order. EOT understands and hereby waives any right to appeal this Consent Order to Superior Court, or an administrative hearing before the Department, a tentative decision, judicial review, rehearing, re-argument and reconsideration of the issuance and/or the terms of this Consent Order, and to notice of any rights of review. This waiver does not extend to any other order issued by the Department or any other claim, action, suit, cause of action or demand which the

Department or any other person may initiate with respect to the subject matter of this Consent Order.

4. The activities performed pursuant to this Consent Order shall be performed in accordance with all applicable federal, state and local laws, regulations and approvals.

5. This Consent Order shall apply to and be binding upon EOT and its agents or assigns. EOT agrees to provide a signed copy of this Consent Order to any agent or assign.

6. EOT shall not violate this Consent Order and shall not allow its agents, assigns or contractors to violate this Consent Order.

7. EOT agrees to the following revised schedules, mitigation projects, and penalties for violations of the ACO as follows:

### A. Silver Line Transit Service – Service to Logan Airport

1. **Revised Schedule:** MBTA will complete Silver Line service to Logan as follows:

By June 1, 2005 Complete Service will be in place and operating to Logan Airport. Complete Service includes the daily schedules and a one-seat ride from South Station to Logan Airport terminals as further defined in the MBTA's operating plan and its access agreement with Massport, as detailed in Attachment B.

2. **Penalty:** The penalty assessed for this delay is $80,000.

### B. Orange Line – 18 Additional Cars

In its 2003 and 2004 annual report, MBTA projected that it would not meet the deadline for delivery of the 18 additional cars. In a 2003 letter the Department informed the MBTA that it would be in noncompliance with the December 31, 2004 deadline based upon its projection The MBTA did not provide an alternative mitigation measure and a schedule that achieves a reduction in vehicle miles traveled (VMT) equal to or greater than the project pursuant to DEP's determination on the Amended Preconstruction Certification of the CA/THT project under 310 CMR 7.38 issued on 9/1/00.

1. **Mitigation project:**

ECD Buses: To mitigate the delay in the delivery of the Orange Line cars, the MBTA will purchase 85 Emission Controlled Diesel (ECD) buses at a cost of approximately $32 million to replace 85 of the oldest buses in the fleet at the time of delivery ("1994 buses"). The new, cleaner, ECD buses will provide air quality

benefits not available from the 85 1994 diesel buses. Replacement of the 85 1994 buses with the ECD buses will provide approximately 80 kg/day of NOx reductions due to improved emission controls. The buses will be equipped with on-board diagnostic (OBD) computer systems, which help to ensure that buses are timely and appropriately serviced. OBD computer systems identify when the engine system is not operating according to specification (e.g., is not operating at the specified temperature so that the Diesel Particulate Filter will not work properly, or when the filter is clogged). The OBD computer system provides information showing that the vehicle needs to be brought in for maintenance, via a "Check Engine" light illuminated on the operator's control panel. The MBTA will implement a Standard Operating Procedure (SOP) that directs the operator of the bus to notify the dispatcher that the "Check Engine" light is illuminated, upon which the dispatcher enters the information into the Bus Maintenance tracking system, which will direct the facility to bring the bus in for maintenance prior to its next use. The buses are also equipped with system controls that act as a fail-safe to prevent the bus from being used if such maintenance is needed and not performed.

2. **Revised Schedule**:

**ECD Buses:** EOT will seek MBTA Board approval no later than the March 31, 2005, MBTA Board meeting. Once approved, buses will be delivered by July 15, 2006. The new ECD buses will be deployed in the Orange Line corridor to replace older buses or to increase bus operation in that area. If not approved by the MBTA Board, EOT will submit an alternative equivalent mitigation project for review and approval by the Department, within 30 days of the MBTA Board's disapproval.

