UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

CONSERVATION LAW FOUNDATION, INC.,    )
                                          )
                Plaintiff,               )
                                          )
v.                                          )     C.A. No. 05-10487/NG
                                          )
MITT ROMNEY, in his official capacity as    )
GOVERNOR OF MASSACHUSETTS, et al.,    )
                                          )
              Defendants.      )
_____)

**MEMORANDUM IN SUPPORT OF THE MBTA DEFENDANTS'
MOTION TO DISMISS**

     Pursuant to Fed. Rule Civ. P. 12(b)(6), Defendants the Massachusetts Bay Transportation

Authority (the "MBTA") and its General Manager Michael H. Mulhern (collectively the "MBTA

Defendants") move to dismiss in their entirety Counts 1, 5-12 and 17-19 of Plaintiff

Conservation Law Foundation's ("CLF") Complaint for failure to state valid claims for relief

under the Clean Air Act's citizen suit provisions, 42 U.S.C. § 7604.  Counts 1 and 7-12 of the

Complaint must be dismissed because they allege violations of the terms of a state permit, not

itself incorporated in the State Implementation Plan ("SIP"), which have been superseded by

subsequent state action.[1]  Because the permit terms at issue are no longer in effect, they provide

no basis for CLF's allegations of non-compliance.  Dismissal of Counts 5-6 and 17-19 is

required because they concern alleged non-compliance with public transportation commitments

that have performance deadlines that lie years in the future or have no stated performance

deadlines at all.  CLF has identified no present non-compliance with any requirement of the SIP

---

[1] As set forth below, this Motion also requests that Counts 2 and 4 of the Complaint, which rely in part on alleged violations of the same state permits, be dismissed to the extent that they are premised on the terms of those permits.

or any order issued thereunder by the State with regard to the performance of these commitments, and therefore has no right to relief.

## Relevant Facts

CLF brings this action pursuant to the Clean Air Act's "citizen suit" provisions, 42 U.S.C. § 7604, alleging non-compliance by various Massachusetts officials, agencies and independent public authorities with requirements of the Massachusetts State Implementation Plan ("SIP"). Complaint ¶2. Under the Clean Air Act's decentralized regulatory scheme, SIPs serve as a primary vehicle for implementation of the Act's requirements, by identifying the specific emission control measures and strategies the state will implement to attain and/or maintain the National Ambient Air Quality Standards ("NAAQS"). Complaint ¶30. New control measures and strategies proposed by a state for inclusion in an existing SIP become enforceable once they are reviewed and approved by the Environmental Protection Agency ("EPA") as supporting achievement of the NAAQS. 42 U.S.C. § 7410(l); 40 CFR § 51.

The SIP violations alleged by CLF in its Complaint concern public transportation improvements, including expansions of the commuter rail and subway systems, developed in connection with the Central Artery/Tunnel Project ("CA/T Project"). E.g., Complaint ¶¶2, 67, 71. CLF contends these transportation projects, as well as the schedules and procedures for their implementation, were adopted into the Massachusetts SIP, and thereby became enforceable requirements under the Clean Air Act. Id. By this action CLF seeks injunctive relief and unspecified monetary penalties from the defendants for alleged non-compliance with the schedules and procedures for the projects it claims are incorporated in the SIP. Complaint at p. 30, ¶¶2-3.

I.    **Additional Facts Relevant to MBTA's Motion to Dismiss Counts 1 and 7-12 (in whole) and 2 and 4 (in part)**

The SIP requirements alleged by CLF in this lawsuit derive from two principal sources. Several of the requirements are based on the terms of Massachusetts regulation 310 CMR 7.36, referred to by CLF as the "Transit Regulation," which specifically identifies a number of transit system improvements for the metropolitan Boston area.  Complaint ¶40 & Exhibit 5.  A second and partially overlapping set of requirements are based on the terms of preconstruction permits issued for the CA/T Project by the Massachusetts Department of Environmental Protection ("DEP") pursuant to a second Massachusetts regulation, 310 CMR 7.38 (hereinafter the "Certification Regulation").  Complaint ¶36 & Exhibits 2-4.  Of the requirements at issue in CLF's lawsuit, seven -- identified in Counts 1 and 7-12 of the Complaint -- appear only in permits issued pursuant to the Certification Regulation.  Complaint ¶¶51, 85, 93, 100, 106, 113, 119.  Four additional counts -- identified as Counts 2 and 4-6 -- are premised on public transit improvements referenced in both the preconstruction permits and the Transit Regulation. Complaint ¶¶56, 66, 71, 78.

By its terms the Certification Regulation does not address public transit.  See Complaint, Exhibit 2 (reproducing 310 CMR 7.38).  Rather, it establishes a procedure for review by DEP of tunnel ventilation systems associated with highway projects intended to ensure that those systems will not cause or worsen ambient air quality violations.  Complaint ¶36; 310 CMR 7.38(1).  To this end, the Certification Regulation requires the proponent of a covered project to certify to DEP, and receive DEP's written acceptance, that the tunnel ventilation system and associated highway project will not "cause or exacerbate a violation" of enumerated federal and state ambient air quality standards and will not "result in an actual or projected increase in the total amount of non-methane hydrocarbons measured within the project area when compared

with the no-build alternative." 310 CMR 7.38(2)(a). Upon receipt of a proposed preconstruction certification, DEP is authorized to approve it, approve it with conditions, or deny it. Complaint ¶36; 310 CMR 7.38(3)(b).

The Certification Regulation was submitted by DEP to EPA on January 30, 1991, to be reviewed for inclusion in the state SIP.[2] The submitted package did not contain any approval related to the CA/T Project, because no certification had yet been submitted or approved for that Project. Complaint, Exhibit 3 at p. 1 (noting that the CA/T Project certification was submitted to DEP in February and March 1991). It was not until July 8, 1991, while the Certification Regulation was still being reviewed by EPA, that DEP issued a "conditional acceptance" of the preconstruction certification submitted for the CA/T Project -- an approval referred to in the Complaint as the "Vent Stack Permit." Id. The Vent Stack Permit included, as "conditions" on DEP's acceptance of the certification, numerous public transportation measures, including significant extensions of the commuter rail system, upgrading and expansion of the bus and subway systems and water transit. Complaint, Exhibit 3 at pp. 2-4. The Permit also included a procedure for substitution of the projects specifically identified. Id.

Several months later, on December 1991, EPA issued a notice of proposed rulemaking indicating EPA's intent to approve the Certification Regulation for the Massachusetts SIP.[3] Although the Vent Stack Permit for the CA/T Project had by then been issued by DEP, EPA did not incorporate the Permit or any of its specific requirements into the SIP. EPA's notice indicated instead that its approval was based on its assessment of the regulatory program in

---

[2] DEP's submittal of the certification regulation is recited in EPA's proposed rulemaking approving the regulation for inclusion in the SIP. See 56 FR 67,266 (December 30, 1991). For the Court's convenience, a copy of the Federal Register Notice is attached hereto as Exhibit A.

[3] See 56 FR at 67,268.

general as "supporting air quality goals and assisting in the maintenance of projected air quality emissions." 56 FR 67,268. EPA's final rule approving the Certification Regulation, issued in October 1992, also did not reference or incorporate the Vent Stack Permit into the SIP. See 57 FR 46,310 (October 8, 1992).[4]

Between 1992 and 2000 many of the public transportation projects identified in the Vent Stack permit were completed. Complaint, Exhibit 4 at pp. 4-5. The completed projects included major capital improvements to the regional transit system, among them the construction of two branches of the restored Old Colony commuter rail line, extension of commuter rail service to Ipswich, Newburyport and Worcester and the purchase of 86 additional Red Line cars. Id. However, other projects had not been completed by the dates specified in the Vent Stack Permit. These projects included completion of the Greenbush branch of the Old Colony line, implementation of six-car trains on the Blue Line, acquisition of additional trains for the Orange Line and replacement service for Washington Street. Complaint, Exhibit 4 at p. 2.

