UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
CONSERVATION LAW FOUNDATION, INC.,           )
                                             )
                    Plaintiff,               )
                                             )
v.                                           )        C.A. No. 05-10487/NG
                                             )
MITT ROMNEY, in his official capacity as     )
GOVERNOR OF MASSACHUSETTS, *et al.*,         )
                                             )
                    Defendants.              )
_____ )

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO THE MOTIONS OF THE
STATE DEFENDANTS, THE MBTA DEFENDANTS, AND THE TURNPIKE
DEFENDANTS TO PARTIALLY DISMISS C.A. NO. 05-10487/NG FOR
FAILURE TO STATE CLAIMS UNDER THE FEDERAL CLEAN AIR ACT**

Pursuant to Local Rule 7(b)(2), Conservation Law Foundation, Inc. (hereinafter

"CLF") opposes the several motions to partially dismiss CLF's lawsuit for failure to state

claims on which relief can be granted filed by Governor Mitt Romney, Secretary Douglas

I. Foy, Secretary Daniel Grabauskas, Commissioner John Cogliano, Commissioner

Robert W. Golledge (hereinafter "State Defendants"), the Massachusetts Bay

Transportation Authority and its General Manager Michael H. Mulhern (hereinafter

"MBTA Defendants"), and the Massachusetts Turnpike Authority and its Chairman,

Matthew J. Amorello (hereinafter "Turnpike Defendants").

**REQUEST FOR ORAL ARGUMENT**

Plaintiffs respectfully request oral argument on the three motions to dismiss

before the Court.  Plaintiffs wish for the opportunity to be heard on this opposition to

1

defendants' dispositive motions.  Additionally, plaintiffs believe that oral argument will assist the Court.

## MEMORANDUM OF REASONS

I.    Standard of Review under Fed. R. Civ. P. 12(b)(6)

Allegations in CLF's complaint must be taken as true for purposes of ruling on defendants' motions to dismiss. See, e.g., Rivera v. Rhode Island, 402 F.3d 27, 33 (1st Cir. 2005). A motion to dismiss can be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Id. The facts of CLF's complaint and the reasonable inferences from those facts clearly demonstrate that the State Defendants, the MBTA Defendants, and the Turnpike Defendants are in significant and on-going violation of numerous emissions standards and limitations in effect under the Massachusetts State Implementation Plan (hereinafter "Massachusetts SIP").  These violations are actionable pursuant to citizen suit provision of the CAA, and therefore within the Court's jurisdiction to enforce. For that reason, the partial motions to dismiss must each be denied.

II.    Background

    a.    Nature of the Case

This case is a citizen suit brought pursuant to section 304(a)(1) of the federal Clean Air Act, 42 U.S.C.A. § 7604(a)(1), to force certain state officials and state authorities to comply with their legal and public obligations under federal law to protect the public health and welfare of the people of Massachusetts. Specifically, the lawsuit seeks judicial relief for the on-going failures of the State Defendants, the MBTA Defendants, and the Turnpike Defendants to comply with specific emission standards and

2

limitations in effect under the federally-approved Clean Air Act Massachusetts SIP.[1] The

Massachusetts SIP is the primary regulatory tool by which the Commonwealth of

Massachusetts meets its obligations to achieve and protect the public health and welfare

from air pollution under the federal Clean Air Act. 42 U.S.C.A. §§ 7401 – 7671q. Parts of

Massachusetts are not currently meeting these minimum air quality standards established

by the Clean Air Act. CLF Complaint at ¶ 32.  CLF, on behalf of its members whose

health and well-being are adversely affected by the defendants' continuing failures to

meet obligations in effect under the Massachusetts SIP, seeks declaratory and injunctive

relief as well as civil penalties with respect to those violations.

The State Defendants, the MBTA Defendants, and the Turnpike Defendants have

filed substantially similar motions to dismiss various counts in CLF's Complaint pursuant

to Fed. R. Civ. P. 12(b)(6).  CLF files this consolidated memorandum in opposition to all

three motions.

      b.  <u>Functional Analysis of State Implementation Plans under the Clean Air
Act.</u>

While the Clean Air Act is a complex, multi-faceted legislative scheme that courts

have sometimes struggled with since its enactment in 1970, its basic architecture with

respect to the legal issues raised by CLF's complaint is straight-forward. The principal

purpose of the Clean Air Act is to "protect and enhance the quality of the Nation's air

resources so as to promote the public health and welfare and the productive capacity of

its population…." 42 U.S.C.A. § 7401(b)(1). The Clean Air Act furthers this goal through

a complex process that includes the establishment of primary (health-based) and

---

[1] The Massachusetts SIP is set forth at 40 C.F.R. § 52.1119-1169.

secondary (welfare-based) National Ambient Air Quality Standards (hereinafter "NAAQS") for specified air-borne pollutants. 42 U.S.C.A. § 7409(a)&(b)(1)&(2).

States are required to have federally-approved state implementation plans (hereinafter "SIPs") that "provide for the implementation, maintenance, and enforcement" of the primary and secondary NAAQS. Id. at § 7410. Depending on whether the monitored air quality in those states is in compliance with the primary and secondary NAAQS, the air quality of the various states or regions of states is in "attainment," is in "non-attainment," or is "unclassifiable" under the Clean Air Act. Id. at §§ 7407(d). For states with ambient air quality that is in "non-attainment" with respect to a particular air quality standard, the state must have a "non-attainment" plan as part of its SIP that implements control measures "as expeditiously as practicable" and provides for attainment of the NAAQS. Id. at § 7502(c)(1). These "non-attainment" plans "shall include enforceable emission limitations, and such other control measures, means, and techniques … as may be necessary or appropriate to provide for attainment of such standard … by the applicable attainment date." Id. at § 7502(c)(6).  When approved by the U.S. EPA, the provisions of a SIP become enforceable against the state as federal law under the Clean Air Act.  E.g., Bayview Hunters v. Metropolitan Transportation Comm'n., 366 F.3d 692, 695 (9th Cir. 2004). The provisions of an approved SIP remain fully enforceable as a matter of federal law unless or until they are revised. See, e.g., Council on Commuter Orgs. v. Metropolitan Transportation Auth., 683 F.2d 663, 669 (2nd Cir. 1982).

The Massachusetts SIP contains an emission control regime applicable to the construction and operation of tunnel ventilation systems in the metropolitan Boston air

shed to ensure that air emissions from these systems do not violate or contribute to the

ongoing non-attainment of the NAAQS. 310 C.M.R. § 7.38, entitled "Certification of

Tunnel Ventilation Systems in Metropolitan Boston Air Pollution Control District,"

(hereinafter "Tunnel Ventilation Certification Regulation").  Massachusetts chose to

regulate the ventilation systems through a permitting or "Certification Program" which

the U.S. EPA approved as part of the Massachusetts SIP.  40 C.F.R. §

52.1120(c)(96)(i)(B).  The U.S. EPA has also affirmed that the Tunnel Ventilation

Certification Regulation and any certification issued thereunder are federally enforceable.

