UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MITT ROMNEY, in his official capacity as ) <br> GOVERNOR OF MASSACHUSETTS, et al., ) <br> ) <br> Defendants. ) <br> ) | C.A. No.  05-10487/NG |

**REPLY BRIEF OF THE MBTA DEFENDANTS
IN SUPPORT OF THEIR MOTION TO DISMISS**

The present lawsuit unfolds against a backdrop of active transportation planning at the highest levels of Massachusetts government.  Less than two weeks ago, on May 18, 2005, the Executive Office of Transportation ("EOT") announced the outcome of a public process begun in early 2005 to evaluate several public transit projects at issue in this case.  In its announcement, the EOT committed to an expansion of the proposed extension of Green Line service into Medford -- one of the projects championed by CLF -- that would double the originally expected ridership by extending service to Somerville's Union Square and West Medford.  The EOT also committed to an ambitious plan to create new stations along the underused Fairmount Commuter Rail Line in Dorchester, Mattapan and Hyde Park, thereby creating a high speed connection between downtown Boston and some of its most historically underserved neighborhoods.  These projects, along with a planned expansion of park and ride facilities, are expected to provide 110% of the air quality benefits associated with the remaining unfinished transit projects on the list originally developed in the late 1980s, with CLF's participation, in connection with the

B3038952.2

Central Artery/Tunnel Project ("CA/T").[1] At the same time, the announcement indicated that two unfinished projects sought by CLF -- restoration of trolleys along the Arborway Line in Jamaica Plain and creation of a connection between the Blue and Red Lines of the subway -- may be reconsidered.

Not surprisingly, the EOT's proposals have already spurred significant debate, reflecting the important role public transit can play not only as a means of mobility for individuals but as a means of promoting economic growth and encouraging sustainable urban development. However, while public comment on EOT's announcement should and will continue, it is important to note that there has been no disagreement regarding the importance of providing transit improvements in connection with the CA/T project. Indeed, the lion's share of projects anticipated by the original agreements have already been completed and put into operation in the intervening years, including implementation of silver line bus rapid transit service from Dudley Square to Boston and from South Station to Logan airport, addition of 86 cars to increase service on the Red Line, implementation of bus service on the circumferential urban ring and expansions of commuter rail service north to Newburyport and west to Worcester. Other projects are underway, including restoration of rail service along the Old Colony line to the south and expansion of Blue Line platforms to accommodate six-car trains. What remains under discussion is how best to meet the air quality goals associated with a small number of projects originally conceived in the 1980s, such as the Green Line extension, the Arborway project and the

---

[1] The EOT's letter to the Department of Environmental Protection formally advancing these projects and discussing their air quality benefits is attached as Exhibit A to this reply brief.

Blue/Red connection, which have come under scrutiny over time due to public ambivalence or because other transit improvements serving the same purpose made their completion less urgent.[2]

Addressing these outstanding questions was one of the primary purposes of the Administrative Consent Order ("ACO") entered into between the transportation agencies and DEP in early 2005. While imposing penalties and mitigation projects to address prior delays, the ACO directed the agencies to commence immediately a public process to review the remaining transit projects to determine whether alternative public transportation improvements would address air quality goals while more closely matching available public funds to the most urgent transportation needs. As a result of that process, EOT determined that existing plans for the Green Line and Fairmount Commuter Rail line should be significantly expanded, both because of their significant air quality benefits and their importance in serving areas where the need for public transit is greatest. The Arborway Line and Red/Blue connection were given a lower priority.[3]

It is the Defendants' position that implementation of these proposals, in addition to being the best use of transit dollars, not only meets the air quality goals established for public transit in the 1980s but will do so consistently with all applicable requirements of the Massachusetts SIP.[4]

---

[2] At present, service is provided along the Arborway Line using buses fueled by compressed natural gas. This approach provides many of the air quality benefits of electric trolleys without raising the public safety concerns associated with a fixed-rail system running down the center of a busy street. Better Red Line access to Logan Airport -- a key benefit of the Red/Blue connector -- became available with the beginning of Silver Line service to Logan from South Station on the Red Line. Bus service was also expanded to areas of Somerville that would be served by the Green Line extension.

