UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-10487/NG |
| MITT ROMNEY, in his official capacity as GOVERNOR OF MASSACHUSETTS, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

Surreply of Conservation Law Foundation

This matter is before the Court on the motions to dismiss filed by the State Defendants,[1] the Massachusetts Bay Transportation Authority ("MBTA Defendants"), and the Massachusetts Turnpike Authority ("Turnpike Defendants"). In their supporting memoranda, the State Defendants suggest that Conservation Law Foundation's ("CLF") prime motivation for pursuing the Clean Air Act violations alleged in its complaint is to give some of CLF's favorite projects "a 'leg up' in the ongoing transportation debate." State Reply Mem. at 1. This mischaracterization is an attempt to distract the Court from the serious legal issues that CLF raises here.

---

[1] The State Defendants are Mitt Romney, in his official capacity as Governor of Massachusetts; Douglas I. Foy, in his official capacity as Secretary of Commonwealth Development and Chairman of the the Commonwealth Development Coordinating Council; John Cogliano, in his official capacity as Secretary of the Executive Office of Transportation; Thomas Waruzilla, in his official capacity as Acting Commissioner of the Massachusetts Highway Department; and Robert W. Golledge, in his official capacity as Commissioner of the Department of Environmental Protection. Substitutions of officials as appropriate have been made pursuant to Fed. R. Civ. P. 25(d)(1).

1

After fifteen years the Commonwealth continues to fail to fulfill its federally-enforceable public transit commitments under the U.S. EPA-approved state implementation plan (hereinafter "Massachusetts SIP") to offset the air quality impacts of the Central Artery/Tunnel Project ("CA/T") and to bring the Commonwealth's eastern airshed into attainment with the federal Clean Air Act's public health air quality standards. The defendants now argue that the remaining federal public transit commitments are too vague to pursue, or that the projects have been further delayed by consensual agreements between the state agencies, or that enforcement is premature.

The Motions to Dismiss should be denied for the reasons set forth in CLF's earlier memorandum. CLF will focus in this surreply on three critical points: 1) that the schedules and permit terms issued in accordance with the regulations contained in the Massachusetts SIP are enforceable under the citizen suit provision of the Clean Air Act ("CAA"); 2) that enforcement of the transit commitments in Counts 5 and 6 is timely; and 3) that this Court may enforce the transit commitments in Counts 17-19 because they are sufficiently specific.

I. <u>The Terms and Conditions of Permits and Construction Approvals Properly Issued In Accordance With Regulations Contained in the Massachusetts SIP Remain Enforceable Under The Citizen Suit Provision of the CAA.</u>

The defendants argue that the specific transportation measures contained in the "Vent Stack Permits" are not "in effect under" the Massachusetts SIP because they have been superseded by the provisions of several state interagency orders. CLF disagrees.

The Massachusetts SIP through the regulatory mechanism of the Tunnel Ventilation Certification Regulation ("310 C.M.R. 7.38") establishes a federal regulatory regime for the review and approval of ventilation systems from highway projects. CLF

2

refers to this regulatory regime as a "permitting" regime because the regulation has all the functional attributes of a permitting mechanism: an application process, performance standards, mandatory agency approval and conditioning authority, prohibitions, public hearing procedures, compliance monitoring, and record keeping. See generally 310 C.M.R. 7.38(1)-(11).[2]  In any event, the EPA-approved regulatory regime established by 310 C.M.R. 7.38 specifically includes the approval mechanisms by which this regulation operates, and compliance with those provisions is fundamental to the effectiveness of the Massachusetts SIP and attainment of federal air quality requirements.

Two approvals issued by the Massachusetts Department of Environmental Protection ("DEP") pursuant to 310 C.M.R. 7.38 with respect to the CA/T are relevant to the present motions: the July 1991 conditional determination with respect to the CA/T's preconstruction certification (CLF Complaint, Ex. 3, "1991 Vent Stack Permit") and the September 2000 conditional determination with respect to the CA/T's amended preconstruction certification (CLF Complaint, Ex. 4, "2000 Amended Vent Stack Permit"). These DEP approvals authorize the construction and operation of the air pollutant emission structures from the CA/T under the Massachusetts SIP.