**Orange Line cars:** The MBTA's study evaluating infrastructure needs for a new Orange Line fleet will be complete by May 1, 2005. The MBTA will review the study and determine necessary infrastructure changes and Orange Line car requirements by December 1, 2006. The MBTA will then program for implementation in the appropriate CIP the purchase of a sufficient number of new Orange Line cars such that the total is 18 more cars (or the equivalent carrying capacity) than are in the fleet in 2005, on a time line consistent with replacement of existing Orange Line fleet at the end of the current cars' useful life (2015). By December 1, 2007, EOT will provide the Department with a schedule including additional milestones needed to bring a new Orange Line fleet into service by 2015.

3. **Penalty:** The penalty assessed for this delay is $306,300.

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

C. **Blue Line Platform Lengthening and Modernization to Accommodate Six Car Trains: Orient Heights, Maverick, State, and Government Center Stations**

1. **Revised Schedule:**

MBTA will complete the minor modifications to Government Center, Maverick and Orient Heights by 12/31/05.

Consistent with its construction contract, the MBTA will complete the State Street Station platform extension to accommodate six-car trains by 12/31/05, or as set forth below:

Due to the delays in obtaining construction access to 60 State Street, the contractor may not be able to meet the 12/31/05 deadline. Additionally, it is not yet known what additional egress and fire safety requirements will be needed to open the longer platform before the full station is completed. Pursuant to the MBTA's contract, by 12/31/05 temporary emergency egress structure located at 53 State Street will be completed, as well as a temporary emergency egress use of the 60 State Street Entryway. If the contractor is unable to meet this deadline, EOT will provide the Department with its determination, and the reasons therefore, that the contractor cannot meet the deadline within 30 days of making such determination, but in no event later than the 12/31/05 completion date. In the event that EOT meets this reporting requirement, the completion date will automatically extend to 12/31/06.The requirement to complete modernization by December 2008 remains unchanged.

Delivery of the new Blue Line cars is due to begin in July 2006. MBTA will begin phasing in use of the new Blue Line cars as the new cars begin to arrive and will operate the new cars in six-car consists by 12/31/06.

2. **Penalty: The penalty assessed for this delay is $3,900.**

D. **Blue Line/Red Line Connector and Green Line Extension to Medford Hills**

EOT was required to prioritize these projects for funding by 10/1/01. EOT is in compliance with these provisions of the ACO.

1. **Penalty: None**

### E.  Arborway Green Line

By December 31, 2001, MBTA was required to submit an Arborway Green Line Restoration schedule for design and construction.  MBTA did not submit such schedule.

1.  **Penalty:**  The penalty for this delay is assessed at $215,000 and is suspended pursuant to Section VI.

2.  **Revised Schedule:**  This project will be reviewed in the context of the public process detailed below in Section III. F.  At the conclusion of that process, this project, or a substitution project providing equal or greater air quality benefits, will be implemented.

### F.  Public Process:

By letter dated November 17, 2004 the Department agreed to EOT's request to review the three remaining air quality transportation commitments (the Blue Line/Red Line Connector, Arborway Green Line and the Green Line Extension to Medford Hills) through a public process initiated at a public meeting on December 14, 2004 The purpose of that public meeting was "...to inform interested parties about the public process our agencies [EOT and DEP] will conduct to make decisions on the three remaining Central Artery/Tunnel project transit commitments." [November 17, 2004 correspondence from Commissioner Golledge to Secretary Grabauskas]

Additional public meetings will take place in January or February 2005 in Somerville and Jamaica Plain, again to seek comment on the proposed public process to review the air quality benefits and to reevaluate the three remaining commitments.  Within thirty (30) days after the receipt from the Department of the air quality target for the three projects. EOT shall schedule meetings for the applicable MPOs, and make available the criteria and the projects to be discussed at those meetings.  The proposed public process matrix is attached hereto as Attachment C, and will be replaced with an updated matrix including estimated timelines following the Somerville and Jamaica Plain meetings in response to public comment.