On September 1, 2000, DEP accepted a request for approval of an amended preconstruction certification for the CA/T Project addressing the unfinished projects listed above. Complaint, Exhibit 4 at p. 1. In its approval letter, DEP "recognize[d] the efforts of the transportation agencies . . . to expand the transit system of the Commonwealth" and acknowledged that "many of the transportation and air quality mitigation Commitments of the CA/T project have been completed." Complaint, Exhibit 4 at p. 2. DEP also acknowledged that the CA/T Project itself, for which the mitigation was designed, had been delayed from 1999 to 2004. Id. Given this, DEP gave its approval to the amended preconstruction certification (referred to by CLF as the "Amended Vent Stack Permit") through an Administrative Consent

---

[4] A copy of the Notice for EPA's final rule is attached hereto as Exhibit B.

Order ("ACO"), issued pursuant to, _inter alia_, the Certification Regulation, which extended certain deadlines and established requirements for further transit improvements serving as mitigation or in substitution for projects whose deadlines had been missed.  Complaint, Exhibit 4, Exhibit 6 at pp. 1 & 6-9.[5]

DEP has since issued two ACO Amendments under the Certification Regulation addressing projects identified in the Amended Vent Stack Permit/ACO.  The First Amended ACO, issued in May 2002, clarified certain bus retrofit requirements included as mitigation projects in the Amended Vent Stack Permit/ACO.  Complaint, Exhibit 7.  The Second Amended ACO, issued in January 2005, addressed, among other matters, transportation and mitigation projects identified in the Vent Stack Permit and/or Amended Vent Stack Permit/ACO that had missed or were not expected to meet current deadlines.  Complaint, Exhibit 8 at p. 2.[6]  With respect to these projects, the second amended ACO took several actions, including: (a) revising certain deadlines established in the earlier ACOs; (b) approving significant mitigation measures for delayed projects, including the purchase of 85 low emissions buses at a cost of $32 million; (c) assessing substantial monetary penalties and establishing a schedule of stipulated penalties to be applied in the event of future violations; (d) approving the implementation of a Supplemental Environmental Project involving the creation of a new commuter rail station in the underserved Four Corners area of Dorchester and renovation of two other stations on the same line at an

---

[5] Among the substitutions approved in the ACO was to utilize signal improvements on the Orange Line to substitute, in part, for the purchase of additional orange line cars.  Complaint, Exhibit 8 at p. 8.  In accordance with this approved substitution, the number of cars to be purchased was reduced from 46 to 18.  Id.

[6] The ACO acknowledged that, in a number of cases, project delays had been caused by circumstances beyond the control of those charged with implementing the public transit improvements.  For example, Silver Line service to Logan Airport was delayed by restrictions on access to the airport imposed by Massport to address terrorism concerns.  Complaint, Exhibit 8 at p. 3.  Expansion of the platform at the Blue Line State Street Station to allow use of six-car trains was delayed by the refusal of an affected property owner to grant access, requiring the MBTA to initiate a takings proceeding.  Id. at p. 5.

estimated cost of $55 million; and (e) approving a public process to review certain delayed projects for possible substitution with other projects having equivalent environmental benefits. Complaint, Exhibit 8 at pp. 8-14.

## II.    Additional Facts Relevant to MBTA's Motion to Dismiss Counts 5-6 and 17-19

Counts 5 and 6 allege, respectively, that the SIP has been violated by failure to take steps necessary to complete the proposed connection of the Red and Blue subway lines and by failure to take steps necessary to complete the proposed extension of the Green Line to Medford Hillside.  Complaint ¶¶75, 82.  Both the Red Line/Blue Line connection and Green Line extension projects are identified in the Transit Regulation and also in permits and approvals issued by DEP pursuant to the Certification Regulation.  Complaint ¶¶71, 78.  The current deadline for completion of both projects as set forth in those documents is, at earliest, December 31, 2011.  Id.[7]  No interim construction deadlines are alleged to have been established in the Transit Regulations or the permits for either project.

Counts 17-19 allege "in the alternative" that the SIP was violated by non-compliance with three provisions of the Amended Vent Stack Permit/ACO.  Count 17 alleges the violation of a provision in the Amended Vent Stack Permit/ACO entitled "Regional Transit Service Improvements to Maintain Capacity and Increase Ridership" which states in full: "In cooperation with the Rhode Island Department of Transportation, provide regional rail service between Boston and TF Green Airport in Rhode Island."  Complaint ¶143 & Exhibit 6 at p. 9.  No deadline for completion of the project or interim deadline for completion of any component of the project is included in the Amended Vent Stack Permit/ACO or any subsequent permit or approval.

---

[7] Pursuant to the Transit Regulation, this date may be extended for an additional three years, with substitution required only if a project is delayed beyond the extension date -- December 31, 2014.  See 310 CMR 7.36(3)(c).

Count 18 alleges non-compliance with a provision in the Amended Vent Stack Permit/ACO stating that the Executive Office of Transportation and Construction ("EOTC") "will promote the use of signalization technology to give priority to mass transit vehicles over automobiles within the metropolitan Boston area." Complaint ¶146 & Exhibit 6 at p. 8. No further detail regarding the specific steps to be undertaken under this provision nor any deadline for the completion of all or any part of the work appears in the Amended Vent Stack Permit or in any subsequent permit or approval.

Count 19 alleges non-compliance with language in the Amended Vent Stack Permit/ACO concerning required efforts by the EOTC to obtain federal funding for Phase III of the Silver Line project -- a tunnel connecting South Station with Boylston Street Station and the New England Medical Center. Complaint ¶¶149-150, Exhibit 6 at p. 7. According to the Amended Vent Stack Permit/ACO, the EOTC was required to complete a preliminary design for this project "sufficient under current standards for an application for federal funding by December 31, 2004." Complaint, Exhibit 6 at p. 7. A subsequent provision provides that if federal funding is not secured "by 2005 and if, as a result, the tunnel section will not be completed by 2010," the EOTC shall undertake "other urban transportation investments and enhancements." Id. CLF has not alleged a failure to complete the design required to be completed by December 31, 2004.

## ARGUMENT

Settled precedent establishes that a Clean Air Act citizen suit alleging a violation of a SIP requirement can be maintained only to enforce a specific emission standard or limitation in effect under a SIP. As is confirmed by the documents appended to CLF's Complaint and other documents appropriately considered for purposes of a Motion to Dismiss, Counts 1, 5-12 and 17-19 of the Complaint cannot meet this threshold requirement. The violations alleged in Counts 1

and 7-12 are premised on requirements of state permits that were never incorporated into the Massachusetts SIP and that have been superseded by subsequent actions of the permitting authority.  The violations alleged in Counts 5-6 and 17-19 of the Complaint are premised on "requirements" that appear nowhere at all, since the projects to which CLF refers have completion dates that either lie in the future or have never been established and CLF has identified no interim construction deadline or milestone that has not been met.

As a result, each of the foregoing claims must be dismissed in their entirety.  In addition, Counts 2 and 4 of CLF's Complaint must be dismissed to the extent that they rely on the terms of the same superseded permits on which Counts 1 and 7-12 are premised.[8]

I.      **The Clean Air Act Authorizes Citizen Suits Only to Enforce Specific Strategies or Commitments in Effect Under a State Implementation Plan**

The Clean Air Act's citizen suit provision authorizes civil actions against a party "who is alleged to have violated . . . or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a state with respect to such a standard or limitation."  42 U.S.C. § 7604(a)(1).  The phrase "emission standard or limitation under this chapter" is in turn defined by the Act to include an enumerated group of pollution control measures or requirements,[9] provided that any such measure "is in effect under this chapter . . . or under an applicable implementation plan."  Id. at § 7604(f).