See EPA Final Rule Approving the Tunnel Ventilation Certification Regulation, 57 Fed.

Reg. 46310-11, attached to Memorandum in Support of MBTA Defendants' Motion to

Dismiss (hereinafter "MBTA Memorandum") as Exhibit B.  The certifications or permits

delineate the specific limitations and controls that apply to these tunnel ventilation

systems.

       c.   <u>The Role of Citizen Suit Litigation in the Clean Air Act Regulatory Scheme.</u>

Congress provided citizens with a central enforcement role in the Clean Air Act's

statutory scheme. Citizen suit litigation is one of the principal mechanisms by which

Congress sought to ensure that state implementation plans would be enforced according

to their terms. From the earliest case law under the Clean Air Act, courts have recognized

that "citizen groups are not to be treated as nuisances or troublemakers but rather as

welcomed participants in the vindication of environmental interests." <u>Friends of the

Earth v. Carey</u>, 535 F.2d 165, 172 (2d Cir. 1976), <u>cert. denied</u>, 434 US 902 (1977).

Congress' explicit intent with respect to this central role that citizen suits were

intended to play was further reinforced in the 1990 amendments to the Clean Air Act. In

those amendments, Congress added language to the citizen suit section of the Act to emphasize its intent that citizen suit subject matter jurisdiction should extend not just to include the specific provisions set forth in state implementation plan but also to "any other standard, limitation, or schedule established … under any applicable State implementation plan approved by the Administrator [of EPA], any permit term or condition, and any requirement to obtain a permit as a condition of operations." 42 U.S.C.A. 7604(f)(4), added by Pub.L. 101-549, Title VII, § 707 (a) – (g), 104 Stat. 2574, 2682-3 (1990). These amendments provide broad subject matter jurisdiction in citizen suits over both the specific SIP itself and the regulatory permitting mechanisms and procedures adopted as part of the EPA-approved SIP, including state law permitting mechanisms.  U.S. v. Louisiana Pacific Co., 908 F.Supp. 835, 842 (D. Colo. 1995) (citing National Mining Ass'n v. U.S. E.P.A., 59 F.3d 1351, 1363 (D.C. Cir. 1995))

> d.  Massachusetts is in Violation of its SIP Provisions Designed in Part to
> Achieve Attainment of the Ozone Primary NAAQS.

Eastern Massachusetts is in "severe non-attainment" with the one-hour NAAQS for ozone and in "moderate non-attainment" for the eight-hour NAAQS for ozone.  CLF Complaint ¶ 32. Emissions from vehicles significantly contribute to the formation of ozone.  Id. at ¶ 33. Ozone is a powerful respiratory irritant that causes reduced lung function and tissue deterioration and which has been linked to respiratory infections and diseases.  Id. at ¶ 33.  Furthermore, ozone is particularly harmful to children, elderly people, and to people with pre-existing respiratory diseases. Id. at 34.

The Central Artery/Tunnel Project (hereinafter "CA/T Project") in metropolitan Boston is a massive $15 billion transportation project that significantly expanded highway capacity in downtown Boston by adding travel lanes to the existing highway

system and by adding tunnel capacity. Id. at ¶ 2.  The First Circuit described the CA/T Project and the history leading up to the regulation at issue here in Sierra Club v. Larson. 2 F.3d 462, 463-65 (1st Cir. 1993).  In order to secure federal regulatory approval for the new sources of air pollution from the increased traffic coming into Metropolitan Boston in conjunction with this expanded capacity, including air emissions that contribute to the on-going non-attainment of the ozone NAAQS, the Commonwealth of Massachusetts committed to a number of transportation projects and programs to offset the increased air emissions associated with the CA/T Project. Id. at ¶¶ 2, 4, 12, and 35.

These prescribed projects and programs are specifically identified in several documents that are in effect under the Massachusetts SIP.  A number of the projects are specifically identified in the approved Massachusetts SIP itself through the incorporation by reference of 310 C.M.R. §7.36 (Massachusetts "U Transit System Improvements) into the Massachusetts SIP (hereinafter "Transit Regulation"). 40 C.F.R. § 52.1120(c)(101)(i)(B). CLF Complaint at ¶¶ 35 & 40.

Additional projects and programs specified by Massachusetts to achieve compliance with the Clean Air Act were pursuant to the Tunnel Ventilation Certification Regulation, 310 CMR 7.38, as part of the "preconstruction certification" for the CA/T Project.  This certification process is popularly known as the "Vent Stack Permit." CLF Complaint at ¶¶ 36 – 38.  The Vent Stack Permit authorized the construction and operation of the CA/T Project air ventilation system to vent vehicle emissions from the CA/T Project to the atmosphere. Id. at ¶¶ 36 & 38. The Vent Stack Permit was issued pursuant to the regulatory regime established by 310 C.M.R. § 7.38.  The original Vent Stack Permit was amended pursuant to the SIP-approved procedures in September 2000

and added additional projects and programs at that time. Id. at 39 and Exhibit 4 to CLF Complaint.

The Tunnel Ventilation Certification Regulation establishes a specific requirement that the approval of any construction and operation of a tunnel ventilation system for the CA/T must be based on a certification that, inter alia, the ventilation system as operated would not cause or worsen a NAAQS violation. 310 C.M.R. § 7.38(2). In approving the certification, the Massachusetts Department of Environmental Protection is required to impose conditions the recipients to ensure compliance with the NAAQS. The regulation also requires that the project proponent identify "feasible pollution prevention measures designed to reduce vehicle miles traveled including identification of the available short and long-term measures, commitments to implement said measures, and a schedule for implementing said measures." 310 C.M.R. § 7.38(3)(a)(5).

The Vent Stack Permit and the Amended Vent Stack Permit specify a number of projects and programs that were deemed necessary to ensure that the emissions from the ventilation system were offset by other transportation improvements.  CLF Complaint at ¶ 38. Some of these projects and programs were similar to projects and programs that were individually identified in the Massachusetts SIP itself through the Transit Regulation; others were not specifically identified in the Massachusetts SIP itself but were adopted pursuant to the SIP-approved certification program. Id. at ¶¶ 36-40.

The Vent Stack Permit, issued under this SIP-approved regulation, includes specific procedures on how project delays are to be dealt with and the mitigation measures that are necessary. Id. at ¶ 42. The Transit Regulation also has specific

procedures required to substitute new projects for any of the transit improvement projects identified in the Transit Regulation. CLF Complaint at ¶ 43.