[3] Usage estimates indicated that the Arborway project, estimated to cost $70 million and raising significant safety concerns would add almost no new riders to the system. Instead of the trolley service sought by CLF, the EOT has proposed making the compressed natural gas bus service permanent, using better signalization to shorten drive times. The EOT also plans to continue to expand Silver Line service to Logan.

[4] Comparing the group of projects now proposed to those remaining from the original list, Commonwealth Development Secretary Doug Foy stated simply "this package is vastly better" -- serving almost twice the number of commuters, doubling air quality benefits, and doing both at an equivalent or slightly lower cost.

As a matter of transit policy, CLF disagrees. However, for CLF to seek to enforce its preferences in *this* proceeding requires a showing that specific, objective requirements in effect under the Massachusetts SIP require that result. With respect to the counts the MBTA Defendants have moved to dismiss, it has made no such showing. Because CLF has identified no adequate basis to support its claims, they must be dismissed for failure to state a claim cognizable in a Clean Air Act citizen suit.

**Argument**

**I.     Counts 1 and 7-12 Allege no Violation of a Requirement In Effect under the SIP**

In its Opposition, CLF acknowledges that a requirement is "in effect under" a SIP, and therefore enforceable in a citizen suit, only if it is "currently or presently operative under the terms of the SIP." CLF Opp. at 17 (citing Delaware Valley Citizens Council for Clean Air v. Davis, 932 F.2d 256, 265 (3d Cir. 1991)). Having stated the correct proposition, CLF then goes on to argue exactly the opposite with respect to the challenged counts -- claiming that the Court should enforce in this action the requirements of the July 1991 "Vent Stack Permit" and the September 2000 "Amended Vent Stack Permit" although both of these approvals were superseded by a subsequent state order -- the Second Amended Administrative Consent Order ("Second Amended ACO") issued in January 2005. None of the arguments or cases advanced by CLF provide any justification for this counterintuitive result.

As CLF's Opposition admits, there is no doubt that DEP has the authority to revise the terms of the approvals of certifications it refers to as Vent Stack Permits. CLF Opp. at 18. In fact, DEP's authority to do so is assumed on the face of CLF's Complaint -- many of CLF's claimed violations are premised on deadlines appearing in the Amended Vent Stack Permit, *not* the original approval. See, e.g., Complaint ¶¶ 53, 88, 95. Nor is there any dispute that DEP,

acting expressly pursuant to this authority, revised the relevant deadlines and terms of the Amended Vent Stack Permit by means of the Second Amended ACO, an approval that also imposed penalties and approved mitigation projects to address project delays.  Complaint, Exhibit 8 at 1, 7-14.  As a result , the deadlines and terms considered by DEP to be "presently or currently operative" with respect to Counts 1 and 7-12 appear in the Second Amended ACO, not the Vent Stack Permit or Amended Vent Stack Permit.

Although CLF contends that the revised deadlines and other terms recited in the Second Amended ACO should be treated as ineffective, CLF provides no valid basis on which the court could reach that conclusion.  CLF is clearly wrong to argue that the actions taken by DEP in the Second Amended ACO were required to conform to procedures set forth in the original Vent Stack Permit or the Transit Regulation.  See Complaint, ¶¶45, 48; CLF Opp. at 18.  By the time the Second Amended ACO was issued, the original Vent Stack Permit had already been replaced by the Amended Vent Stack Permit and therefore could not limit DEP's discretion in issuing the Second Amended ACO.[5]  The Transit Regulation is irrelevant, since it did not purport to govern the issuance of Vent Stack Permits.[6]  Nor could it be argued, as CLF suggests at ¶49 of its Complaint, that EPA approval was required to modify the Amended Vent Stack Permit.  Because