Each of these regulatory approvals contains a number of specified transit projects and programs that DEP, pursuant to its regulatory mandate under 310 C.M.R. 7.38(3)(b), determined were necessary to ensure that the CA/T ventilation system met the requirements of the Massachusetts SIP. Implementation of these measures was explicit:

---

[2] MBTA Defendants argue that the Vent Stack Permits are not permits because they are technically approvals of certifications. See MBTA Reply Mem. at 6.  This is a distinction without a difference. The CAA does not define a "permit" or a "certification" but in subchapter I "preconstruction requirements," the CAA uses "permit" and "certification" interchangeably. See 42 U.S.C. § 7475(d)(2) (C)(iv) "in the case of a permit issued pursuant to clause (iii)" and 42 U.S.C. § 7475 (d)(2)(D)(i) "in any case where the owner or operator of a proposed major emitting facility who has been denied certification under subparagraph (C)(iii)…." (emphasis added).

3

"continued progress and final implementation of the measures set out below, in accordance with the specified timetables, is a condition for the construction and eventual operation of the project." CLF Complaint, Ex. 4 at 3 (emphasis in original). The DEP also included a specific protocol in 310 C.M.R. 7.38 for revising any of the measures to ensure continued compliance with the terms of the Massachusetts SIP. Id.

The terms and conditions contained in these Vent Stack Permits, including the revision protocols set forth in the permits themselves, are "emission standards or limitations" in effect under the Massachusetts SIP and, as such, are enforceable by citizens under Section 304(a) of the CAA. 42 U.S.C. §7604(a)(1)(A).

Enforceability turns on whether the provisions of the Vent Stack Permits meet the statutory definition of being a "standard, limitation, or schedule established …under any [approved] applicable implementation plan …, [under] any permit term or condition, and [under] any requirement to obtain a permit as a condition of operations[,] which is in effect … under an applicable implementation plan." 42 U.S.C. § 7604(f).[3] The terms of the Vent Stack Permits are enforceable because they fit within several of the categories listed in this broad statutory definition. They are "standard[s], limitation[s] or schedule[s]" established under the Massachusetts SIP and, simultaneously, they are permit terms or conditions in effect under the Massachusetts SIP. Morevoer, contrary to the suggested restriction posed by the State Defendants that only CAA subchapter V permits are enforceable, see State Reply Mem. at 8, n.8, this jurisdictional clause contains

---

[3] See 42 U.S.C. § 7602(p) defining "schedule and timetable of compliance" as "a schedule of required measures including an enforceable sequence of actions or operations leading to compliance with an emission limitation, other limitation, prohibition, or standard."

no such limitation. As such, the terms of the Vent Stack Permits are fully enforceable against the Commonwealth.[4]

This position is fully supported by the plain language of the CAA,[5] Congress' strong interest in providing citizens with "unprecedented opportunities" to implement the CAA,[6] and EPA's interpretation of the Massachusetts SIP and 310 C.M.R. 7.38.[7] CLF Opp. Mem. at 26-27. The more difficult question seems to be what the effect of the various "administrative consent orders" negotiated between the state agencies has been on these otherwise enforceable federal SIP obligations with respect to the transit commitments that were developed and approved under the SIP's 310 C.M.R. 7.38 permitting regime.

The defendants have argued that the three administrative consent orders ("ACOs") entered into between the Massachusetts DEP and the state transportation agencies have superceded the Vent Stack Permits and seem to suggest that CLF should pursue enforcement of the ACO terms under the provisions of 42 U.S.C. § 7604(a)(1)(B). E.g., State Reply Mem. at 3; MBTA Reply Mem. at 6. While CLF does not challenge the legitimacy of these ACOs as a matter of state law, the legal status of these instruments in

---

[4] State Defendants continue to refer to 11th Amendment defenses in their reply argument. State Reply Mem. at 3, n.4. CLF has consistently pled and argued that the state officials are in violation of federal law, and therefore the 11th Amendment does not shield their violations in federal court. CLF will defer full argument of this point until the issue comes directly before the Court.

[5] CLF Opposition Mem. at 21-25.