### G.  Funding:

EOT will recommend for identification, in the 2005 State Transportation Improvement Program (STIP) that will be submitted for federal approval on or before October 31, 2005, the status of funding for the three projects or substitutions.  If the appropriate federal agencies approve a later date for submittal

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

of the 2005 STIP. EOT shall submit it by that date. Federal approval of the plan will be indicated by the release of federal funds for Federal FY 06. As outlined in a letter dated September 11, 2003, from Secretary Grabauskas to the Division Administrator of the Federal Highway Administration, the Boston MPO has assumed that the legal commitments for the remaining projects are the responsibility of the state and not the MBTA. Based on this letter, EOT is responsible for identifying the funding of these projects, or any applicable substitution, to the satisfaction of the relevant federal agencies in order to continue to qualify for federal transportation funds. EOT shall continue to recommend for prioritization the projects agreed to in this Consent Order in the MBTA Capital Improvement Plan, the long term transportation plan for the applicable region, and if necessary, the appropriate Transportation Improvement Program. With respect to the three projects subject to the public review process set out above in Section III, F (Public Process), EOT will include these projects in such prioritization, unless as a result of the public process, other projects are substituted for any of the three projects.

### H. MHD Construction Retrofit Program

**1. Revised Schedule: Starting on March 15, 2005, MHD will include the following diesel retrofit specification for construction equipment when advertising contracts:**

The contractor shall certify that all large non-road (greater than 50 horsepower) diesel construction equipment used in this contract has emission control devices installed, such as oxidation catalysts or particulate filters, on the exhaust system side of the diesel combustion engine equipment.

The Status Reports required in Section V will include the results of this specification including each contract awarded, the number of vehicles subject to the specification and the number of vehicles retrofitted by vehicle type.

**2. Penalty: The penalty for this delay is assessed at $1,400,000.**

### I. Urban Ring DEIR/EIS

**1. Revised Schedule:** EOT has submitted drafts of the modeling proposal to meet FTA's new requirements and expects FTA's response within a few months. Pending acceptance of the modeling revisions by the FTA, the draft EIS will be submitted by October 31 2005, provided that the Commonwealth has identified the source of 50% non-federal matching funds, as required by FTA.

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

> The Status Reports required in Section V will include updates regarding EOT's progress with the modeling, status on obtaining state matching funds and FTA's response to the draft EIS.

8. DEP concludes, in view of:

    a. the various legitimate reasons for delay of the transit projects as set forth in Section II, 7;

    b. the substantial mitigation proposed by EOT and accepted by DEP;

    c. the Supplemental Environmental Project proposed by EOT and accepted by DEP;

    d. the new schedules and stipulated penalties if EOT fails to meet them; and

    e. the avoidance of extended dispute negotiations which would only further delay implementation of the public transportation projects identified herein.

    that this ACO is in the public interest and represents changes that will result in equal or greater air quality benefits than the underlying commitments would have absent this agreement.

## IV.  SUPPLEMENTAL ENVIRONMENTAL PROJECT

1. The Department has determined that it is appropriate to include a Supplemental Environmental Project ("SEP") in the resolution of this matter. Such SEP is included for the purpose of mitigating the administrative penalty and not in lieu thereof. The terms of the SEP are set forth below.

2. Fairmont Line Stations: To address ridership in the Orange Line corridor, EOT will ensure that design is completed for the new Four Corners Station on the Fairmont Line, a project which, while conceptually discussed, was not a previous commitment and had never had any implementation dates associated with it. The cost of completing the design for the new station is estimated at $1,100,000. In addition, EOT will award contracts for station modernization on the Uphams Corner and Morton Street stations of the Fairmont Line. The upgrades of these stations are estimated at $6,800,000 and $7,200,000 respectively.

All three stations will include improved parking spaces, lighting and signage, bus shelters for inter-modal transfers, and be integrated into the adjacent business and residential centers, all of which will promote increased ridership, thereby decreasing VMTs and reducing air pollution. The new station and the station modernizations will provide commuter rail service to a currently underserved community, which does not currently have access to the commuter rail line that runs through the community. The Uphams Corner and Morton Street Station will provide 40 additional parking

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

spaces, while the Four Corner Station is anticipated to have 30 to 40 spaces. Most important, however, is that these stations are located directly in high density, transit dependant neighborhoods and the stations will predominantly be walk-in stations, as opposed to access by automobile. These three stations are projected to have nearly 2,000 weekday boardings even with the relatively small number of parking spaces.