---

[8] As stated on page 3 of this Motion, Counts 2 and 4-6 of the Complaint rely on *both* the state permits and the Transit Regulation as sources of the alleged SIP requirements on which this action is premised.  For purposes of this Motion, the MBTA Defendants request dismissal of Counts 2 and 4 only to the extent they are premised on alleged violations of the state permits.  This limitation does not apply to Counts 5-6, which are subject to dismissal as a whole because the deadlines under both the permits and the Regulation lie in the future and are therefore unenforceable.  See infra, Part III.

[9] The definition includes a varied group of general and specific types of control measures, ranging from a "standard of performance or emission standard" and a "schedule or timetable of performance" to "vehicle inspection and maintenance programs or vapor recovery programs" and "transportation control measures."  E.g, 42 U.S.C. § 7604(f)(1 & 3).  CLF does not indicate in its Complaint which of the numerous categories it believes encompass its claims.

Applying these provisions in the context of suits alleging violations of SIPs, courts have held that a valid Complaint must establish two essential elements. First, in order to fall within the scope of the Clean Air Act's citizen suit provision, the Complaint must allege the violation of "a specific strategy or commitment" under one of the categories identified in § 7604(f). Council of Commuter Organizations v. Metropolitan Transportation Authority, 683 F.2d 663, 670 (2d Cir. 1982); see also Bayview Hunters Point Community Advocates v. Metropolitan Transportation Commission, 366 F.3d 692, 701 (9th Cir. 2004) (recognizing, in a case involving transportation requirements similar to those identified here, "the well-established rule that courts may only enforce specific SIP strategies, and may not enforce a SIP's overall objectives or aspirational goals"). This requirement of specificity is imposed to effectuate Congress's expressed intent to "limit [citizen suit] jurisdiction to claims that would not require reanalysis of technological or other considerations at the enforcement stage and would have to meet an objective evidentiary standard," Conservation Law Foundation v. Busey, 79 F.3d 1250, 1258 (1st Cir. 1996) (internal quotation marks omitted) (citing legislative history), and has been strictly enforced. See, e.g., Council of Commuter Organizations, 683 F.2d at 670-71 (upholding dismissal of claims where plaintiff's Complaint failed to "allege a violation of a specific strategy or commitment in the SIP and describe, with some particularity, the respects in which compliance with the provision is deficient"); Wilder v. Thomas, 854 F.2d 605, 615 (2d Cir. 1988) (upholding dismissal of Complaint alleging inter alia violation of SIP requirement that "all carbon monoxide hotspots will be eliminated" on ground that it was insufficiently specific and merely restated the general goals of the Clean Air Act); see also Busey, 79 F.3d at 1258 (referring to the specificity requirement as "the linchpin of citizen suit jurisdiction").[10]

---

[10] Given the language in cases, including Busey, suggesting that the specificity requirement is jurisdictional, CLF's failure to allege the violation of specific requirements arguably justifies dismissal for lack of subject matter

Second, the identified measures, strategies or commitments must be "in effect" under the SIP at the time of the suit. Thus, for example, a citizen suit cannot be brought to enforce a requirement of state law not yet incorporated into a SIP. See Save Our Health Organization v. Recomp of Minnesota, 829 F. Supp. 288, 291 (D. Minn. 1993) aff'd 37 F.3d 1334 (8th Cir. 1994) (in order to support a citizen suit based on a state odor regulation "the plaintiffs must demonstrate that the odor regulations are contained in an approved state implementation plan"); Cate v. Transcontinental Gas Pipe Line, 904 F. Supp. 526, 532-33 (W.D. Va. 1995) (alleged violations of agreement between state agency and company requiring pollution reductions not enforceable where agreement was not a part of state SIP). Nor can a suit be premised on violations of SIP requirements no longer in effect at the time the action is commenced. See, e.g., Council of Commuter Organizations, 683 F.2d at 668 (alleged violations of SIP relating to mass transit measures became moot once the measures were deleted from the SIP).

## II.    Counts 1 and 7-12 Must be Dismissed in Whole and Counts 2 and 4 in Part Because They are Premised on Violations of Standards That are Not in Effect Under the Massachusetts SIP

Viewed against these standards, Counts 1 and 7-12 of CLF's Complaint are unsustainable as a matter of law, because they allege no violation of a requirement "in effect" under the Massachusetts SIP. In each case, the violations alleged are of deadlines or mitigation requirements CLF purports to find not in the SIP itself, but in the Vent Stack Permit or the Amended Vent Stack Permit/ACO issued by DEP. See, e.g., Complaint ¶¶51-53, 86-88, 93-95. However, DEP has now modified those deadlines and confirmed the mitigation it believes is required through the First and Second Amended ACOs. Complaint, Exhibits 7-8. As a result,

---

jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) in addition to for failure to state a claim. To the extent that the Court believes dismissal on the jurisdictional ground is more appropriate, the MBTA Defendants request that this Motion be treated as requesting in the alternative dismissal pursuant to Fed. R. Civ. P. 12(b)(1).

the specific timetables and requirements of the Vent Stack Permit and Amended Vent Stack

Permit/ACO are no longer "in effect" and cannot serve as a basis for a citizen suit under 42

U.S.C. § 7604.  See Council of Commuter Organizations, 683 F.2d at 668.[11]

Apparently aware of this fundamental problem with these counts, CLF suggests in its

Complaint that DEP may have entered into the amended ACOs without following procedures

described in the Vent Stack Permit.  Complaint, ¶45.  Whether true or not, this conjecture adds

nothing to the validity of CLF's claims.  CLF does not suggest that the Vent Stack Permit was

itself incorporated into the SIP.[12]  Therefore DEP retained the same discretion to revise or

reconsider the Vent Stack Permit's procedural terms that CLF acknowledges the agency had to

extend deadlines in the Vent Stack Permit by issuance of the Amended Vent Stack Permit/ACO.

See, e.g., Complaint ¶¶51, 53 (acknowledging that the Amended Vent Stack Permit extended the

deadline for providing additional cars for the Orange Line).

For the same reason, CLF's assertion that 40 CFR § 51 represents "the exclusive

procedure for SIP modification," Complaint ¶49, does not aid CLF's position.  Because the

requirements of the Vent Stack Permit were not incorporated into the Massachusetts SIP, it did

not require any modification of the SIP to alter those requirements.  CLF's failure to identify

non-compliance with any requirement "in effect" under the SIP requires the dismissal of the

---

[11] Although the statutory language and precedent construing it sufficiently establish that superseded permit requirements cannot sustain a citizen suit, the same result is required by the Supreme Court's precedent regarding the redressability element of standing.  As the Supreme Court stated in Steel Company v. Citizens for a Better Environment, redressability requires that there be "particular and concrete" allegations that a violation is continuing or that a repetition is imminent.  523 U.S. 83, 108-09 (1998).  However, there can be no further violations of a permit that is no longer in effect.  Cf. Satterfield v. J.M. Huber Corporation, 888 F. Supp. 1561, 1564 (N.D. Ga. 1994) (Clean Air Act violations associated with lack of permit not capable of repetition where defendant had in fact obtained the missing permit prior to the commencement of litigation).

[12] Nor is there anything in EPA's Federal Register notices concerning this issue suggesting that EPA intended to incorporate the permits into the SIP.  As noted on page 4 above, EPA's first notice could have indicated no such intent, since the first Vent Stack Permit had not yet been issued.  Nor did anything in EPA's final notice indicate that the Permit had been incorporated into the SIP.

claims relying, in whole or part, on the superseded terms of the Vent Stack Permit and/or

Amended Vent Stack Permit/ACO.