CLF alleges that the State Defendants, the MBTA Defendants, and the Turnpike Defendants have failed to complete specific projects and programs set forth in the SIP and have failed to enforce the terms and conditions of the vent stack permits that were issued as part of state permitting mechanisms that were adopted and approved as part of the Massachusetts SIP. CLF Complaint passim. CLF further alleges that the specific projects and programs adopted under the Massachusetts SIP, the schedules associated with those projects, the mitigation requirements associated with delays of any of those projects and programs, and the rules and procedures for substituting new or alternative projects for those projects are all in effect under a state regulatory regime in the Massachusetts SIP. CLF Complaint ¶¶ 38-40, 42-43. Unless and until those approved projects, permits, and permit terms and conditions are properly changed in the manner consistent with the approved Massachusetts SIP as well as with EPA's regulations with respect to SIP changes and modifications, they remain enforceable by CLF through the provisions of section 304 of the Clean Air Act. 42 U.S.C.A. § 7604. See, e.g., Friends of the Earth, 535 F.2d at 178; Save Our Health Org. v. Recomp of Minnesota, 829 F.Supp. 288, 291 (D. Minn. 1993).

III.    Argument

Defendants' Motions rely on three incorrect propositions: first, that several of the otherwise enforceable emission standards and limitations have not been violated since they are not yet due under the terms of the Massachusetts SIP, second, that the transit commitments of the State have been superseded by newer transit commitments that are

not enforceable as federal law, and third, that even if the transit commitments have not

been superseded, they are not enforceable because they are not specifically identified

within the four corners of the Massachusetts SIP.  For the reasons set forth below, the

Court should reject each of these arguments and deny the motions to dismiss.

> a.   Counts 5 and 6 Properly Seek to Enforce Ongoing Violations of
>        "Emission Standards or Limitations" under the Massachusetts SIP.

The State Defendants, the MBTA Defendants, and the Turnpike Defendants have

moved to dismiss Counts Five and Six of CLF's Complaint on the basis that these counts

represent "anticipatory" claims, not ripe for judicial review under the citizen suit

provisions. State Defendants' Memorandum in Support of Partial Motion to Dismiss at

13-16 (hereinafter "State Memorandum at __); MBTA Memorandum at 7.[2] CLF

disagrees with the defendants' characterizations of the Massachusetts SIP requirements.

The failure of the State Defendants to take steps necessary to complete the Red-Blue

Connector and the Green Line Extension to Medford Hillside as required by the

Massachusetts SIP is an ongoing violation of the Clean Air Act. Accordingly, Counts

Five and Six of the CLF Complaint should not be dismissed.

The citizen suit provisions of the Clean Air Act expressly provides for

enforcement of ongoing violations.  Citizens may bring actions against one who is

"alleged to have violated" or "to be in violation" of an emission standard or limitation.

42 U.S.C. § 7604 (a).  Interim steps required in a SIP to meet a SIP deadline can be

enforced prior to that final deadline.  American Lung Ass'n. of N.J. v. Kean, 670 F. Supp.

---

[2] None of the defendants argue either that these particular projects are not enforceable emissions standards
and limitations under section 304(a) of the Clean Air Act or that they are not "in effect" under the
Massachusetts SIP.

1285, 1291 (D.N.J. 1987) (enforcing interim requirements to meet final SIP deadline prior to those deadlines).

The State Defendants argue that the only relevant deadline in the Massachusetts SIP with respect to these projects is the "ultimate completion date…." State Memorandum at 8. The language of the SIP itself, however, states that "EOTC [now The Executive Office of Transporation (hereinafter "EOT")] shall <u>plan and construct and render available</u> for public use, transit system improvement projects…," including the Green Line extension to Medford Hillside and the Red-Blue Connector. CLF Complaint ¶ 40, Exhibit 5 (310 CMR 7.36(2)) (emphasis added). Defendants' argument ignores the specific and on-going requirement in the Massachusetts' SIP to plan and construct these projects. Planning and construction are specific obligations of the SIP that precede the deadline for rendering the Red-Blue Connector and Green Line to Medford Hillside open to public use. CLF Complaint ¶¶ 70-83.   In order to comply with the specific obligations in the Massachusetts SIP to plan, construct and render available the Red-Blue Connector and the Green Line Extension to Medford Hillside, defendants must be actually planning and constructing this project, including the basic project planning, securing project funding, undertaking project design, environmental permitting and approval, land acquisition, and then construction.  CLF Complaint ¶¶ 72 & 79. CLF's allegations, which must be taken as true for purposes of this motion, are that these activities are not occurring with respect to either the Red-Blue Connector or the Green Line Extension to Medford Hillside. <u>Id</u>. at ¶¶ 73 & 79.  Because defendants are not planning or constructing the Red-Blue Connector and Green Line Extension, they are directly violating specific SIP requirements.

In <u>Kentucky v. Ruckelshaus</u>, the Sixth Circuit held that a schedule or timetable of compliance can be enforced prior to the ultimate SIP deadline under the Clean Air Act citizen suit provisions as a preventative measure to avoid violation of an emissions standard.  Id., 497 F.2d 1172, 1175 (6th Cir. 1974). Yet, State Defendants cite <u>Ruckelshaus</u> for the opposite proposition.  State Defendants *imply* from this holding that "a suit would not be available where such an explicit 'schedule or timetable' did not exist."  State Memorandum at 15, n.17.   <u>Ruckelshaus</u> did not make such a holding, but rather stated, "[i]t is not necessary that the State or other aggrieved party wait until an emission standard is violated to bring suit."  497 F.2d at 1175.  The Court here should enforce the specific requirements to plan and construct the Red-Blue Connector and the Green Line Extension projects as soon as it is determined that the defendants are not pursuing a specified requirement in a SIP.  <u>See</u> <u>Friends of the Earth</u>, 535 F.2d at 173 (finding of SIP violation obligates court to impose remedy).

The State Defendants and the MBTA Defendants point to <u>Bayview Hunters Point Comm. v. Metro. Transp. Ass'n</u>., 212 F.Supp. 2d 1156 (N.D. Cal. 2002), <u>rev'd on other grounds</u>, 366 F.3d 692 (9th Cir. 2004), for the proposition that intermediate milestones should not be imposed when they are not contained in a state's SIP.  State Memorandum at 15; MBTA Memorandum at 14.  The holding in <u>Bayview</u>, however, is inapposite.  In <u>Bayview</u>, the district court declined to provide a judicial remedy with specified deadlines that were not specifically contained in a SIP since the court had only found a violation of a final deadline.  <u>Id.</u> at 1168**.**  The court noted that it was not barred from requiring interim steps to ensure compliance with a SIP deadline through exercise of its equitable powers, and that intermediate milestones were not included in the remedy only because

they were not necessary to ensure achievement of the SIP obligation at issue, a 15%

increase in transit ridership.  Id. at 1169. In the current case, interim steps (planning and

constructing) are both specifically required in the SIP itself and are self-evidently

necessary to accomplish the final deadline in the SIP.  310 CMR 7.36(2).  There is no

jurisdictional infirmity with CLF seeking to show at this time that the defendants are in

violation of interim activities already specifically required by the Massachusetts SIP

itself.