---

[5] CLF tries to argue that the existence of violations of the Vent Stack Permit, because set forth in its Complaint, must be "taken as true for purposes of this motion."  Complaint, 18.  However, this is plainly incorrect.  Dismissal cannot be avoided by asserting a legal conclusion that it is contradicted by the facts the plaintiff itself asserts.  See Doran v. Massachusetts Turnpike Authority, 348 F.3d 315, 318 (1st Cir. 2003) (in reviewing grant of motion to dismiss, noting that court is not required to accept legal conclusions); New England Cleaning Services, Inc. v. American Arbitration Ass'n, 199 F.3d 542, 545 (1st Cir. 1999) ("The court is not required to accept legal conclusions as true when considering a motion to dismiss.").

[6] Although the MBTA Defendants have moved to dismiss two counts -- Counts 2 and 4 -- that refer to projects appearing both the Vent Stack Permits and the Transit Regulation, it was made clear that dismissal was sought only to the extent they relied on the Vent Stack Permits.  Mot. to Dismiss at 1, n. 1.

neither the Vent Stack Permit nor the Amended Vent Stack Permit were ever incorporated into the SIP, a SIP amendment was not needed to modify their terms.[7]

CLF has also pointed to no requirement that would have precluded DEP from using the form of an ACO to confirm approval of revised Vent Stack Permit terms. In fact, the "Amended Vent Stack Permit," which CLF accepts, itself consisted of a cover letter and an ACO (the "Amended Vent Stack Permit/ACO") setting forth additional detail on the affected transit and mitigation requirements. See Complaint, Exhibits 4 & 6.[8] CLF's misleading use of the terms "Vent Stack Permit" and "Amended Vent Stack Permit" to refer to these approvals cannot obscure the fact that they are not "permits" in the usual sense, but simply DEP approvals of certifications. These approvals were not required to take any particular form.

Although CLF tries to question DEP's motives, suggesting that DEP used the ACOs in order "to make the specific strategies to attain compliance . . . unenforceable by the court," CLF Opp. at 20, this argument wholly misrepresents the Defendants' position and the operative law. The Defendants have never argued that the ACOs are unenforceable "orders" for purposes of a Clean Air Act citizen suit. See 42 U.S.C. § 7604(a)(1)(B) (authorizing citizen suits premised on violations of, among other things, "an order issued by the Administrator or a State"). Rather, they have argued that, to the extent the terms of an ACO clarified or modified the terms of the approvals referred to here as the Vent Stack Permit and the Amended Vent Stack Permit, it is the

---

[7] CLF does not appear to press this argument strenuously in its Opposition, for obvious reasons. It is undisputed that the Amended Vent Stack Permit properly superseded the original Vent Stack Permit -- CLF itself relies on the terms of the Amended Permit -- yet no EPA approval was ever sought or received for this amendment.

[8] Although CLF drafted its Complaint to suggest that there were two separate documents -- an "Amended Vent Stack Permit" and a simultaneous "ACO," CLF's position is belied by the plain terms of the September 1, 2000 letter, which make clear that DEP viewed the ACO as an integral part of the approval. Complaint, Exhibit 4 at 1 (expressly incorporating the attached ACO by reference); id. at 2 (stating that the projects identified in the letter would be implemented "according to the schedules contained in . . . the September 1, 2000 Consent Order").

ACOs' conditions that are currently "in effect" under the Massachusetts SIP.  MBTA Mot. to Dismiss at 11-12; State Motion to Dismiss at 17.

It should also be noted that the effect of DEP's decision to use an ACO rather than a letter approval was to make the terms of the Amended Vent Stack Permit/ACO *more* enforceable, not less.  Had DEP issued only its written approval -- as it did in the case of the first Vent Stack Permit -- the agency would potentially have had to commence a Clean Air Act citizen suit to enforce compliance with its terms.  By incorporating those requirements into an ACO, DEP gained the additional ability to enforce compliance with its requirements directly, through its administrative process.