[6] The Honorable Henry A. Waxman, An Overview of the Clean Air Amendments of 1990, 21 Envtl. L. 1721, 1748 (1991)

[7] State Defendants continue to argue that the First Circuit has adopted a highly restrictive definition of "in effect under" in CLF v. Busey, 79 F.3d 1250, 1258 n.1 (1st Cir. 1996). State Reply Mem. at 11 n.13. The referenced footnote does not support this conclusion but rather observes, in *dicta*, that a conformity requirement was not "in effect under" under the SIP because it had not been included in the SIP at the "material times." Busey, 79 F.3d at 1258, n.1. Interestingly, the MBTA Defendants give the "in effect under" clause its proper reading, but incorrectly conclude that the ACOs have superseded the Vent Stack Permits, and therefore argue that it is the ACOs', not the Vent Stack Permits', conditions that are currently "in effect under" the Massachusetts SIP. See MBTA Reply Mem. at 5; See also Turnpike Reply Mem. at 3.

federal law under the CAA and the Massachusetts SIP and thus the appropriateness of proceeding under 42 U.S.C. § 7604(a)(1)(B), however, is not so clear.

CLF has proceeded in this action with a legal theory that is based on its conclusion that the ACOs are not "in effect under" the Massachusetts SIP and the CAA. CLF reaches this conclusion on the basis of several factors. First, the ACOs are inconsistent with the federally-approved substantive and procedural requirements of the SIP.[8] While 310 CMR 7.38 gives the state some flexibility to amend the specific transportation measures chosen to achieve compliance with the Massachusetts SIP through the vent stack permitting program, that flexibility is constrained by procedural and substantive requirements that the ACOs fail to meet.[9]

310 C.M.R. 7.38 sets forth the core substantive requirements:

> No person shall cause, permit or allow the construction of any tunnel ventilation system without first certifying to the Department, and receiving the Department's written acceptance of such certification, that any tunnel ventilation system, project roadway and roadway network within the project area…will not:
>   (a) cause or exacerbate a violation of any National Ambient Air Quality Standards…or a Massachusetts Ambient Air Quality Standard…or
>   (b) cause or exacerbate a violation of the Department's one hour ambient $NO_2$ guideline of 320 mg/m$^3$; or
>   (c) result in an actual or projected increase in the total amount of non-methane hydrocarbons measured within the project area when compared with the no-build alternative.

310 CMR 7.38 (2).

---

[8] Defendants argue that the procedural requirements of 310 C.M.R. 7.38 should not be applied to permit amendments and should only apply to the original permit. State Reply Mem. at 10. The federal regime in 310 C.M.R. 7.38 would fail if the substantive and procedural requirements in the regulation could be subsequently ignored through an amendment process. Furthermore, the language of the regulation applies to certifications generally and does not exclude amended certifications. See 310 C.M.R. 7.38(2); 310 C.M.R. 7.38(3)(b).

[9] Turnpike Defendants contend that 310 C.M.R. 7.38 does not specify any procedural requirements. See Turnpike Reply Mem. at 3. The Turnpike Defendants are simply mistaken as the regulation does contain procedural requirements including the requirements to provide an opportunity for public participation and to demonstrate compliance with air quality criteria.

6

By virtue of the inclusion and approval of this regulation as part of the Massachusetts SIP, these requirements have now become part of a federal regime that the Commonwealth is not at liberty to ignore. See, e.g., Sierra Club v. Larson, 2 F.3d 462, 470 (1st Cir. 1993)(finding that 310 C.M.R. 7.38 extended a federally-approved regime to regulation of the ventilation systems). The ACOs do not contain any demonstration that they comply or otherwise meet the criteria set forth at 310 CMR 7.38(2). See CLF Complaint, Exs. 6 – 8.

The ACOs also do not comply with the public participation requirements in 310 C.M.R. 7.38. This regulation requires notice and public hearings before DEP approval of the certification of a tunnel ventilation system. 310 CMR 7.38(3)(b); 310 CMR 7.38(11). While public hearings were held regarding some terms of the first ACO that was signed in 2000( the "2000 ACO"),[10] no public participation whatsoever was provided for the Amended ACO signed in 2002 (the "2002 ACO") or the Second Amended ACO that was signed in 2005 (the "2005 ACO"). CLF Complaint, Ex. 7 at 2 § III.1 (2002 ACO terms were agreed upon through internal agency discussions) & Ex. 8 at 2 § II.6 (2005 ACO, describing internal agency enforcement conference through which terms were negotiated).

The lack of public process used by the defendants in developing the three ACOs stands in stark contrast with the process they used when they proceeded in 1999 and 2000 under 310 C.M.R. 7.38 to amend the 1991 Vent Stack Permit, where public comments

---

[10] Because the 2000 ACO was incorporated by reference into the Amended Vent Stack Permit, CLF considered that the terms of the 2000 ACO might have thereby become enforceable under the Massachusetts SIP. CLF ultimately decided that the defendants' failure to submit the entire ACO to public comment and the failure to ensure equivalent air quality benefits as required by 310 C.M.R. 7.38 defeated its effectiveness as a proper amendment to the Massachusetts SIP for federal enforcement purposes. The provision of the Amended Vent Stack Permit incorporating the 2000 ACO therefore is invalid.