3.  Schedule: Contracts will be awarded for the upgrades of Uphams Corners and Morton Street stations by 12/31/05. Design will be completed for the new Four Corners Station by 12/31/07.

4.  EOT hereby certifies that, as of the effective date of this Consent Order, EOT is not required to perform the actions of the SEP by: (1) any contractual or other legal obligation; (2) any federal, state or local law or regulation; or (3) any agreement, grant or as injunctive relief.

5.  Failure to perform and complete the SEP in accordance with this Consent Order shall subject EOT to the Stipulated Penalties provisions set forth in this Consent Order and assessment of suspended penalties.

6.  In the event the cost of performing and completing the Fairmont Line Station projects in accordance with the provisions of this paragraph is less than $1,720,000, Respondent shall pay to the Commonwealth as a civil administrative penalty the difference between $1,720,000 and the actual amount expended. Such penalty shall be paid on or before the due date for the SEP Completion Report as set forth in Section V Reporting Requirements and payment shall be made in the manner set forth in Section VI of this Consent Order.

7.  EOT shall state in a prominent manner whenever it publicizes the SEP, or the results thereof, that the SEP was undertaken, or is being undertaken, as part of the resolution of an environmental enforcement action by the Department.

## V.    REPORTING REQUIREMENTS:

1.  By March 1, 2005, EOT shall submit to the Department status reports containing detailed project schedules, benchmarks and milestones, and appropriate documentation to demonstrate that the projects in this ACO amendment, as listed below, will be completed by the deadlines contained in the ACO amendment.

    a.   Silver Line Service to Logan Airport (June 1, 2005)
    b.   Orange Line – 18 additional cars, or their equivalent carrying capacity (January 1, 2015)
    c.   Purchase and Delivery of 85 ECD Buses (July 15, 2006)
    d.   Blue Line Platform Lengthening and Modernization and operation of Six Car Trains (December 31, 2006)

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

       e.     MHD Construction Retrofit Program (contract specification requirements in place by March 15, 2005)

       f.     Urban Ring draft EIS

2. Until such time that each project in this Consent Order is complete and operational and confirmed in writing by the Department, EOT shall submit updated status reports to the Department for each project by the first day of every other month beginning May 1, 2005, as may be modified by the Department in writing from time to time. Such status reports will include supplemental information quantifying the air quality benefits of each project. Simultaneously with each submittal, EOT shall post each status report on a MBTA's environmental webpage and distribute copies of the status reports to the ACO distribution list.

3. SEP Completion Report: Within thirty (30) days of awarding the Fairmont Line Station contracts described in Section IV above, EOT shall submit to the Department a SEP Completion Report, which shall document the Fairmont Line Station projects by including: (1) verifications that the notice to proceed with work has been issued, the date of such issuance and construction completion dates; (2) estimation of the air quality benefits that will be gained, or air pollution avoided, over a two year period due to the earlier awarding of the contracts for the Uphams Corner and Morton Street contracts, and the new station at Four Corners; (3) a certification that EOT implemented the SEP in accordance with the provisions of this Consent Order.

4. All reports will be delivered in hand or by first class mail to:

       Christine Kirby
       DEP
       1 Winter Street
       Boston, MA 02108

## VI.  PAYMENT OF PENALTIES

1. EOT shall pay to the Commonwealth the sum of $100,000 within sixty (60) days of the effective date of this Consent Order as a civil administrative penalty for the violations identified in Section III above, or pursuant to a payment plan approved by the Department within that time period.

2. The Department has determined that it is appropriate to include a Supplemental Environmental Project ("SEP") in the resolution of this matter. Such SEP described in Section IV is included for the purpose of mitigating the administrative penalty and not in lieu thereof. The estimated value of the SEP is approximately $15,100,000, mitigating approximately $1,600,000 of the administrative penalty.