**III.    Counts 5-6  and 17-19 Must be Dismissed Because They Identify No Specific Commitments that Have Not Been Met**

The basis for dismissal of Counts 5-6 and 17-19 is equally clear, since these counts rely

on alleged "violations" of deadlines that were never established or have yet to occur and thus

cannot possibly have been exceeded.  As CLF admits in its Complaint, the actual deadline for

both the Red Line-Blue Line connection (Count 5) and the Green Line extension (Count 6) is, at

earliest, December 31, 2011.[13]  Complaint ¶¶71 & 78.  The Silver Line federal funding deadline

(Count 19) will not elapse until December 31, 2005.  Complaint, Exhibit 6 at p. 7.[14]  No

deadlines whatsoever are alleged to have been established with respect to the T.F. Green Airport

connection (Count 17) and the alleged requirement to "promote the use of signalization

technology to give priority to mass transit vehicles" (Count 18).  CLF's failure to allege the

violation of any specific commitment in the SIP requires dismissal of these claims.  Council of

Commuter Organizations, 683 F.2d at 670-71.

In an effort to create interim deadlines where none exist, CLF asserts with respect to

Counts 5 and 6 that the project completion deadlines should be interpreted to imply "all the

---

[13] As noted at n. 6, supra, the Transit Regulation allows for this deadline to be extended for a further three years before any requirement of substitution would arise.

[14] Although CLF drafts its Complaint to obscure this fact, it is evident from the Amended Vent Stack Permit/ACO that the federal funding deadline for Phase III of the Silver Line lies at the end of 2005, not the beginning.  In the Amended Vent Stack Permit/ACO, DEP established an interim deadline for the EOTC to complete a design for this project "sufficient under current standards for an application for federal funding by December 31, 2004." Complaint, Exhibit 6 at p. 7.  In the next section, the ACO states what steps should be taken if federal funding is "not secured…by 2005 and if, as a result, the tunnel section will not be completed by 2010 . . . ." Id.  Under the circumstances, any suggestion that the federal funding had to actually be obtained by December 31, 2004 is wholly illogical -- DEP would hardly have given the EOTC until the end of 2004 to develop the underlying design needed for its federal funding proposal if it also intended to hold the agency responsible for actually obtaining funding on the same day.  The only reasonable interpretation of this language is that the requirement to obtain federal funding for Phase III has a deadline of December 31, 2005.

conditions precedent to ensure that such obligation is met." Complaint ¶¶72, 79. Similarly, CLF

contends with respect to Counts 17 and 18 that the Defendants should be found in non-

compliance for failing to take "substantial steps" to complete those projects, although *no*

deadline for completion of the two projects has ever been established. Complaint ¶¶143, 146.

However, settled law precludes CLF's attempt to infer deadlines not actually set forth in SIP

documents. As courts have uniformly held, "plaintiffs are limited under § 7604 to seeking relief

from *specific violations of existing SIPs*; they may not, through a citizen suit, obtain modification

of an SIP to conform with their own notion of proper environmental policy." Wilder, 854 F.2d at

613 (emphasis added); accord Bayview, 366 F.3d at 698 ("[A]n obligation cannot be imposed

based upon a SIP if that obligation was not actually undertaken in the SIP."); Action for Rational

Transit v. West Side Highway Project, 699 F.2d 614, 616 (2d Cir. 1983) ("The aims and goals of

the SIP are not enforceable apart from the specific measures designed to achieve them.").

 Further, CLF's request that this Court invent, in the context of this citizen suit, interim

construction requirements the state chose not to specify would entail precisely the type of

"reanalysis of technical or other considerations" the First Circuit has held exceeds the scope of

the district courts' citizen suit jurisdiction. Busey, 79 F.3d at 1258. There is not only no

"objective" requirement with respect to interim deadlines for these projects within the SIP, see

id., there is no requirement at all.[15] That CLF may be unhappy with the deadlines specified with

respect to these projects, or skeptical of the progress of the projects in the absence of additional

---

[15] Although the absence of any violation of a SIP-based deadline is sufficient to dismiss each of Counts 5-6 and 17-19, it should be noted that dismissal of Count 18 is also required on the independent ground that the substantive obligation it sets forth is unenforceably vague. Nothing in the Amended Vent Stack Permit/ACO purports to explain what steps are to be taken to "promote the use of signalization technology to give priority to mass transit vehicles" nor does either this document or any subsequent approval establish objective criteria for deciding whether the significant steps the MBTA Defendants have already undertaken in this regard fulfill this goal. As a result, this is precisely the sort of "aspirational goal" courts have held to be unenforceable in a citizen suit. Bayview, 366 F.3d at 701.

or interim deadlines, cannot create jurisdiction this Court does not have to afford relief the Clean Air Act's citizen suit cause of action does not provide.

## CONCLUSION

For the foregoing reasons, the MBTA Defendants respectfully request that this Court dismiss Counts 1, 5-12 and 17-19 of Plaintiff's Complaint in their entirety, and Counts 2 and 4 of the Complaint to the extent they rely upon alleged requirements of the Vent Stack Permit and/or Amended Vent Stack Permit, for failure to state a claim upon which relief may be granted.

Respectfully submitted,

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY and MICHAEL H. MULHERN

By their attorneys,


/s/ Dean Richlin
Dean Richlin (BBO# 419200)
Randall Kromm (BBO #640940)
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA  02109
(617) 832-1000
drichlin@foleyhoag.com

Date: April 22, 2005

**Exhibit A**

*Example 5. Acquiring a project.* In 1993, P purchases all of Q's interest in a qualified enhanced oil recovery project, including all of Q's interest in tangible property that is an integral part of the project and all of Q's operating mineral interest. In 1994, P incurs costs for additional tangible property that is an integral part of the project and which is used for the primary purpose of implementing the project. P also incurs costs for tertiary injectants that are injected in connection with the project. In determining the credit for 1994, P may take into account costs P incurred for tangible property and tertiary injectants. However, P may not take into account any amount that P paid for Q's interest in the project in determining P's credit for any taxable year.

### § 1.43–5  At-risk limitation. [Reserved]

### § 1.43–6  Election out of section 43.

(a) *Election to have the credit not apply*—(1) *In general.* A taxpayer may elect to have section 43 not apply for any taxable year. The taxpayer may revoke an election to have section 43 not apply for any taxable year. An election to have section 43 not apply (or a revocation of an election to have section 43 not apply) for any taxable year is effective only for the taxable year to which the election relates.

(2) *Time for making the election.* A taxpayer may make an election under paragraph (a) of this section to have section 43 not apply (or revoke an election to have section 43 not apply) for any taxable year at any time before the expiration of the 3-year period beginning on the last date prescribed by law (determined without regard to extensions) for filing the return for the taxable year. The time for making the election (or revoking the election) is prescribed by section 43(e)(2) and may not be extended under § 1.9100–1.

(3) *Manner of making the election.* An election (or revocation) under paragraph (a)(1) of this section is made by attaching a statement to the taxpayer's federal income tax return or an amended return (or, in the case of a Coordinated Examination Program taxpayer, on a written statement treated as a qualified amended return) for the taxable year for which the election (or revocation) applies. The taxpayer must indicate whether the taxpayer is electing to not have section 43 apply or is revoking such an election and designate the project or projects to which the election (or revocation) applies. For any taxable year, the last election (or revocation) made by a taxpayer within the period prescribed in paragraph (a)(2) of this section determines whether section 43 applies for that taxable year.