Defendants do not dispute that it is impossible for the Green Line extension to

Medford Hillside and the Red-Blue Connector to be planned, constructed and open to

public use by December 31, 2011, as CLF alleges, but instead argue that these projects

could be replaced with substitute projects.  State Memorandum at 16.  However, the

Massachusetts SIP does not allow substitute projects to replace the Red-Blue Connector

and Green Line Extension to Medford Hillside.  To replace a SIP-approved project, EOT

must demonstrate that a specific project listed in the SIP is infeasible.  310 CMR 7.36 (4).

The required projects cannot be replaced at will or merely to avoid noncompliance with

the specified deadlines.  Neither the Red-Blue Connector nor Green Line Extension to

Medford Hillside has been found infeasible.  Neither project meets the requirements to be

eligible for substitution. The provisions of the Massachusetts SIP are binding on the state

until and unless they are changed. See, supra at 8.[3]

Defendants argue that the possibility of a three year delay, mentioned in the

Massachusetts SIP at 310 CMR 7.36(3)(b), provides the defendants with the option to

delay completion of the specific mitigation measures in the SIP even further for three

---

[3] These arguments border on factual disagreements that are not appropriate for resolution in a Fed. R. Civ.
P. 12(b)(6) context.

years.  State Memorandum at 16, n.18. This is an incorrect reading of the SIP.  A delay of

three years in completing these projects would be a violation of the transit regulation

which includes unambiguous deadlines and no right of delay. 310 CMR 7.36.

　　　The State Defendants should not be allowed to interpret a SIP to avoid obligations

they themselves created.  In <u>American Lung Ass'n</u>, the court stated:

> [t]he fact that, under the [Clean Air] Act, New Jersey was given a part in
> designing the regulations which bind it does not mean the New Jersey
> should now be afforded the opportunity to define away attempts at
> regulatory enforcement.  Indeed, such a conclusion would render the
> regulatory effort in general a useless exercise.

 670 F. Supp. at 1291.  As a state in severe non-attainment of the ozone NAAQS, the

State Defendants should be seeking to expedite strategies to improve air quality and not

granting itself deadline extensions in violation of its own SIP provisions. CLF Complaint

at ¶¶ 31-32.

　　　The result of ignoring the SIP requirement to plan and construct the transit

commitments would be devastating delay.  If the Court does not enforce the

Massachusetts SIP requirements to plan and construct these projects, defendants will be

unable to meet the prescribed deadlines specified.  CLF Complaint at ¶ 73, 74, 80, 81.

Indeed, having failed to allocate any money for these projects through 2010, <u>Id</u>. at ¶ 73, it

seems that the State Defendants intend to wait until the deadlines pass to even begin

implementing the specific SIP requirements to plan and construct. The Court has

jurisdiction under the specific terms of the Massachusetts SIP to ensure that the

defendants are brought back into compliance with these important projects.

　　　Failure to undertake steps necessary to complete the Red-Blue Connector and

Green Line Extension to Medford Hillside is analogous to anticipatory repudiation on a

contract, a theory under which relief is available where actions have been taken rendering performance of contractual duties impossible prior to the performance deadline.  See Restatement of Contracts §318; See also Roehm v. Horst, 178 U.S. 1, 8 (1900).  Just as a contracting party need not wait to recover when the other contracting party has rendered performance impossible, so too, in this case, where the defendants have rendered the opening of the Red-Blue Connector and Green Line extension to Medford Hillside impossible by the prescribed dates by their failure to allocate funding to begin the many phases of work necessary to complete these projects, there is no reason enforcement must wait until the final ribbon-cutting deadline for the public opening of this project.  In addition to being federal law, the transit commitments are a contract: they are a promise to neighborhoods most impacted by CA/T Project construction and expanded operation to provide air quality mitigation.  The Commonwealth has repudiated its contract with the people of the Commonwealth and residents should not have to wait until it is too late to provide the promised mitigation to enforce their agreement.

     b.   The Violations Specified in Count 1 and Counts 7-12 Pertain to Emissions Standards and Limitations in Effect Under the Massachusetts SIP.

In moving to dismiss Counts 1 and 7-12 of CLF's Complaint,[4] the defendants argue for an interpretation of the citizen suit provision of the Clean Air Act that would permit state governmental entities to violate their federal legal obligations under an approved Clean Air Act state implementation plan and evade judicial review. In essence, they claim that the specific transportation control projects and programs that are the certification conditions identified in the Vent Stack Permit to ensure compliance with the

---

[4] The MBTA Defendants also argue that parts of Counts 2 and 4 that rely on violations of projects that are in the Transit Regulations and the Vent Stack Permit should be dismissed to the extent they rely on the Vent Stack Permit. Since this raises no new issues, CLF will not separately brief this aspect of the motion but opposes this aspect of the MBTA Motion for the reasons set forth in this memorandum in opposition.

SIP's Tunnel Ventilation Certification Regulation and the Clean Air Act are not federally enforceable under the Clean Air Act, and that the state retains plenary authority to modify these provisions without regard to the Massachusetts SIP provisions. E.g., State Memorandum at 7 & 16-17.

The enforceability of the Vent Stack Permit transportation commitments depends on the interpretation of the phrase "in effect under" in the citizen suit provisions of the Clean Air Act. Defendants do not argue that the transportation commitments are not emission standards or limitations but rather, that they are not in "in effect under" the Massachusetts SIP for purposes of citizen enforcement. In making this argument, defendants implicitly rely on two meanings of the term "in effect under." They utilize a temporal meaning of "in effect under," arguing that the terms of the Vent Stack Permit are not "in effect under" because they have been superseded by new requirements arising from the Administrative Consent Orders (hereinafter "ACOs"). E.g., State Memorandum at 16-19. Secondly, they argue that "in effect under" should be interpreted to require emission standards or limitations to be specifically included in the text of a State Implementation Plan itself. E.g., State Memorandum at 9-10. The latter interpretation is incorrect; the former is misapplied.

> i.  The Terms of the Vent Stack Permit Are "In Effect Under" Because They Are Operable under a Current SIP Regime and Have Not Been Superseded Consistent with that Regime.

The certification conditions imposed by the Massachusetts Department of Environmental Protection in issuing the Vent Stack Permit remain in effect under the Massachusetts SIP because they have not been superseded and continue to be required as part of a federally-approved regime in effect under the Massachusetts SIP. "In effect

under" should be given its plain meaning in the sense that an emission standard that is being enforced must be currently or presently operative under the terms of the SIP. Delaware Valley Citizens Council for Clean Air v. Davis, 932 F. 2d 256, 265 (3rd Cir. 1991) (42 U.S.C.A. § 7604 allows for enforcement of standards once they are "in effect" as opposed to 42 U.S.C.A. § 7607 that allows for review of the approval process of an emission standard). The effectiveness of a particular emission standard or limitation is a function of its status under a federally-approved SIP. U.S. v. Louisiana Pacific Corp., 908 F. Supp. at 842. The specific commitments and schedules contained in the Vent Stack Permit and the Amended Vent Stack provisions remain "in effect under" the SIP and enforceable by citizens until they are properly amended or removed.