In the end, CLF has simply failed to identify any basis on which this Court could conclude that the Vent Stack Permit and/or the Amended Vent Stack Permit are "currently or presently operative under the terms of the SIP."  Delaware Valley, 932 F.2d at 265.  To the contrary, it is clear that the terms of DEP's most recent approval have been properly formalized in the January 2005 Second Amended ACO.  Because Counts 1 and 7-12 are premised on violations of the superseded approvals, they must be dismissed.

## II.    CLF Has Identified No Enforceable Requirements Under Counts 5-6 and 17-19

It is settled law that district court jurisdiction to hear Clean Air Act citizen suits based on SIP requirements is limited to the enforcement of "specific measures, strategies or commitments" of the SIP.  Conservation Law Foundation, Inc. v. Busey, 79 F.3d 1250, 1258 (1st Cir. 1996); accord Bayview Hunters Point Community Advocates v. Metropolitan Transportation Commission, 366 F.3d 692, 701 (9th Cir. 2004); Council of Commuter Organizations v. Metropolitan Transportation Authority, 683 F.2d 663, 670 (2nd Cir. 1982).  Furthermore, district courts "may not enforce a SIP's overall objectives or aspirational goals" except to the extent set

forth in a specific, objective SIP commitment. Bayview, 366 F.3d at 701; accord Action for Rational Transit v. West Side Highway Project by Bridwell, 699 F.2d 614, 616 (2nd Cir. 1983) ("The aims and goals of the SIP are not enforceable apart from the specific measures designed to achieve them."); Busey, 79 F.3d at 1258 (district court jurisdiction limited by Congress to those commitments that meet "an objective evidentiary standard" and "would not require reanalysis of technological or other considerations at the enforcement stage") (quoting Clean Air Act Legislative History). CLF's Opposition fails to demonstrate that Counts 4-5 and 17-19 are premised on specific, objective SIP requirements of the kind required as the basis of a valid citizen suit.

### A. No Enforceable Interim Deadlines Exist for Counts 4 and 5

MBTA moved to dismiss Counts 5-6 because the alleged "violations" on which they are premised relate to projects whose only stated deadlines lie years in the future. MBTA Mot. to Dismiss at 13-15. Hoping to avoid dismissal, CLF now argues with respect to these counts that an enforceable SIP requirement should be implied based on a statement in the Transit Regulation that, CLF alleges, requires the EOT to "plan and construct and render available for public use" the transportation improvements at issue. CLF Opp. at 11. CLF's argument fails on three independent grounds. First, it is manifestly *not* the ground for suit alleged in CLF's Complaint. There, CLF alleged that a violation should be found for these Counts not based on any language in the Transit Regulation but because the final deadlines for the projects should be read to "include[e] by necessary implication all conditions precedent to ensure that such obligation is met in a timely manner." Complaint, ¶¶ 72, 79.

Second, CLF's construction misconstrues the import of the quoted language in the Transit Regulation. Contrary to what CLF would have this Court believe, the "plan and

construct" language does not set forth a requirement specifically applicable to these projects, but appears in the preface to the list of *all* transportation projects identified in the Transit Regulation. That preface, in full, states:

> EOTC [the Executive Office of Transportation and Construction] shall plan and construct and render available for public use, transit improvement projects including the following projects *in accordance with the schedules set forth in this section*."

310 CMR 7.36(2) (emphasis added).  With respect to the projects at issue here, the relevant "schedules" appear at 310 CMR 7.36(2)(h), which states:

> Before December 31, 2011 construction of the following facilities shall be completed and shall be opened to full public use:
>
> 1.      Green Line Extension to Ball Square/Tufts University
> 2.      Blue Line connection from Bowdoin Station to the Red Line at Charles Station.

Thus, the only "specific requirements" that the Transit Regulation even purports to establish for these projects are that "construction . . . shall be completed" and they "shall be opened to full public use" by December 31, 2011.  Because that deadline lies years in the future, any suit to enforce that deadline is premature.