7

were solicited and incorporated into the DEP approval as required by the Massachusetts SIP. CLF Complaint, Ex. 4 at 1. The differences in how the Commonwealth itself has approached these two processes reinforces the conclusion that the ACOs were "outside the SIP" while only the Vent Stack Permits were issued in compliance with the Massachusetts SIP.

The second factor CLF considered was the fact that the ACOs do not even purport to be amendments of the Vent Stack Permits. See CLF Complaint, Exs. 6-8. In fact, the 2000 ACO was released as a separate document on the same date and by the same agency as the Amended Vent Stack Permit under 310 C.M.R.7.38. See CLF Complaint, Exs. 4 & 6. While the two Vent Stack Permits issued by DEP specifically reference 310 C.M.R. 7.38 as their authorizing authority,[11] the ACOs have no such reference.

Similarly, the Vent Stack Permit that was issued under the Massachusetts SIP contains amendment measures that all three ACOs fail to meet. CLF Complaint, ¶¶ 45-46.[12] The Vent Stack Permit includes a process for amendment of its terms:

> In the event that DPW finds that one or more of these measures cannot be implemented on the schedule provided herein, the DPW shall notify the DEP and, within sixty (60) days of said notice, provide an alternative mitigation measure and/or schedule which achieves a reduction in vehicle miles traveled which is equal to, or greater than, the measure which could not be implemented.

CLF Complaint, Ex. 3 at 2. The Amended Vent Stack Permit complied with this procedure and even restated the requirement. Id., Ex. 4 at 2-3.

---

[11] See CLF Complaint, Exs. 3 & 4.
[12] State Defendants point out that the procedural requirements contained in the Vent Stack Permit can be amended. State Reply Mem. at 10 n.10. CLF agrees that the procedural requirements of the Vent Stack Permit could be amended provided that the procedures contained in 310 CMR 7.38 were followed. However, this has not occurred.

8

The ACOs, however, do not comply with this requirement.  Indeed, following a recital of the various requirements of 310 C.M.R. 7.38, the Vent Stack Permit, and 310 CMR 7.36, the 2000 ACO simply states:

> As results of discussions which have taken place between the Department and EOTC [now "EOT"], and without adjudication of, admission to, or agreement about any fact or law set forth above, the parties have agreed to negotiate the Administrative Consent Order (hereinafter "Consent Order"), rather than expend the time and resources necessary to adjudicate this matter.

CLF Complaint, Ex. 6 at IV.1.  The 2000 ACO was signed approving new substitute transit measures without the project comparability demonstration required as a precondition to any changes by 310 C.M.R. 7.38.  See id. at 8-9 (ACO allows demonstration of comparability of reductions in vehicle miles traveled to be provided in the future *after* mitigation measures were accepted as sufficient).  The 2002 ACO and the 2005 ACO do not even discuss the requirement for comparable reductions in vehicle miles traveled.  See CLF Complaint, Exs. 7-8.  The failure to demonstrate that alternative measures will provide equal or greater reductions in air pollution violates the terms of the fundamental regulatory mechanism through which 310 C.M.R. 7.38 in the Massachusetts SIP is implemented.

The final factor influencing CLF's treatment of the ACOs is the inconsistency between the procedures by which the ACOs were developed and the procedural mandates of the Transit Regulation, 310 CMR 7.36, which is also part of the federal Massachusetts SIP. See CLF Complaint, ¶¶ 45-46.  The Transit Regulation requires that a project must be proven infeasible before it can be substituted. 310 CMR 7.36 (4). It also requires a demonstration that substitute projects achieve equal or greater emission reductions of nonmethane hydrocarbons, carbon monoxide, and nitrogen oxides and a greater

9

improvement in air quality for carbon monoxide and nitrogen oxides in the area where the required project was to have been implemented, in both the short and long term. 310 CMR 7.36 (4).  The Transit Regulation also requires an explanation for a delayed project and measures to reduce delay as well as a proposed alternative deadline. 310 CMR 7.36 (3).