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

3. If EOT violates any provision of this Consent Order, EOT shall pay to the Commonwealth an additional $215,000 within thirty (30) days of the date the Department issues EOT a written demand for payment.

## VII.  STIPULATED PENALTIES

1. In addition to the penalties in Section VI above, if the Department determines that EOT, or its employees, agents or contractors has violated this Consent Order, it shall pay stipulated civil administrative penalties to the Commonwealth in accordance with the following schedule:

Class I Penalties:

| Period of Violation | Penalty Per Day |
|---|---|
| 1st through 7th day | $ 1,000 |
| 8th through 30th day | $ 5,000 |
| 31st through 60th day | $10,000 |
| 61st day and thereafter | $25,000 |

Class II Penalties:

| Period of Violation | Penalty Per Day |
|---|---|
| 1st through 7th day | $ 500 |
| 8th through 30th day | $ 750 |
| 31st day and thereafter | $1,000 |

2. Stipulated civil administrative penalties shall begin to accrue on the day a violation occurs and shall continue to accrue until the day EOT corrects the violation or completes performance, whichever is applicable. Stipulated civil administrative penalties shall accrue regardless of whether the Department has notified EOT of a violation or act of noncompliance.

3. All stipulated civil administrative penalties accruing under this Consent Order shall be paid within thirty (30) days of the date the Department issues EOT a written demand for payment. Specifically, EOT shall pay such stipulated penalties by certified check, cashier's check or money order payable to the Commonwealth of Massachusetts, and shall clearly print the name EOT- ACO-BO-007001-Amendment#2", on the face of the payment, and shall mail it to:

Commonwealth of Massachusetts
Department of Environmental Protection
Commonwealth Master Lockbox
P.O. Box 3982
Boston, Massachusetts 02241-3982

16

Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2

At the same time, EOT shall deliver a copy of the payment to:

> Christine Kirby
> DEP
> 1 Winter Street
> Boston, MA 02108

4.  If a court judgment is necessary to execute a claim for such stipulated penalties under this paragraph, EOT agrees to assent to the entry of such judgment. The stipulated civil administrative penalties set forth herein shall not preclude the Department from electing to pursue alternative remedies or alternative civil or criminal penalties which may be available by reason of EOT's failure to comply with the requirements of this Consent Order. In the event the Department collects alternative civil administrative penalties, EOT shall not be required to pay such stipulated penalties pursuant to this Consent Order.

## VIII.  NON WAIVER

Failure on the part of the Department to complain of action or non-action on the part of EOT shall not constitute a waiver by the Department of any of its rights hereunder. Furthermore, no waiver by the Department of any provision herein shall be construed as a waiver of any other provision herein.

## IX.  SEVERABILITY

If any term or provision of this Amendment to the ACO, or the application thereof, to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Amendment to the ACO, and the application thereof, shall not be affected thereby, and each remaining term and provision shall be valid and enforceable to the fullest extent permitted by law.

## X.  SAVINGS CLAUSE

This Amendment shall not in any way alter or waive the remaining provisions of the original ACO signed September 1, 2000, and the first Amendment shall remain in force.

Amended Administrative Consent Order: ACO-BO-00-7001 - Amendment #2

## 7. EFFECTIVE DATE

The Amendment to the ACO shall be effective on the date of the last signature set forth below. Each undersigned representative hereby certifies that he/she is fully authorized to enter into the terms and conditions of this Amendment to the ACO and to legally bind the party on whose behalf such representative is signing to this Amendment to the ACO.


Date: 1/26/05

Daniel A. Grabauskas

Secretary, Executive Office of Transportation



Date: January 26, 2005

Robert W. Golledge
Commissioner, Department of Environmental Protection

17

**Amended Administrative Consent Order: ACO-BO-00-7001-Amendment #2**

**Attachment A**

## EOT has completed, or is in compliance with the following commitments:

Silver Line:   EOT has completed Phase I of the Silver Line Project, completing the first phase of the Washington Street transit service using 40' CNG vehicles from Dudley Square to Downtown Crossing in July 2002. New 60' CNG vehicles were introduced in Spring 2003.