(b) *Election by partnerships and S corporations.* For partnerships and S corporations, an election to have section

43 not apply (or a revocation of an election to have section 43 not apply) for any taxable year is made, in accordance with the requirements of paragraph (a) of this section, by the partnership or S corporation with respect to the qualified enhanced oil recovery costs paid or incurred by the partnership or S corporation for the taxable year to which the election relates.

### § 1.43–7  Effective date of regulations.

(a) *In general.* Unless a taxpayer makes an election under paragraph (b)(1) of this section, the provisions of §§ 1.43–1, 1.43–2, 1.43–3, 1.43–5, and 1.43–6 apply to costs paid or incurred after December 31, 1991, in connection with an enhanced oil recovery project for which the first injection of liquids, gases, or other matter occurs after December 31, 1990.

(b) *Election*—(1) *In general.* A taxpayer may elect to apply the provisions of §§ 1.43–1, 1.43–2, 1.43–4, 1.43–5, and 1.43–6 for any taxable years beginning after December 31, 1990, with respect to costs paid or incurred in connection with an enhanced oil recovery project for which the first injection of liquids, gases, or other matter occurs after December 31, 1990.

(2) *Time and manner of election.* An election under this paragraph (b) is made on the taxpayer's federal income tax return for a taxable year beginning after December 31, 1990, and before January 1, 1992, by attaching a written statement to the return that includes the name, address, and taxpayer identification number of the taxpayer making the statement and contains a declaration that an election is being made under this paragraph (b). The taxpayer's return must be filed not later than the last date prescribed by law (including extensions) for filing the return.

## PART 602—OMB CONTROL NUMBERS UNDER THE PAPERWORK REDUCTION ACT

### § 602.101  [Amended]

Par. 4. Section 602.101(c) is amended by removing the entry for section 1.43–2 and adding the following entry:

"1.32–2 .............................. 1545–0074".

Michael J. Murphy,

*Acting Commissioner of Internal Revenue.*

[FR Doc. 91–30875 Filed 12–27–91; 8:45 am]

BILLING CODE 4830–01–M

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[MA–14–1–5358; FRL–4088–8]

### Approval and Promulgation of Air Quality Implementation Plans; MA.; (Amendment to Massachusetts SIP, for Ozone and for Carbon Monoxide, for the Control of Air Pollution by Certifying Roadway Tunnel Ventilation Systems in the Metropolitan Boston Air Pollution Control District)

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA is proposing to approve a State Implementation Plan (SIP) amendment submitted by the Commonwealth of Massachusetts. This amendment establishes and requires the pre-construction and operating certification of roadway tunnel ventilation systems in the Metropolitan Boston Air Pollution Control District. The intended effect of this action is to control vehicular emissions of carbon monoxide (CO), hydrocarbons (HC) and nitrogen oxides ($NO_x$). These pollutants contribute to the carbon monoxide and ozone air pollution problems in the Boston urbanized area. This action is being taken under section 110 and part D of the Clean Air Act.

**DATES:** Comments must be received on or before January 29, 1992. Public comments on this document are requested and will be considered before taking final action on this SIP amendment.

**ADDRESSES:** Comments may be mailed to Linda M. Murphy, Director, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region I, JFK Federal Bldg., Boston, MA 02203. Copies of the State submittal and EPA's technical support document are available for public inspection during normal business hours, by appointment at the Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region I, One Congress Street, 10th floor, Boston, MA and (Division of Air Quality Control, Department of Environmental Protection, One Winter Street, 7th Floor, Boston, MA 02108).

**FOR FURTHER INFORMATION CONTACT:** Donald O. Cooke, (617) 565–3227; FTS 835–3227.

**SUPPLEMENTARY INFORMATION:** On January 30, 1991, the Massachusetts Department of Environmental Protection (DEP) submitted an amendment to its

The quality of this microfiche is equivalent to the condition of the original work.
WILLIAM S. HEIN & CO., INC.

State Implementation Plan (SIP) for Ozone and for Carbon Monoxide, for the control of air pollution by certifying roadway tunnel ventilation systems in the Metropolitan Boston Air Pollution Control District. The amendment contains definitions for four new terms added to 310 C.M.R. 7.00 and adds a new section, 310 C.M.R. 7.38, to establish the roadway tunnel ventilation systems certification program.

### Background

The Commonwealth of Massachusetts Department of Environmental Protection—Division of Air Quality Control (DEP) has adopted a state regulation for certifying roadway tunnel ventilation systems in the Metropolitan Boston Air Pollution Control District. This new regulation establishes a process for reviewing and accepting certification for the construction and operation of tunnel ventilation systems built after January 1, 1991 in the Metropolitan Boston Air Pollution Control District.

The certification process requires that anyone proposing to construct and operate a tunnel ventilation system that services a public roadway certify in writing to DEP prior to construction that the operation will not cause a violation or exacerbation of the National Ambient Air Quality Standards (NAAQSs). In addition, approximately one year after opening the roadway to the public and every five years thereafter, the operator shall demonstrate by applying for an operating certification that the operation of the ventilation system will not cause violations of the NAAQSs. In addition, interim reporting of air quality and traffic monitoring data is required in order to demonstrate continued compliance with the NAAQSs.

Finally, EPA does not consider roadway tunnel ventilation systems to be stationary sources as defined by Clean Air Act Section 302(z), as amended, because emissions from roadway tunnel ventilation systems are generated directly by mobile sources that use the roadway and are not generated by stationary sources.

### Summary of SIP Revision

#### Preconstruction Certificate

Any proponent of a highway project that includes the construction and operation of any tunnel ventilation system in the Metropolitan Boston Air Pollution Control District, which begins construction on or after January 1, 1991, is required to submit information sufficient for the DEP to review the certification. Such information shall include: (1) An analysis of the existing and projected non-methane hydrocarbon emissions from the project area, including the emissions from the tunnel ventilation system, the project roadway and the roadway network in the project area; (2) a comparative analysis that predicts the air quality impact within the project area after the project is built compared to a no-build alternative; (3) information concerning the ventilation building heights and locations, a conceptual site plan, the design criteria for the proposed ventilation equipment and project roadway, standard operating procedures and standard maintenance procedures for the tunnel ventilation system; (4) an analysis of the projected vehicle miles traveled (VTMs), average vehicle speeds and vehicle hours that are expected to occur within the project area when the project is completed compared with the projected VMT, projected average vehicle speeds, and projected vehicle hours travelled under the no-build alternative; and (5) an identification and analysis of feasible pollution prevention measures designed to reduce vehicle miles travelled including identification of the available short and long-term measures, the commitments to implement said measures, and a schedule for implementing said measures.

No construction on a tunnel ventilation system or project roadway subject to the tunnel ventilation certification process shall commence until the certification has been accepted. The DEP may impose conditions on any acceptance of a certification deemed necessary to meet the criteria of the state regulation and insure under standard operating and standard maintenance procedures that the ventilation system will not cause or exacerbate a violation of the NAAQSs, as set forth at 40 CFR 50, or result in an actual or projected increase in the total amount of non-methane hydrocarbons measured within the project area when compared with the no-build alternative.

#### Operation Certificate

Any person who has received written acceptance of certification to construct a tunnel ventilation system may commence operation of the tunnel ventilation system and open the project roadway to general public use for a period not to exceed eighteen (18) months. That person must submit an application for an operating certificate no earlier than twelve (12) nor later than fifteen (15) months following the commencement of full operation of the tunnel ventilation system or opening of the project roadway for general public use. Any operating certification shall demonstrate that the operation of the tunnel ventilation system shall, at a minimum, be in strict accordance with the maintenance of NAAQSs and demonstrate through actual measured emissions and traffic data that any actual or projected increase in the total amount of non-methane hydrocarbons measured within the project area is lower than when compared with the no-build alternative.