The series of ACOs are noncompliant with the express terms of the federally-approved Tunnel Ventilation Certification Regulation, as well as with the express terms of the Vent Stack Permit that is in effect pursuant to that regulation and therefore do not supersede the Vent Stack Permit.[5] 310 C.M.R. § 7.38. The Tunnel Ventilation Certification Regulation prescribes a specific level of required mitigation and air quality offsets and a procedure for implementation of that mitigation. 310 CMR 7.38 (2) & (3) (requiring analysis of emissions to ensure that a violation or exacerbation of air quality standards won't occur and specifying that mitigation measures including improvements in public transit be put in place through the certification process to ensure air quality protection). The Vent Stack Permit issued pursuant to the Tunnel Ventilation

---

[5] The ACOs also fail to comply with the procedural and substantive requirements of the Transit Regulation, 310 CMR 7.36. Complaint ¶ 45. CLF would also note, consistent with Counts 16 -20 of its Complaint, that if the ACO's are determined to have amended the terms of either the Vent Stack Permit or the Amended Vent Stack permit, then they are also actionable under the citizen suit provisions either as an emission standard or limit or as a state order directly. The defendants are also in violation of many of the requirements of those orders.

Certification Regulation also prescribes a procedure to ensure that necessary air quality benefits are delivered.  See CLF Complaint ¶ 42.

The defendants assert that the obligations effectuated through the SIP in the vent stack permit can be revised at will.  E.g., MBTA Memorandum at 12.  Moreover, the ACO process was an effort by the state defendants to do just that. CLF has alleged that the two ACOs did not comply with the prescribed procedures in either the Transit Regulation or the Vent Stack Permit. CLF Complaint ¶ 48.  Those allegations must be taken as true for purposes of this motion. Rivera, 402 F.3d at 33.  The terms of the ACOs themselves suggest that they are not intended to reflect federally enforceable commitments. See CLF Complaint at Exhibit 6, First ACO at ¶  IV.3.(EOTC [now EOT] reserves rights to contest third parties enforcing terms of ACO in any other proceeding); see CLF Complaint at Exhibit 8, Second Amended ACO at ¶ III.3.

While CLF agrees fully that the Vent Stack Permit itself can be changed within the Clean Air Act/SIP regulatory regime prescribed by the Massachusetts SIP; the State Defendants cannot defeat the explicit provisions of the tunnel ventilation certification regime with backroom negotiations that ostensibly alter the SIP requirements without the demonstrations required by the modification provisions in effect under the Massachusetts SIP.  The ACOs failed to comply with the procedural requirements of the Tunnel Ventilation Certification Regulation itself, and the Vent Stack Permit itself, and therefore have no impact on either document.  Complaint ¶ 45.

The cooperative federalism effectuated through the Clean Air Act provides states with a great deal of flexibility in achieving NAAQS.  States set their own rules through SIPs to achieve the NAAQS and can amend those rules with EPA approval.  42 U.S.C. §

7410. The Clean Air Act provides the exclusive procedure for SIP modification. 42

U.S.C. 7410(l). Massachusetts has not amended the Transit Regulation or the Tunnel

Ventilation Certification Regulation. The State must follow its own federally-approved

plan for coming into attainment with the NAAQS. American Lung Ass'n, 670 F. Supp.

at 1291. The multi-layered obligations of the Clean Air Act, the SIP and the Vent Stack

Permit cannot be defeated by a contrary negotiated agreement outside the process

dictated by that regime.

Defendants argue "superseded SIP provisions cannot provide basis for suit."

State Memorandum at 18 and MBTA Memorandum at 12. State Defendants are correct

that SIP requirements that have been properly superseded cannot be enforced by citizen

suit. See Council of Commuter Orgs., 683 F.2d at 669(SIP itself was modified and SIP

terms that had been removed were held to be unenforceable). That case, again, is

inapposite. The SIP provisions relevant to this case have not been modified consistent

with the Massachusetts SIP. Accordingly, the SIP provisions remain in effect.

The citizen suit provision of the Clean Air Act provides an important protection

when the state is not adequately enforcing air quality protection measures. CLF v.

Busey, 79 F.3d 1250, 1257-58 (1st Cir. 1996)(citizen suit jurisdiction necessary to resolve

"a failure on the part of officials to act"). That mechanism is even more important when

the state officials and agencies are themselves violating their own Clean Air Act

obligations. As the Third Circuit has observed, "Perhaps in wisdom borne of occasional

sad experience with sole reliance on expert bureaucracies…, [the CAA] provides a means

for publicly interested citizens to obtain judicial enforcement…." Delaware Valley

Citizens Council for Clean Air v. Davis, 932 F.2d 256, 260 (3rd Cir. 1991).

In negotiating away Clean Air Act deadlines and obligations in the ACOs, defendants are attempting to defeat the Court's enforcement authority. Through ACO deadline extensions and project substitutions negotiated outside the regulatory framework of the Massachusetts SIP, defendants attempt to make the specific strategies to attain compliance with the NAAQS unenforceable by the court.

If defendants are permitted to perpetually extend deadlines and substitute projects and are allowed to characterize those activities as state events outside the Clean Air Act such that they are not enforceable, Massachusetts will avoid the very commitments that would ensure it reaches attainment of the NAAQS. The result of the negotiations creating the ACOs has been a continual decrease in the substance and delay in the deadline for delivery of needed air quality improvements that the Clean Air Act requires be provided "as expeditiously as practicable." 42 U.S.C. §7502(c)(1). The ACOs approve substantial project delays, lack appropriate mitigation for those delays and substitute projects with fewer air quality benefits all contrary to the Massachusetts SIP and permits issued under the SIP. CLF Complaint, Exhibits 7-8. The Second Amended ACO was released January 26, 2005, fourteen days *after* CLF's notice of intent to sue was served to enforce the very commitments this ACO attempts to dilute and evade. If this perpetual pushing off of Clean Air Act obligations is allowed to supersede the state's approved-SIP obligations within the Clean Air Act regulatory framework, the important court enforcement role codified in the Clean Air Act citizen suit provision will be defeated.

     ii.  <u>Defendants Should Not Be Allowed to Undermine the Regulatory Regime Created by the Tunnel Ventilation Certification Regulation through an Interpretation of "In Effect Under" that is Inconsistent with the Clean Air Act.</u>

Defendants also argue that the Vent Stack Permit provisions are not "in effect under" because they are not directly referenced in the Massachusetts SIP itself. <u>E.g.</u>, State Memorandum at 10 & fn. 12. This argument relies on a misinterpretation of the term "in effect under."  The State Defendants argue in one breath that "courts may only enforce specific SIP strategies."  Then, in the next breath, they argue that even SIP strategies, at least in the form of permits and permit conditions, are not enforceable under the citizen suit provisions. <u>See</u> State Memorandum at 5-6. This position is neither compelled by nor consistent with the plain meaning of the Clean Air Act, Congressional intent, or EPA's interpretation of the Massachusetts SIP.