Third, even if the regulation could possibly be construed as making the "plan and construct" language independently applicable to the Green Line Extension and Blue/Red Connection, the interpretation CLF urges could not be squared with other provisions of the same regulation.  In particular, 310 CMR 7.36(3)(a) specifically authorizes the EOTC to investigate and propose substitute projects if any of the listed projects "is expected to be delayed more than three years beyond the deadline" given in the regulation (i.e. beyond 2014).  To read the "plan and construct" language to create a *presently* enforceable obligation with respect the particular listed projects would effectively read this provision out of the regulation -- suggesting that EOTC

- 9 -

could be required to plan and begin building transportation projects that, by the regulation's plain language, it remains free to replace with other projects. Established canons of construction preclude such a result. See United States v. Commonwealth Energy System and Subsidiary Cos., 235 F.3d 11, 15 (1st Cir. 2000) (noting that "a statute should be construed so that each part is given effect and no part is rendered inoperative or superfluous."); Kelly v. Keystone Shipping Co., 281 F. Supp. 2d 313, 328 (D. Mass. 2003) (applying the same rule in construing a regulation).

Although CLF continues to press the argument that this court may impose its own interim deadlines, even if the regulatory language does not, CLF offers not a single case supporting its view. In American Lung Ass'n of N.J. v. Kean, 670 F. Supp. 1285 (D.N.J. 1987), the issue of judicially created deadlines never arose -- each of the interim deadlines at issue in the case was specifically set forth in the SIP. Id. at 1288-89.[9] Despite CLF's disingenuous argument, Kentucky v. Ruckelshaus, 497 F.2d 1172 (6th Cir. 1974), has nothing to do with interim deadlines at all -- the court's statement that a plaintiff need not "wait until an emission standard is violated" refers only to the fact that the Clean Air Act's express language also authorizes suits based on "a schedule or timetable of compliance" set forth in a SIP. Id. at 1175. Such schedules and timetables are notably absent here.

The district court opinion in Bayview Hunters Point Community Advocates v. Metropolitan Transportation Commission, 212 F. Supp. 2d 1156 (N.D. Ca. 2002), rev'd, 366 F.3d 692 (9th Cir. 2004), is equally inapposite, since it discussed interim deadlines solely in the context of a remedial injunction being issued to enforce compliance with a deadline that had

---

[9] In fact, the court expressly notes that the plaintiffs are not advancing claims with respect to certain provisions whose performance deadlines lie in the future -- plaintiff is only seeking enforcement of those that have already passed. See id.

already been missed.  Bayview, 212 F. Supp. 2d at 1168-69; see also 366 F.3d at 695-96 (summarizing basis of suit in alleged failure to meet in 1987 an obligation to increase transit ridership over 1982 levels).  That a court has equitable power to shape its injunction to ensure compliance does nothing to obviate the requirement that, in the first instance, enforcement is limited to requirements set forth with specificity under the SIP.  Busey, 79 F.3d at 1258.  In the absence of such any such requirement, these counts must be dismissed.[10]

### B.   Counts 17-19 Allege No Violation of an Enforceable SIP Requirement

With respect to Counts 17-19, CLF relies for the most part on bare assertion, claiming, without elaboration, that the language on which these counts are premised is "sufficiently specific" and "clear and objective" to fall within the court's jurisdiction.  CLF Opp. at 31.  Tellingly, however, CLF is unable to point to a single case that would support treating the statement that an agency will "promote the use of signalization technology" (Complaint, Count 18) as a sufficiently specific commitment to enforce in a Clean Air Act citizen suit.  Nor has CLF identified any instance in which a general statement to "provide regional rail service" (Complaint, Count 17) to a particular destination, with no associated deadline, has been held to be enforceable.[11]  Merely saying that they are enforceable cannot make up for the lack of on-point authority showing that any similar requirement ever has been held to meet the clearly established "specificity" and "objectivity" thresholds.