The 2002 ACO and the 2005 ACO fail to adhere to these SIP requirements even while they purport to delay and substitute projects specifically identified in the Transit Regulation. While the parties to the ACOs clearly intended that the ACOs would shape DEP's enforcement prerogatives under state law, it seems equally clear that they failed to follow the amendment provisions in the Massachusetts SIP. [13]

Accordingly, CLF concludes that the ACOs are not operative in changing the legitimate provisions of the regulatory programs prescribed in the Massachusetts SIP and those provisions remain enforceable through 42 U.S.C. § 7604(a)(1)(A).

> II.     Citizen Suit Enforcement of the Transit Commitments Identified in Counts 5 and 6 Is Appropriate at this Time.

The requirements to "plan and construct and render available for public use" the Red-Blue Connector (CLF Complaint Count 5) and Green Line Extension to Medford Hillside (CLF Complaint Count 6) by December 31, 2011 are specific emission standards or limitations, explicitly set forth in the Transit Regulation in the Massachusetts SIP. The State Defendants, in a bold exercise of statutory construction legerdemain, parse the "planning" requirement for these projects completely out of the SIP, suggesting that the only obligation set forth is the ultimate obligation to have the projects available for public

---

[13] As CLF has already observed, EOT has reserved the right to challenge the terms of the ACOs in proceedings brought by third parties. See CLF Opposition Mem. at 18. That is hardly the sort of enforceable provision one finds operating under a state implementation plan under the CAA.

10

use by December 31, 2011. State Reply Mem. at 5.[14] The MBTA Defendants make an equally startling argument that the SIP's requirement to "plan and construct" does not apply to the two specific projects in Counts 5 and 6 because the requirement applies equally to all the projects set forth in the regulation. MBTA Reply Mem. at 8-9.

The language and obligations set forth directly in the SIP on this point, however, are perfectly clear and objective. Defendants are obligated to "plan <u>and</u> construct" all the projects identified in the Transit Regulation "in accordance with the schedules set forth," which in the case of the Counts 5 and 6 projects produces two major subway projects available for public use by December 31, 2011. 310 C.M.R. 7.36(2).

The Court can enforce the planning and construction obligation without delving into details or interfering unduly with agency executive perogatives with respect to implementation of the CAA. Planning, constructing, and rendering public transportation projects available for public service are standard, well-defined, public processes which include allocation of funding, project design, engineering, land and rights-of-way acquisition, contracting, and construction. These steps are all necessary; they all have standard and objective "critical path" schedules that must be developed and followed; and set procedures exist for completing each stage. Indeed, even the timing of the necessary actions is dictated by the process required to render these projects available by 2011. See CLF Complaint, ¶¶ 70-83. A factual inquiry will show that the standard procedures for planning, constructing and rendering these projects available by December 31, 2011 require that work must already have begun as CLF has alleged. CLF Complaint, ¶¶ 74, 81.

---

[14] The State Defendants continue to claim an absolute right to extend this obligation under any circumstances whatsoever until December 31, 2014. See State Reply Mem. at 6-7. This characterization of their obligations under the SIP is far from the mark. CLF Opposition Mem. at 13-14.

11

The Court need not tell the State Defendants how to go about constructing these projects; it merely needs to direct defendants to comply with the very regulations they have drafted and EPA has approved and to take those steps needed to "render [these projects] available for public use" by December 31, 2011. Special expertise is neither necessary to determine that the Commonwealth has not complied with its ongoing obligations with respect to these SIP measures nor to direct the Commonwealth to come into compliance.

Defendants argue that CLF's position presents a slippery slope where CLF could have filed suit as soon as these commitments were codified. See State Reply Mem. at 6. This argument is false because CLF continues to have the factual burden of demonstrating noncompliance with an activity that is required under the SIP. CLF's allegations satisfy that burden for purposes of these motions. For example, capital transportation investment funding, currently allocated through 2010, does not include these projects with the result that money will only be available in 2011 at the earliest to begin these projects. CLF Complaint, ¶¶ 73, 81. In any event, these are factual matters not appropriately resolved in the context of defendants' current motions.

III.    Counts 17-19 Are Specific and thus Enforceable by Citizen Suit.

Citizens may only enforce emission standards or limitations if those emission standards or limitations are adequately specific. CLF v. Busey, 79 F.3d 1250, 1258 (1st Cir. 1996). While there is not a "bright line" test, case law provides clear criteria to define what is and is not "specific" for purposes of citizen suit enforcement. The transit commitments identified in Counts 17-19 each satisfy those criteria and are therefore specific measures which can be enforced by citizen suit.