Phase II: Complete.

Phase III: EOT is in compliance with Phase III, completing the preliminary design for the connection between Section A and Section B of the Silver line transit service (tunnel between South Station, Boylston Street and the New England Medical Center) sufficient under current standards for an application for federal funding by December 31, 2004.

EOT has met the ACO requirement to add 20,000 new park and ride spaces throughout the region.

EOT has completed and implemented service at four Worcester stations two years ahead of the ACO schedule.

EOT has demonstrated an increase in peak period bus capacity of 12,000 by December 2000

EOT purchased and brought into service 358 new CNG buses and ECD buses. Additionally, EOT rebuilt all 400 of the Zero series diesel bus engines, retrofit them with diesel particulate filters and now uses Ultra Low Sulfur Diesel on all of the diesel fleet.

EOT implemented the diesel construction retrofit requirement on all MBTA construction projects advertised since January 1, 2001.

EOT completely re-modernized Blue Line Stations at Aquarium and Airport Station (in addition to the four completed prior to the ACO) to accommodate six car trains.

EOT implemented Orange Line Signal Improvements that allow for improved headways. EOT continues to implement Orange Line Signal Improvements to improve safety and reliability, though these improvements are not part of the ACO transit commitments.

The Greenbush Line was originally due to be completed in 1996, by letter dated December 27, 1996, the Department approved a 3-year delay pursuant to 310 CMR 7.36(3).   The ACO, Section IV, 11, confirmed the delay, but required offsets after 1999 until the project is complete. The off-sets implemented by EOT are still in place, and will remain in place until the Greenbush Line is completed include:  Hingham ferry service, improved service on the Haverhill Commuter Rail Line; Salem to Boston Express Bus Service; New Reverse Commute Service from Alewife to Burlington on Route 351; Grafton Station o the Worcester Line; Four new stations on the Worcester Line (up until December 31, 2004; New Commuter Rail Service at JFK/UMASS. The Greenbush Line is on track for operation to begin in June of 2007

Attachment B

## Composite Exhibit B
### Description of Silver Line Airport Service

**Hours of Service**
In general, Airport Silver Line Service will begin at approximately 5am and will end at approximately midnight.

**Headways**
In Phase II, Airport service will operate at 10-minute intervals during Airport peak periods, and 15-minute intervals during Airport off-peak periods.

**Peak Demand Periods**
Peak periods, in terms of Airport operations, refer to peak demand periods at Logan Airport. These periods are preliminarily defined as shown below.

**Weekdays**
Peak:        7:00am to 7:59pm
Off Peak:    Beginning of service to 6:59am
             8:00pm to end of service

**Weekends**
Peak         None
Off Peak     Beginning of service to end of service

**Peak Seasonal Demand Weeks**
Peak Hours:       Beginning of service to end of service
Off Peak Hours:   None

Logan Airport experiences Peak Seasonal Passenger Demand during the following weeks:
New Year's
February school vacation week
April school vacation week
Easter
Memorial Day
July 4th
Labor Day
Columbus Day
Veteran's Day
Thanksgiving
Christmas

ATTACHMENT C

Re-evaluation Process for the Three Remaining
Central Artery/Tunnel Project
Air Quality Mitigation Transit Commitments

DEP
EOT

DEP ———— EOT/MPOs ———— Affected ———— EOT/MPO ———— DEP ———— DEP ———— EPA ———— EPA ———— MPO ———— MPO
                              MPO's
                            (35 days)          (30 days)          (45 days)          (30 days)

- Public
- Meeting
- Projects
- Regulations
- SIPs

Air Quality Goal

Discuss Projects that Meet Air Quality Goal

Public Meeting

Proposed SIP Substitution

Public Hearing On Possible Reg. & SIP Revision

Submit Final Reg. & SIP Revision to EPA if necessary

Federal Register

Finalize SIP Substitution/Reg. Change

Public Meeting

RTP Amendment Approved

 = Milestones

Note: To the extent appropriate, public process will be conducted jointly.