In addition to demonstrating compliance, the operating certificate submittal shall include a contingency plan consisting of measures which could be implemented in cases of exceedances of the emission limitations in the certification.

Any operating certification accepted by the DEP pursuant to this subsection shall be in effect for five (5) years from the date of acceptance and shall be subject to revrnewal every five (5) years from the date of acceptance and shall be subject to renewal every five (5) years. The DEP shall apply the same criteria to the renewal of an operating certification that apply to the acceptance of pre-construction certification and the initial operating certification.

#### Completeness of the Application for Operating Certificate

The DEP shall, within 30 days of receipt of an initial operating certification or its renewal, make a determination whether all information necessary for review of said certification has been submitted. The DEP may impose such conditions on any acceptance of a certification issued as it deems necessary to ensure maintenance of the NAAQSs, and maintenance of any actual or projected increase in the total amount of non-methane hydrocarbons measured within the project area at a lower concentration than would be provided by the no-build alternative.

#### Contingency Plans

The certification process requires a contingency plan that would be implemented when exceedances of the emission limitations stated in the certification occur. A contingency plan shall identify available contingency measures including, but not limited to, alternative tunnel ventilation system operations and maintenance, and transportation control measures; a commitment to implement the above measures; a schedule for implementing measures on a days-to-full effectiveness basis; and an analysis of the daily air quality impact of the measures on the emissions from the tunnel ventilation system and within the project area.

The quality of this microfiche is equivalent to the condition of the original work.
WILLIAM S. HEIN & CO., INC.

*Mitigation Plan*

If the DEP finds that one or more of the criteria set forth in the certification process or conditions established by DEP are being violated, or are likely to be violated within the period for which the operating certification is valid, then upon being notified by DEP the certificate holder shall submit to the DEP for review and approval a mitigation plan that identifies specific measures the operator intends to implement to bring the tunnel ventilation system and associated project area into compliance. These measures shall meet the criteria set forth in the State regulation and include implementation of any all conditions the DEP accepted as part of the certification. The mitigation plan shall at minimum contain: (1) A study that identifies the factors causing or contributing to the violation; (2) identification and an affirmative demonstration of specific measures which will result in compliance with the certificate criteria and DEP's conditions for acceptance of the certificate; (3) a demonstration of adequate funding mechanisms for implementation of these measures; and (4) a schedule for implementing the measures.

A mitigation plan shall examine measures that address the operation of the ventilation system as well as measures that address operation of the tunnel roadway and roadway network within the project area.

*Completeness of the Mitigation Plan*

The DEP shall review the mitigation plan and shall, after notice and public hearing, accept or reject the plan in writing no later than 90 days after the DEP determines that all information necessary to review the plan has been submitted. The DEP may impose any conditions on their acceptance of the plan it deems necessary to meet the certification criteria, as well as certification conditions accepted pursuant to the tunnel ventilation system certification process.

*Compliance Monitoring*

The certification process requires that the operator of the ventilation system (holder of the certificate) monitor air quality at the ventilation stack, downwind sites, and at DEP selected receptor sites. The certification process also requires the monitoring of traffic data within the project area, the numbers and locations of which shall be determined in consultation with the DEP.

*Air Quality Impacts*

The certification process established by this regulation is viewed as supporting air quality goals and assisting in the maintenance of projected air quality emissions.

EPA believes that the tunnel ventilation certification process will improve air quality because of the requirement to not cause or exacerbate a violation of any NAAQS. In addition, the certification process will not allow a project to increase actual amounts of non-methane hydrocarbons as compared to a non-build alternative. The tunnel ventilation certification process requires the monitoring of emissions and traffic data to ensure that the tunnel ventilation system continues to meet the certification criteria in the future.

EPA's review of this material indicates that the certification process submitted as a SIP amendment will result in improved air quality. EPA is therefore proposing to approve the Massachusetts SIP amendment for Ozone and for Carbon Monoxide, for the control of air pollution by certifying Roadway Tunnel Ventilation Systems in the Metropolitan Boston Air Pollution Control District, which was submitted on January 30, 1991. EPA is soliciting public comment on the issues discussed in this notice or on other relevant matters. These comments will be considered before taking final action. Interested parties may participate in the Federal rulemaking procedure by submitting written comments to the EPA Regional office listed in the **"ADDRESSES"** section of this notice.

**Proposed Action**

EPA is proposing to approve the SIP amendment for Ozone and for Carbon Monoxide, for the control of air pollution by certifying Roadway Tunnel Ventilation Systems in the Metropolitan Boston Air Pollution Control District.

Under 5 U.S.C. 605(b), I certify that this SIP amendment will not have a significant economic impact on a substantial number of small entities. (See 46 FR 8709.)

This action has been classified as a Table 2 action by the Regional Administrator under the procedures published in the **Federal Register** on January 19, 1989 (54 FR 2214–2225).

The Office of Management and Budget has exempted this rule from the requirements of section 3 of Executive Order 12291.

Nothing in this action should be construed as permitting or allowing or establishing a precedent for any future request for amendment to any State

Implementation Plan. Each request for amendment to the State Implementation Plan shall be considered separately in light of specific technical, economic, and environmental factors and in relation to relevant statutory and regulatory requirements.

The Administrator's decision to approve or disapprove the SIP amendment will be based on whether it meets the requirements of Sections 110(a)(2)(A)–(K) and 110(a)(3) of the Clean Air Act, as amended, and EPA regulations in 40 CFR part 51.

**List of Subjects in 40 CFR Part 52**

Air pollution control, Carbon monoxide, Hydrocarbons, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides.

Authority: 42 U.S.C. 7401–7642.

Dated: December 17, 1991.

**Julie Belaga,**

*Regional Administrator, Region I.*

[FR Doc. 91–31153 Filed 12–27–91; 8:45 am]

BILLING CODE 6560-50-M

---

**40 CFR Part 185**

[OPP-300238A; FRL-4008-3]

**Dicofol; Revocation of Food Additive Regulation; Extension of Comment Period**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule; Extension of comment period.

**SUMMARY:** This document extends to February 18, 1992, the comment period for persons who want to submit comments on EPA's Carcinogen Review and Verification Effort (CRAVE) review of the carcinogenicity of dicofol.

**DATES:** Written comments on CRAVE review, identified by the Office of Pesticide Programs (OPP) document control number [OPP-300238A], must be received on or before February 18, 1992. Written comments on other aspects of the proposed revocation must be received by January 2, 1992.

**ADDRESSES:** By mail, submit written comments to: Public Response and Program Resources Branch, Field Operations Division (H7506C), Office of Pesticide Programs, Environmental Protection Agency, 401 M St., SW., Washington, DC 20460. In person, bring comments to: Rm. 1128, CM #2, 1921 Jefferson Davis Hwy., Arlington, VA. Further information on procedures for

**Exhibit B**

**III. USEPA's Rulemaking Action**

The SIP revision submitted by the WDNR to resolve the CO ambient air violations of 1988 and 1989 in Oshkosh satisfies the Clean Air Act requirements for such plan revisions. Therefore, USEPA is approving the Oshkosh Carbon Monoxide State Implementation Plan as a revision to the Wisconsin SIP for CO.

Because USEPA considers today's action noncontroversial and routine, we are approving it today without prior proposal. The action will become effective on December 7, 1992. However, if we receive notice by November 9, 1992 that someone wishes to submit critical comments, then USEPA will publish: (1) A notice that withdraws the action, and (2) a notice that begins a new rulemaking by proposing the action and establishing a comment period.

Nothing in this action should be construed as permitting or allowing or establishing a precedent for any future request for revision to any SIP. Each request for revision to the SIP shall be considered separately in light of specific technical, economic, and environmental factors and in relation to relevant statutory and regulatory requirements.