In 1990, Congress expanded the definition of actionable "emission standards and limitations" subject to citizen suit litigation to include "<u>any other standard, limitation or schedule</u> … established under any applicable State implementation plan, [and/or] <u>any permit term or condition</u> which is in effect under an applicable implementation plan" 42 U.S.C.A. § 7604(f)(4)(emphasis added). The plain language meaning of this statutory language contradicts the defendants' claims that the <u>terms and conditions</u> of the Vent Stack Permit and the Amended Vent Stack Permit, both of which were issued and conditioned pursuant to the SIP-approved Tunnel Ventilation Certification Regulation, are not within the jurisdiction of this Court.

The plain language of the Clean Air Act is the starting point for all statutory construction issues. <u>E.g.</u>, <u>Ardestani v. INS, 502 U.S. 129, 134  (1991)</u>(quotations

omitted) (the starting point of statutory interpretation is the 'language [of the statute] itself"); In re Bankvest, 360 F.3d 291, 296 (1st Cir. 2004). The Clean Air Act's plain language is contrary to the defendants' collective attempts to argue that "in effect under" means that terms and conditions must be specifically identified into the implementation plan.

The relevant language is set forth in section 304 of the Clean Air Act, 42 U.S.C.A. § 7604. Subsection (a) of section 304 provides in pertinent part:

> [A]ny person may commence a civil action on his own behalf—
> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment of the Constitution) who is alleged to have violated (if there is evidence that the violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or the State with respect to such a standard or limitation.

42 U.S.C.A. § 7604(a).

Subsection (f) of the same section, in pertinent part, defines "emission standard or limitation" as follows:

> [T]he term "emission standard or limitation under this chapter means—
> (1) a schedule or timetable of compliance, emission limitation,     standard of performance or emission standard,
>       * * * * *
> (3) any condition or requirement of a  permit [issued directly under various sections of the Clean Air Act], any condition or requirement under an applicable plan relating to transportation control measures, [other unrelated Clean Air Act provisions], or
>  (4) any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or

> condition, and any requirement to obtain a permit as a
> condition of operations.
> which is <u>in effect under</u> this chapter … or under an applicable
> implementation plan.

42 U.S.C.A. § 7604(f)(emphasis added).

The language of the statute establishes that a particular standard or limitation does not have to be specifically and textually present or referenced in either the section of the Clean Air Act or in an applicable implementation plan to be enforceable by citizen suit. The standard or limitation -- in each and all of its manifestations as defined in subsection 304(f) -- must simply derive directly from either the Clean Air Act or from approaches adopted under a SIP.

The phrase at issue -- "in effect under" -- can be broken down into two parts: "in effect" and "under." Starting with the second word first, the Supreme Court has noted in another context that the plain and ordinary meaning of "under" is "subject [or pursuant] to" or "governed by" the particular statute in question. <u>See</u> <u>Ardestani</u>, 502 U.S. at 135. There is no reason to promote a different meaning of that word in the context of the citizen suit provisions of Clean Air Act such that "under" means "in."  An emission standard or limitation is in effect "under" the act or "under" an applicable implementation plan to the extent to which it is developed "subject to" or "pursuant to" the act or the implementation plan. The plain meaning of the word does not suggest that the standard and limitation has to be specifically present in the text of the SIP itself.  <u>See also</u> <u>Village of Oconomowoc Lake v. Dayton Hudson Corp.</u>, 24 F.3d 962, 964 (7th Cir. 1994) (a state's rules can be emission standards or limitation "under" this chapter' in the sense that they are "*adopted"* under the Clean Air Act or "*satisfy"* the Clean Air Act) (emphasis in original). The Vent Stack Permit explicitly states that "<u>pursuant</u> to 310 CMR

7.38(3)(a)(5) [i.e. the Massachusetts SIP]" the following conditions must be met." Vent Stack Permit, July 8, 1991, at 2, CLF Complaint at Exhibit 3. The Vent Stack Permit and its certification conditions, therefore, were created and adopted pursuant to, or "under" the Massachusetts SIP.

"The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstance' when a contrary legislative intent is clearly expressed." Ardestani, 502 U.S. at 520. Defendants, however, point to no legislative history that would express an intent by Congress to use the phrase "in effect under" to mean "textually within the four corners of the document" as the defendants would have this Court hold.

In fact, the Clean Air Act Amendments of 1990 Conference Summary indicates that the House and Senate agreed that "citizen suits [can be] brought to enforce the requirement to obtain a permit, the conditions of permits, and the requirements contained in SIPs." 136 Cong. Rec. S18037, S18040 (Oct. 24, 1990) "Summary of Title VI: Federal Enforcement: Citizen Suits." The Conference Report reflects the comments of Representative Collins that the addition to the citizen suit provision "expands and enumerates areas of the Clean Air Act that absolutely can be challenged in Federal court by private citizens. The expansion includes: [a]ny aspect of a State implementation plan; any aspect of a permit; and the failure to obtain a permit." 136 Cong. Record H2511, H2858 (May 21, 1990).[6] See Communities for a Better Environment v. Cenco Refining

---

[6] It cannot be argued that the "permit" referred to in this history means only the Title V permit, i.e. the permit program for private polluters, because the language of § 7604(f)(4) states "any other standard…established under any permit issued pursuant to title V…, any permit term or condition, and any requirement to obtain a permit…" A restrictive reading of "permit" to just Title V situations would improperly make the two latter phrases superfluous. *Duncan v. Walker*, 533 U.S. 167, 175 (2001)("it is our duty 'to give effect, if possible, to every clause and word of a statute…we are thus 'reluctant to treat statutory terms as surplusage' in any setting.")

Co., 180 F.Supp. 1062, 1082 (C.D.Cal. 2001)(citizen suit provisions apply to state permitting under approved SIP).

Congress' frustration with narrow jurisdiction rulings for citizen suit litigation is captured well by Representative Collins' floor statement: "[W]e can – and we must – guarantee that the courts will have the power to at least hear the merits of citizens claims." Id. Defendants' restrictive interpretation of the citizen suit provisions runs directly counter to Congress' purposes.

The plain language meaning of the term "in effect under" is consistent with the enforceable regime created by the Clean Air Act, the Massachusetts SIP, and Vent Stack Permit certification process to assure compliance of the emissions from the tunnel ventilation systems with federal law.  This SIP regime strengthened the Tunnel Ventilation Certification Regulation by providing specific enforceable measures to accomplish the more general goals of the SIP.  Indeed, as the First Circuit Court of Appeals has already concluded in Sierra Club v. Larson, the incorporation of the Tunnel Ventilation  Regulation "does not weaken a federally approved state implementation plan but rather strengthens it by extending a new regime to such ventilation systems where previously no federally approved regime applied at all." Id., 2 F.3d at 470.  If the terms of the Vent Stack Permit are not correctly interpreted as "in effect under" in accordance with the plain language of 42 U.S.C. § 7604, the scheme is not enforceable and the relevance of the Tunnel Ventilation Certification Regulation to the SIP's purposes is rendered meaningless.