---

[10] CLF's unsupported effort to import the contract concept of "anticipatory breach" into the Clean Air Act cannot overcome the mountain of precedent, cited above, requiring a specific and objective requirement as the predicate for a citizen suit.  Tellingly, CLF identifies no case accepting such an argument.

[11] The inappropriateness of inferring a deadline is particularly apparent here, because the project in question involves rail service to T.F. Green Airport in Rhode Island, Complaint, Exhibit 6, p. 9, which obviously includes aspects beyond the EOT's control.  Indeed, this was specifically acknowledged in the ACO, which required EOT to pursue the project "in cooperation with the Rhode Island Department of Transportation.  Id.

Contrary to CLF's contention, the fact that these provisions cannot be enforced in this action does not "frustrate the legislative scheme" of the Clean Air Act -- rather, it effectuates Congress's clear intent, expressly recognized by the First Circuit in Busey, that citizen suit jurisdiction be limited to those cases where requirements in SIP documents are sufficiently specific and objective to make district court enforcement practical. Where the agencies delegated the power to draft the relevant documents have chosen not to create an enforceable requirement, a court cannot do so for them. Wilder v. Thomas, 854 F.2d 605, 613 (2nd Cir. 1988) ("[P]laintiffs are limited under § 7604 to seeking relief from specific violations of existing SIPs; they may not, through a citizen suit, obtain modification of an SIP to conform with their own 'notion of proper environmental policy.'"); Bayview, 366. F.3d at 698 ("[A]n obligation cannot be imposed based upon a SIP if that obligation was not actually undertaken in the SIP.").

**Conclusion**

For the foregoing reasons, the MBTA Defendants respectfully request that their Motion to Dismiss be granted.

    Respectfully submitted,

    MASSACHUSETTS BAY
    TRANSPORTATION AUTHORITY
    and MICHAEL H. MULHERN

    By their attorneys,

    /s/ Dean Richlin
    Dean Richlin (BBO# 419200)
    Randall Kromm (BBO #640940)
    Foley Hoag LLP
    155 Seaport Boulevard
    Boston, MA  02109
    (617) 832-1000
    drichlin@foleyhoag.com

Date: June 1, 2005

**Exhibit A**



*The Commonwealth of Massachusetts*

*Executive Office of Transportation*

*Ten Park Plaza, Boston, MA 02116-3969*

*Office of the Secretary*

**Mitt Romney**
Governor

**Kerry Healey**
Lieutenant Governor

**John Cogliano**
Secretary of Transportation

May 18, 2005

Mr. Robert Golledge
Commissioner
Department of Environmental Protection
One Winter Street
Boston, MA 02108

Dear Commissioner Golledge:

I am writing to inform you that the Executive Office of Transportation (EOT), in close consultation with the Massachusetts Bay Transportation Authority (MBTA), has developed a potential framework for meeting the air quality requirements of the State Implementation Plan of the Clean Air Act, as outlined in your letter dated March 25, 2005. We have done this following the recently completed public outreach for the State Implementation Plan (SIP) reevaluation process. The three public meetings held to date provided valuable feedback and information to the transportation agencies on the three remaining projects listed in the transit regulation as incorporated in the SIP.

This letter is to inform you that EOT and the MBTA are now ready to discuss with the Boston Region Metropolitan Planning Organization our preferred alternative for the three remaining projects. This has been envisioned as the third step on the attached public process chart.

In this reevaluation process, EOT has used the adopted statewide criteria to compare the remaining projects to the other high priority projects in the MBTA's Program for Mass Transportation (PMT). For transit projects, the statewide criteria have evolved from those used in the PMT to be an even more dynamic evaluation tool.