There are two requirements courts have identified in delineating which emission standards or limitations are sufficiently specific to be enforced by citizen suit.  First, the emission standard or limitation must "objective."  Wilder v. Thomas, 854 F.2d 605, 614 (2d Cir. 1988); Busey, 79 F.3d at 1258.  Second, the emission standard or limitation must be a measure, strategy or commitment designed to ensure compliance with the NAAQS; citizen suits can not be brought to enforce the NAAQS directly.  Id.  See also Cmtys. for a Better Env't v. Cenco Refining Co., 180 F.Supp.2d 1062, 1078 (C.D.Cal. 2001). The specificity requirement is intended to avoid overburdening the courts and to avoid undue interference in states' implementation of the CAA.  Wilder, 854 F.2d at 613.

MBTA Defendants alone challenge the specificity of the transit commitments in Counts 17 through 19.  Those counts address noncompliance with respect to implementation of the following projects: completing rail service to TF Green Airport in cooperation with Rhode Island transportation agencies, promoting signalization technology to give priority to mass transit vehicles in greater Boston, and securing federal funding for the Silver Line Phase III (or providing an annual alternative urban transit investment).  CLF Complaint, ¶¶ 142-151.  MBTA Defendants argue that these are not sufficiently specific under the Massachusetts SIP. Their rationale appears to be based on the fact that CLF has not identified any precedent holding that a requirement to provide regional rail service or promote signalization technology is enforceable.  MBTA Reply Mem. at 11.  Of course, the test for enforceability at issue is whether these transit commitments are specific, not whether cases exist with identical facts.

Each of these commitments is specific.  No technical expertise is needed to evaluate these commitments; indeed, the average commuter could evaluate

noncompliance with these commitments.  They are satisfactorily objective because the Court can tell what is required by the Massachusetts SIP simply by looking at the commitments themselves and enforcement can proceed without "either overburdening the courts or unduly interfering with implementation of the act." Wilder, 854 F.2d at 613.  In addition, the commitments are clearly measures designed to achieve the NAAQS.  Currently, the Defendants are taking no action with respect to these measures.  The Court need merely direct Defendants to comply with the specific transportation measures that the defendants themselves have prescribed to meet their obligation under the CAA.

The requirement to provide regional rail service to TF Green Airport in Rhode Island is not ambiguous.  The steps to accomplish that task are circumscribed by Massachusetts' standard procedures for implementing transit projects.  CLF has alleged that the defendants are not currently taking any of those steps.  The Court can require the Commonwealth to lay out an implementation plan to comply with this commitment and to execute that plan in a timely manner. If circumstances beyond the defendants' control foreclose compliance, they can seek modification or substitution of the obligation in accordance with the Massachusetts SIP.

The same is true for the commitment to promote signalization technology that gives priority to mass transit vehicles in mixed traffic.  There is no ambiguity about this task; the Commonwealth simply has not implemented a metropolitan Boston program that would affect this obligation. To enforce this requirement, the Court could require defendants to develop and implement such a program.  The details of that program remain within defendants' purview but the court clearly has authority to require them to take the necessary steps to implement a signalization technology program.

The requirement to secure federal funding for Silver Line Phase III or invest annually in alternative urban transit is similarly specific and objective. This commitment requires that federal funding be secured for Silver Line Phase III by 2005. CLF Complaint, ¶¶ 148-151. It is now 2005 and the Commonwealth has no federal funding for Silver Line Phase III. Id. ¶ 150. This commitment also provides that if federal funding is not secured, alternative urban transit investments must be undertaken. Id. ¶149. Defendants have discretion to decide which investments they will undertake, but the requirement to make these investments is not either subjective or discretionary. Since this is a clear and objective measure to achieve the NAAQS under the Massachusetts SIP, it meets the criteria for specificity and is thus enforceable by citizen suit.

III.   Conclusion

For the foregoing reasons, the Court should deny defendants' motions for dismissal under Fed.R.Civ.P. 12(b)(6).

Respectfully submitted,

CONSERVATION LAW FOUNDATION

By its attorneys,

/s/Carrie Schneider
Carrie Schneider (BBO# 660442)
Peter Shelley (BBO# 544334)
Eloise Lawrence, Esq.
Ryan Smith (on the brief)
Conservation Law Foundation
62 Summer Street
Boston, MA  02110
(617) 350-0990
(617) 350-4030 (fax)