This action has been classified as a Table 2 action by the Regional Administrator under the procedures published in the Federal Register on January 19, 1989. (54 FR 2214–2225). On January 6, 1989, the Office of Management and Budget (OMB) waived Table 2 and 3 SIP revisions (54 FR 2222) from the requirements of Section 3 of Executive Order 12291 for a period of 2 years. USEPA has submitted a request for a permanent waiver for Table 2 and Table 3 SIP revisions. The OMB has agreed to continue the temporary waiver until such time as it rules on USEPA's request.

Under the Regulatory Flexibility Act, 5 U.S.C. 600 et. seq., EPA must prepare a regulatory flexibility analysis assessing the impact of any proposed or final rule on small entities. 5 U.S.C. 603 and 604. Alternatively, EPA may certify that the rule will not have a significant impact on a substantial number of small entities. Small entities include small businesses, small not-for-profit enterprises, and government entities with jurisdiction over populations of less than 50,000.

SIP approvals under section 110 and subchapter I, Part D of the CAA do not create any new requirements, but simply approve requirements that the State is already imposing. Therefore, because the federal SIP-approval does not impose any new requirements, I certify that it does not have a significant impact

on any small entities affected. Moreover, due to the nature of the federal-state relationship under the CAA, preparation of a regulatory flexibility analysis would constitute federal inquiry into the economic reasonableness of state action. The CAA forbids EPA to base its actions concerning SIPs on such grounds. Union Electric Co. v. U.S.E.P.A., 427 U.S. 246, 256–66 (S. Ct 1976); 42 U.S.C. § 7410(a)(2).

The Agency has reviewed this request for revision of the federally approved State Implementation Plan for conformance with the provisions of the 1990 Amendments enacted on November 15, 1990. The Agency has determined that this action conforms with those requirements.

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of appeals for the appropriate circuit by December 7, 1992. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

**List of Subjects in 40 CFR Part 52**

Air Pollution control, Carbon monoxide, Incorporation by Reference, Intergovernmental relations, Reporting and record keeping requirements.

Note.—Incorporation by reference of the State Implementation Plan for the State of Wisconsin was approved by the Director of the Federal Register on July 1, 1982.

Dated: August 26, 1992.

Valdas V. Adamkus,

Regional Administrator.

40 CFR part 52, subpart YY, is amended as follows:

**PART 52—[AMENDED]**

1. The authority citation for part 52 continues to read as follows:

Authority: 42 U.S.C. 7401–7671(q).

**Subpart YY—Wisconsin**

2. Section 52.2570 is amended by adding paragraph (c)(62) to read as follows:

§ 52.2570  Identification of plan.

* * * * *

(c) * * *

(62) On December 11, 1991, the United States Environmental Protection Agency

received a revision to Wisconsin's State Implementation Plan for Carbon Monoxide. This revision took the form of Administrative Order AM–91–71, dated November 22, 1991, which incorporates a stipulation between the Wisconsin Department of Natural Resources and the Brunswick Corporation d.b.a. Mercury Marine. The Administrative Order addresses the emissions of carbon monoxide into the ambient air from Mercury Marine Engine Testing Facility in Oshkosh, Wisconsin.

(i) Incorporation by reference. Administrative Order AM–91–71, dated November 22, 1991, which incorporates a stipulation between the Wisconsin Department of Natural Resources and the Brunswick Corporation d.b.a. Mercury Marine.

(ii) Additional materials. Attainment modeling demonstration of control strategy to limit carbon monoxide emissions from Mercury Marine Engine Testing Facility, dated December 20, 1989.

[FR Doc. 92–24304 Filed 10–7–92; 8:45 am]

BILLING CODE 6560-50-M

_____

**40 CFR Part 52**

[MA–14–2–4588; A–1–FRL–4567–4]

**Approval and Promulgation of Air Quality Implementation Plans; Massachusetts; (Amendment to Massachusetts' SIP, for Ozone and for Carbon Monoxide, for the Control of Air Emissions by Certifying Roadway Tunnel Ventilation Systems in the Metropolitan Boston Air Pollution Control District)**

AGENCY: Environmental Protection Agency (EPA).

ACTION: Final rule.

SUMMARY: EPA is approving a State Implementation Plan (SIP) revision submitted by the Commonwealth of Massachusetts. This revision requires the pre-construction and operating certification of ventilation tunnel ventilation systems in the Metropolitan Boston Air Pollution Control District. The intended effect of this action is to control vehicular emissions of carbon monoxide (CO), hydrocarbons (HC) and nitrogen oxides (NOₓ). These pollutants contribute to the carbon monoxide and ozone air pollution problems in the Boston urbanized area. This action is being taken under section 110 and Part D of the Clean Air Act.

EFFECTIVE DATE: This rule will become effect on November 9, 1992.

**Federal Register** / Vol. 57, No. 196 / Thursday, October 8, 1992 / Rules and Regulations     **46311**

**ADDRESSES:** Copies of the documents relevant to this action are available for public inspection during normal business hours, by appointment at the Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region I, One Congress Street, 10th floor, Boston, MA; Public Information Reference Unit, U.S. Environmental Protection Agency, 401 M Street, SW., Washington, DC 20460; and Division of Air Quality Control, Department of Environmental Protection, One Winter Street, 7th Floor, Boston, MA 02108.

**FOR FURTHER INFORMATION CONTACT:** Donald O. Cooke, (617) 565-3227.

**SUPPLEMENTARY INFORMATION:** On December 30, 1991, (56 FR 67266–67268), EPA published a Notice of Proposed Rulemaking (NPR) for the Commonwealth of Massachusetts. The NPR proposed approval of a revision to Massachusetts' State Implementation Plan (SIP) for Ozone and for Carbon Monoxide, for the control of air pollution by certifying roadway tunnel ventilation systems in the Metropolitan Boston Air Pollution Control District. The revision contains definitions for four new terms added to 310 C.M.R. 7.00 (no-build alternative, project area, project roadway, and tunnel ventilation system) and adds a new section, 310 C.M.R. 7.38, to establish the roadway tunnel ventilation systems certification program. The formal SIP revision was submitted by Massachusetts on January 30, 1991.

Other specific requirements of the Commonwealth's State Implementation Plan (SIP) Revision for Ozone and for Carbon Monoxide, for the control of air pollution by certifying roadway tunnel ventilation systems in the Metropolitan Boston Air Pollution Control District, and the rationale for EPA's proposed action are explained in the NPR and will not be restated here.

EPA received comments on the NPR from two organizations. On January 28, 1992, the Sierra Club submitted comments opposing approval of the SIP revision. It supplemented these comments on February 12, 1992.[1] In addition, the Conservation Law Foundation submitted comments on January 29, 1992 which were supportive of EPA's approval of the proposed revision. The region has responded fully to these comments in a response

memorandum attached to the Technical Support Document. A brief summary of these comments and EPA's responses appear below.

In its comments, the Sierra Club argues that the revision of the SIP to include the tunnel roadway ventilation system regulation would weaken the Massachusetts SIP in violation of Section 193 of the Clean Air Act. The tunnel ventilation system regulation states that tunnel ventilation systems are not subject to the plan approval requirements in 310 C.M.R. 7.02 (Regulation 7.02) of the Massachusetts SIP. The Sierra Club maintains that tunnel ventilation systems have been subject to Regulation 7.02 and that the adoption of this SIP revision would weaken the SIP by exempting tunnel ventilation systems from the requirements of Regulation 7.02. The Sierra Club also states that tunnel ventilation systems are "stationary sources" and consequently subject to the new source review and Prevention of Significant Deterioration (PSD) permitting requirements of the Act. Since the tunnel roadway ventilation system regulation does not meet the minimum requirements of a PSD or new source review permitting program, the Sierra Club comments that its adoption represents a weakening of the Massachusetts SIP and is inconsistent with the requirements of Parts C and D of the Act. Moreover, the Sierra Club states that subjecting tunnel ventilation systems to new source review requirements would further the Clean Air Act's purpose of requiring the installation of pollution control equipment on stationary sources. The Sierra Club has made these same arguments in the pending civil action *Sierra Club et al. v. Larson et al.*, Civil Action No. 91–10666C (D. Mass.)