The "federally-approved regime" that is incorporated in the Massachusetts SIP through the Tunnel Ventilation Certification Regulation includes three interlocking

elements that depend on each other to comply with the Clean Air Act; without the presence of any one of the parts, the regime as contemplated by the SIP approval would fail.[7]  First, the Tunnel Ventilation Certification Regulation states: "[t]he Department may impose such conditions on any acceptance of a certification issued pursuant to 310 CMR 7.38(3) as it deems necessary to meet the criteria of 310 CMR 7.38(2)(a)1 through 3[,]" reiterating the relationship between the certification process and the requirement to meet federal NAAQS and other air pollution requirements. 310 C.M.R. §7.38(3)(b). Second, the Vent Stack Permit issued under the Tunnel Ventilation Certification Regulation states that "the department hereby accepts the certification subject to the conditions set forth below [listing a series of mitigating and offsetting pollution reduction projects and programs]…. [P]ursuant to 310 7.38 (3) (a) 5, DEP finds these measures are necessary to mitigate potential adverse impacts from the project." CLF Complaint 38, Exhibit 3, Vent Stack Permit, at 1-2. And third, the Clean Air Act states that a citizen can sue for an emission standard or limitation as defined by a permit term or condition in effect under a state implementation plan. 42 U.S.C.A. § 7604(f)(4)

The federal agency responsible for approving the Massachusetts SIP also understood the incorporation of the Tunnel Ventilation Certification Regulation into the SIP to have the legal effect of making the state permits and permit conditions issued pursuant to the Tunnel Ventilation Certification Regulation federally enforceable. In response to comments and concerns raised by CLF during the rulemaking process that approved this particular revision to the Massachusetts SIP about the enforceability of the ventilation stack permits issued under the regulation, EPA stated:

---

[7] It is not surprising, therefore, that the three elements reference each other explicitly.

> EPA agrees [with CLF'c comments] that the tunnel ventilation system regulation, <u>and any certification issued thereunder</u>, need to be adequately enforced. EPA expects, in the first place, that DEP will ensure compliance with the regulation and any certification issued thereunder.  In addition, EPA notes that federally-approved SIP provisions are enforceable by EPA under section 113 of the Clean Air Act, and that, to the extent that DEP does not adequately enforce, EPA may choose to take additional steps to ensure compliance.

EPA Final Rule Approving the Tunnel Ventilation Certification Regulation, 57 Fed. Reg. 46310-11 (emphasis added), attached to MBTA Memorandum as Exhibit B.  EPA's interpretation of the Massachusetts SIP is entitled to substantial deference. <u>E.g.</u>, <u>Sierra Club</u>, 2 F.3d at 468-69.

 Federal enforceability in the context of the Clean Air Act has been defined to include the right of enforcement through citizen suit.  See <u>National Mining Assoc. v. U.S. EPA,</u> 59 F.3d at 1362 (where court defined control as "federally enforceable' if it is enforceable by the Administrator and citizens under the Act or…under other statutes administered by the Administrator").[8]

 In the face of the plain contrary language of the Clean Air Act, the contrary legislative history, and the contrary EPA interpretation of the Massachusetts SIP Amendment, the State Defendants manufacture a "bright-line test" to determine whether an emission standard or limitation is "in effect under" the Clean Air Act for citizen enforcement purposes: the specific standard or limitation must be included in the "text of

---

[8] The State Defendants allude to 11th Amendment issues in their memorandum but do not base their motion on this defense. State Memorandum at 6 & fn. 7. Because the permit conditions at issue are federally enforceable and do not exist only as a matter of state law, the 11th Amendment of the U.S. Constitution does not shield the defendants. Furthermore, "the Supreme Court has recognized that the Eleventh Amendment does not preclude properly pleaded actions against state officials when the relief sought is prospective and equitable in nature."  *Chaulk Services v. MCAD*, 70 F.3d 1361, 1371 (1st Cir. 1995); *See also*, *Ex Parte Young*, 209 U.S. 123 (1908). CLF reserves the right to brief this issue more fully if defendants raise this issue more directly in the future.

the SIP." State Memorandum at 5. This "bright-line rule" is derived from Cate v.
Transcontinental Gas Pipe Line Corp., 904 F. Supp. 526 (W.D. Vir. 1995). The statutory
interpretation argument in Cate, however, is fundamentally wrong and has not been
followed in the First Circuit for the proposition that defendants advance.

The Cate court misuses a First Circuit case to reach its conclusion. The Cate court
states:

> There appears to be considerable support for the proposition
> that the language "in effect under this chapter" limits the
> citizen suit provision "to suits against individual polluters or
> governmental actors that fail to comply with specific
> requirements of a state or EPA implementation plan…."

904 F. Supp. at 533 (quoting from CLF v. Federal Highway Admin., 24 F.3d 1465 (1st
Cir. 1994). Cate then goes on to state: "[t]hus for many courts, approval by EPA or
inclusion in a state SIP are the outer boundaries of the meaning of 'in effect under' the
Act." Id.

The First Circuit decision, CLF v. FHA, does not stand for the proposition state
"in effect under" means a standard or limitation has to be literally "in" the SIP. In that
case, the First Circuit was deciding whether citizen suit enforceable standards or
limitations had to be in effect under an implementation plan or whether they could arise
from the Clean Air Act itself. CLF v. FHA, 24 F.3d at 1477. In dicta, the First Circuit
notes that some other courts had taken the approach that citizen suits could only be filed
to enforce the specific requirements of a state implementation plan. Id., 24 F.3d at 1477-
78 (referencing the same cases cited Cate). The First Circuit, indeed, criticizes the
analysis of those cases suggesting that the cases were primarily concerned with blocking
citizen litigation that was attempting to enforce the NAAQS directly, rather than

enforcing the specific measures adopted under the SIPs to achieve compliance with the NAAQS. Id.  Thus, contrary to the suggestion in Cate, the First Circuit specifically rejected a narrow construction of 42 U.S.C.A. § 7604.

While the First Circuit *has* referenced the Cate decision in CLF v. Busey, 79 F.3d at 1258, the Court did not do so for the purpose advanced by the defendants.  In fact, the First Circuit has never adopted a "bright-line test" that controls a reviewing court's determination of whether a particular standard or limitation was "in effect under" the Clean Air Act.  See CLF v. FHA, 24 F.3d at 1477-78; see also Sierra Club v Larson, 2 F3d. at 469("state restriction that is part of a federally approved state implementation plan under the Clean Air Act may at least in some circumstances be within the purview of a citizens suit under 42 U.S.C. § 7604.").  The Busey Court was focused on the issue of the specificity of the standard or limitation that was alleged to be violation, not whether the text of the particular provision is specifically identified in the SIP. Id., 79 F.3d at 1258.