Our evaluation of the remaining projects and other high priority expansion projects supports the comments that we have received from Somerville and Medford; namely, that an enhanced Green Line should be extended beyond Lechmere. This redefined Green Line extension, an extension beyond the terminus of Medford Hills referenced in the transit regulation, meets the objective criteria and is projected to yield significant reductions in vehicle miles traveled, hydrocarbons, and carbon monoxide that will make it an important element of the Commonwealth's plan to meet air quality goals. In an effort to exceed the air quality budgets outlined in your March 25, 2005 letter, EOT is also proposing to add the Fairmont Line Improvements and 1,000 additional parking spaces in the Boston Region to the State Implementation Plan. These three projects will combine to exceed even the 110% goal as outlined in your letter. This framework does assume the elimination of the requirement for the Red Line-Blue Line Connector and the Arborway Restoration projects. However, the MBTA intends to make the current Arborway bus service permanent and will work with the City of Boston to improve service through signal prioritization.

Based on these findings, EOT recommends that the Commonwealth leave the Green Line Extension Project as a transit regulation project, but redefine it as an enhanced Green Line and not restrict it to an extension to Medford Hills. This enhanced Green Line would envision using existing rights of way to provide potential service both to the West Medford area and Union Square in Somerville. Twice as much train service will be provided to the extension than was originally contemplated. The MBTA will continue to work with the host communities as this project proceeds through the planning phases. As the attached air quality tables reflect, this project could by itself yield sufficient reductions in vehicle miles traveled, hydrocarbons, and carbon monoxide to meet the remaining air quality goals.

EOT recognizes that low income/minority neighborhoods within the Boston Region MPO would be enriched by increased access to public transportation. Therefore EOT proposes to add the Fairmount Line Improvements to the transit regulation revision. This project would upgrade service on the Fairmount commuter rail line by adding four new stations over and above the Upham Corner and Morton Street Stations currently being rehabilitated on the existing route. In addition the MBTA will provide more service through better utilization of existing equipment. These improvements build on, and do not replicate, the efforts on the Fairmount Line required by the Amendment to the Administrative Consent Order signed on January 26, 2005.

And finally, EOT will propose the addition of 1,000 parking spaces in the Boston Region. These parking spaces could serve commuter rail stations, transit stations and express buses.

EOT understands that changes to the transit regulation and the SIP must be achieved before these projects can become a reality. We understand that such changes will require public meetings and public outreach and we look forward to working with DEP on that process.

EOT will shortly call a meeting of the Boston Region MPO to discuss this recommendation. At the MPO meeting, EOT will provide the results of our evaluation for consideration by MPO members.

I want to thank you for your assistance in this effort, and I look forward to working with you to ensure that the "best projects" are developed to meet the requirements of the SIP.

Sincerely,

John Cogliano
Secretary

attachments

Approved Benefits*

| Project | Vehicle Miles Traveled (miles/day) | Hydrocarbons (kg/day) | Carbon Monoxide (kg/day) | Nitrogen Oxides (kg/day) |
|---|---|---|---|---|
| Arborway Green Line Extension | 4781 | 6.84 | 108.34 | 2.2 |
| Blue Line/Red Line Connector | 21,520 | 16.5 | 190.3 | 34.1 |
| Green Line Extension to Medford Hillside | 27,730 | 22 | 244.2 | 44 |
| Total | 54,031 | 45.34 | 542.84 | 80.3 |

*All numbers include the upward adjustment of 10%

Proposed Benefits

| Project | Vehicle Miles Traveled (miles/day) | Hydrocarbons (kg/day) | Carbon Monoxide (kg/day) | Nitrogen Oxides (kg/day) |
|---|---|---|---|---|
| Enhanced Green Line Beyond Lechmere | 80,300 | 83 | 1,016 | 114 |
| Fairmont CRR Improvement | 1,100 | 1 | 15 | 2 |
| 1000 Parking Spaces | 11,900 | 16 | 166 | 21 |
| Total | 93,300 | 100 | 1,197 | 137 |



The Public Process to Re-evaluate the Three Remaining Central Artery/Tunnel Project Air Quality Mitigation Transit Commitments and the Associated Regulatory Framework

Dec. 14, 2004

▲ = Milestones

Note: To the extent appropriate, public process will be conducted jointly.