EPA has concluded that tunnel ventilation systems are not stationary sources subject to the PSD or new source review permitting requirements of the Act or Regulation 7.02 of the SIP and consequently the adoption of this SIP revision will not weaken, but will rather strengthen, the existing SIP. Tunnel ventilation systems, which do not generate their own emissions but rather simply funnel emissions from mobile sources, are not stationary sources within the meaning of the Clean Air Act. The Clean Air Act provides for means other than new source review and PSD to regulate emissions resulting directly from the internal combustion engines of motor vehicles. Because they are not stationary sources within the meaning of the Clean Air Act, tunnel ventilation systems are not subject to

the new source review and PSD requirements of the SIP and the Act. Similarly, tunnel ventilation systems are not subject to Regulation 7.02 of the Massachusetts SIP. The federally-approved Regulation 7.02 applies to the facilities listed at Subsection 7.02(4). Tunnel ventilation systems do not fall under any of the listed categories of facilities. Consequently, this SIP revision does not remove tunnel ventilation systems from any current requirements of the SIP or the Clean Air Act and therefore is not a weakening of such requirements.

In fact, the SIP revision will strengthen the SIP by contributing to overall state and federal strategies to reduce emissions from mobile sources in the Boston area. The revision requires certification that the construction and operation of a roadway tunnel ventilation system will not cause or exacerbate a violation of the National Ambient Air Quality Standards (NAAQS) or an actual or projected increase in the total amount of non-methane hydrocarbons measured with the project area when compared with the no-build alternative. Moreover, the tunnel ventilation certification process requires the monitoring of emissions and traffic data to ensure that the tunnel ventilation system continues to meet the certification criteria in the future. If the Massachusetts Department of Environmental Protection (DEP) finds that the certification criteria are being violated or are likely to be violated, the revision requires the operator of the tunnel ventilation system to submit a mitigation plan which identifies specific measures that the operator intends to implement to bring the ventilation system and the associated project area into compliance with the certification criteria.

DEP will then review and either accept or reject the plan. The terms of an accepted plan are incorporated into the tunnel ventilation system's operating certification. These requirements, as well as others in the revision, strengthen EPA's and the state's ability to regulate the overall emissions from mobile sources in the Boston area. The revision is consequently quite consistent with the purposes of the Clean Air Act.

The Sierra Club also comments that, because the regulation was not approved by the Governor and Council as required by Mass. Gen. Laws c. 111, § 142A, the state did not properly adopt the tunnel ventilation system regulation under state law and therefore the regulation cannot be approved by EPA as a SIP revision. EPA has concluded that the regulation was properly

---

[1] Although these supplemental comments were dated February 12, 1992, almost two weeks after the comment period on the Notice of Proposed Rulemaking closed, EPA has chosen to respond to the comments in the interest of fully addressing issues brought to the Agency's attention by the interested public.

adopted by the state. As indicated in the Massachusetts Secretary of State's attested certification of compliance with the state's administrative procedures, submitted to EPA with the proposed SIP revision, this regulation was adopted by DEP under its authority at Mass. Gen. Laws c. 111, §§ 142B and 142D. These statutory provisions authorize DEP to adopt such regulations without approval by the Governor and Council.

The Conservation Law Foundation submitted comments "strongly support[ing]" approval of the roadway tunnel ventilation system SIP revision. The organization did express concern over prompt, effective enforcement of the provisions. The Conservation Law Foundation urged EPA to approve the proposed SIP revision and then enforce its provisions.

EPA agrees that the tunnel ventilation system regulation, and any certification issued thereunder, need to be adequately enforced. EPA expects, in the first place, that DEP will ensure compliance with the regulation and any certification issued thereunder. In addition, EPA notes that federally-approved SIP provisions are enforceable by EPA under section 113 of the Clean Air Act and that, to the extent that DEP does not adequately enforce, EPA may choose to take additional steps to ensure compliance.

Final Action: EPA is approving the Commonwealth's regulation for certifying roadway tunnel ventilation systems in the Metropolitan Boston Air Pollution Control District *(310 C.M.R. 7.00 and 310 C.M.R. 7.38)*, as a revision to the Massachusetts SIP.

This action has been classified as a Table 2 action by the Regional Administrator under the procedures published in the **Federal Register** on January 19, 1989 (54 FR 2214–2225).

EPA has submitted a request for a permanent waiver for Table 2 and 3 SIP Revisions. OMB has agreed to continue the temporary waiver until such time as it rules on EPA's request.

Nothing in this action should be construed as permitting or allowing or establishing a precedent for any future request for revision to any State implementation plan. Each request for revision to the State implementation plan shall be considered separately in light of specific technical, economic, and environmental factors and in relation to relevant statutory and regulatory requirements.

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by December 7, 1992. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See Clean Air Act section 307(b)(2).)

**List of Subjects in 40 CFR Part 52**

Air pollution control, Carbon monoxide, Hydrocarbons, Intergovernmental relations, Incorporation by reference, Nitrogen dioxide, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides.

**Note:** Incorporation by reference of the State Implementation Plan for the Commonwealth of Massachusetts was approved by the Director of the Federal Register on July 1, 1982.

Dated: September 9, 1992.

**Julie Belaga,**

*Regional Administrator, Region I.*

Part 52 of chapter I, title 40 of the Code of the Federal Regulations is amended as follows:

**PART 52—[AMENDED]**

1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

**Subpart W—Massachusetts**

2. Section 52.1120 is amended by adding paragraph (c)(96) to read as follows:

**§ 52.1120 Identification of plan.**

* * * * *

(c) * * *

(96) Revisions to the State Implementation Plan submitted by the Massachusetts Department of Environmental Protection on January 30, 1991.

(i) Incorporation by reference.

(A) Letter from the Massachusetts Department of Environmental Protection dated January 30, 1991 submitting a revision to the Massachusetts State Implementation Plan.

(B) Massachusetts Regulation 310 CMR 7.38, entitled "Certification of Tunnel Ventilation Systems in the Metropolitan Boston Air Pollution Control District," and amendment to 310 CMR 7.00, entitled "Definitions," effective in the Commonwealth of Massachusetts on January 18, 1991.

For the State of Massachusetts:

3. In § 52.1167 the table 52.1167 is amended by adding the following entries in numerical order:

**§ 52.1167 EPA-approved Massachusetts State regulations.**

* * * * *

TABLE 52.1167.—EPA—APPROVED RULES AND REGULATIONS

| State citation | Title/subject | Date submitted by State | Date approved by EPA | Federal Register citation | 52.1120(c) | Comments/unapproved sections |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| 310CMR 7.00. | Definitions | 1/30/91 | October 8, 1992 | [FR citation from published date]. | 96 | Definitions of no-build alternative, project area, project roadway, and tunnel ventilation system. |
| * | * | * | * | * | * | * |
| 310CMR 7.38. | Tunnel vent certification regulation. | 1/30/91 | October 8, 1992 | [FR citation from published date]. | 96 | Tunnel ventilation certification regulation for Boston metropolitan area. |

[FR Doc. 92-24386 Filed 10-7-92; 8:45 am]

BILLING CODE 6560-50-M