That consideration is not at issue here. The conditions of the certification under the Tunnel Ventilation Certification Regulation are specific.  See, e.g., Vent Stack Permit A.11. ("Add rolling stock on the MBTA [Red and] Orange Lines by December 31, 1995 (at least…46 cars on the Orange Line)").  These conditions are patently "objective" and not "aspirational" and represent a fundamental part of the Commonwealth's approved SIP strategy for achieving compliance with the Clean Air Act.  Defendants challenge the enforceability of these conditions by way of citizen suit because they were not listed in the text of the Massachusetts SIP. For the foregoing reasons, CLF argues that such listing is not necessary for these critical projects to be "in effect under" the Massachusetts SIP.

CLF does agree with the defendants' view that the jurisdiction of this Court with respect to enforcement of the Clean Air Act is restricted to violations of "emission standards or limitations" as defined by § 7604. But the terms and conditions of the Vent Stack Permit *are* emission standards and limitations under the definitions of that section, and therefore are within the purview of this Court's jurisdiction. See U.S. v. American Electric Power Service Corp. 137 F. Supp.2d 1060, 1066 (S.D. Ohio 2001)("operation of a facility in violation of any condition required by a permit is a violation of the statute [§7604(a)(3)]"); Oregon Environmental Council v. Oregon Dept. of Environmental Quality, 1992 WL 252123, 27 fn.1 (D. Or. 1992) ( "once a pollution source is issued a permit by an authorized state permitting agency…a violation of the permit is a violation of the [Clean Air] Act); Sierra Club v. Georgia Power Co. 2004 WL 3315190, *12 (N.D. Ga. 2004)(court finds citizen suit provision allows suits "against any person…who is alleged to have violated…any condition of an operating permit").

This Court should not limit jurisdiction to redress such significant and continuing violations on the basis of the defendants' so-called "bright line." Defendants' Motions to Dismiss these counts in CLF's Complaint should accordingly be denied.

    c.   The Violations Specified in Counts 17, 18 and 19 Pertain to Enforceable Emissions Standards and Limitations in Effect Under the Massachusetts SIP.

The requirements to provide regional rail service to T.F Green Airport in Rhode Island, to promote signalization technology to give priority to mass transit vehicles, and to secure federal funding for Silver Line Phase III by 2005, are each specific, enforceable emissions standards or limitations. CLF Complaint Counts 17, 18, 19. MBTA Defendants argue that these commitments cannot be enforced because they are not sufficiently

specific to satisfy the definition of an emissions standard or limitation.  MBTA
Memorandum at 14.  In fact, each of these counts allege violations of the type of specific
strategies that the Clean Air Act citizen suit provision gives courts the right to enforce.[9]

Federal courts do not have jurisdiction over a state's success and failures in
achieving the general air quality goals of the Clean Air Act, but can enforce specific
measures designed by the state to achieve Clean Air Act goals.  Communities for a Better
Environment, 180 F.Supp. at 1076. This limitation on judicial action "eliminate[s] the
need for 'reanalysis of technological or other consideration at the enforcement stage.'"
Wilder v. Thomas, 854 F.2d 605, 614 (2d Cir. 1988).

The transit commitments at issue in Counts 17, 18 and 19 are clear and objective.
Each describes a specific strategy committed to by the state to achieve air quality goals.
A strategy can be sufficiently specific to provide jurisdiction even if it does not contain a
numerical goal.  Communities for a Better Environment, 180 F. Supp. 2d at 1077.
Although the measures in Counts 17-19 of CLF's Complaint are narrative, they are clear
and objective requirements and satisfy the specificity requirement of 42 U.S.C. § 7604.[10]
In order to provide relief or determine liability, the Court need not impose new
requirements or reanalyze the measures the state has chosen to achieve the NAAQS.

---

[9] CLF's Complaint pleads the ACO violations in the alternative, because it is unclear what legal force and
effect they have. They do not appear to have been issued consistent with the procedural or substantive
requirements of the Massachusetts SIP; they also appear to be unenforceable by the public. If they are
operative under the Massachusetts SIP, then CLF would argue that the defendants are also in violation of a
number of the commitments in the ACOs. For purposes of arguing this portion of its opposition
memorandum, CLF assumes that the ACO's are enforceable under the Massachusetts SIP.

[10] The ACO states: "In cooperation with Rhode Island Department of Transportation, provide regional rail
service between Boston and TF Green Airport in Rhode Island…, EOTC will promote the use of
signalization technology to give priority to mass transit vehicles over automobiles with the metropolitan-
Boston area… [and]… [i]f federal funding is not secured for Section C [Silver Line phase III] by 2005 and
if, as a result, the tunnel section will not be completed by 2010, EOTC shall, on a yearly basis for each year
that federal funding is not secured for Section C, undertake other urban transportation investments and
enhancements which would not otherwise have occurred until a later date." CLF Complaint ¶ 45, Exhibit 6.

Also, the Court need not delve into the details regarding *how* specific strategies are implemented, i.e., what type of technology the State will use to prioritize mass transit, but the Court can and must inquire into CLF's allegations that the specific strategies are not being pursued at all. [11]

Defendants' efforts to deprive the Court of this fundamental jurisdiction through their characterization of the ACO commitments as "non-specific strategies" is an attempt to frustrate the legislative scheme. Defendants argue, first, that the specific terms of the Vent Stack Permit are not enforceable because they are superseded by the ACO. Next, they argue that the terms of the ACO are not enforceable because they are not sufficiently specific. The end result of defendants' argument is that no judicial enforcement of defendants' Clean Air Act obligations are possible, and indeed, that defendants can violate the very measures they have promised to undertake to enhance the Commonwealth's air quality without consequence.

IV.    Conclusion

The transit commitments are specific emission standards or limitations in effect under the SIP that are enforceable by citizen suit under the Clean Air Act. Commitments in the SIP itself at 310 CMR 7.36 include specific interim obligations to achieve final operating deadlines. Those interim obligations are enforceable in advance of the final operating deadlines. The certification conditions in the Vent Stack Permit are also enforceable because they are "in effect under" the SIP, as required by the citizen suit provision of the Clean Air Act. Because the ACOs are not consistent with the procedural and substantive requirements of the Massachusetts SIP and the permit conditions in effect thereunder, they cannot supercede the obligations set out in the Vent Stack Permit.

---

[11] Again, this is an area where factual disputes must be resolved in favor of CLF.

Similarly, Defendants' argument that even if the terms of the Vent Stack Permits are not superseded, they are not "in effect under" the SIP fails because of the plain language of the Clean Air Act.

For the foregoing reasons, the Court should deny defendants' motions to partially dismiss CLF's Complaint under Fed. R. Civ. P. 12(b)(6).

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.

By its attorneys,


/s/ Carrie Schneider
Carrie Schneider (BBO# 660442)
Peter Shelley (BBO# 544334)
Eloise Lawrence (on the brief)
Conservation Law Foundation
62 Summer Street
Boston, MA  02110
(617) 350-0990
(617) 350-4030(Fax)

DATED: May 6, 2005