UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) C.A. No. 05-10487-NG |
| | ) |
| MITT ROMNEY, in his official capacity | ) |
| as GOVERNOR OF MASSACHUSETTS, | ) |
| DOUGLAS I. FOY, in his official | ) |
| capacity as Secretary of the Office for | ) |
| Commonwealth Development and Chairman | ) |
| of the Commonwealth Development | ) |
| Coordinating Council; THE MASSACHUSETTS | ) |
| BAY TRANSPORTATION AUTHORITY; DANIEL | ) |
| GRABAUSKAS, in his official capacity as | ) |
| Secretary of the Executive Office of | ) |
| Transportation and Chairman of the | ) |
| Massachusetts Bay Transportation | ) |
| Authority; MICHAEL H. MULHERN, in his | ) |
| official capacity as General Manager of | ) |
| the Massachusetts Bay Transportation | ) |
| Authority; THE MASSACHUSETTS TURNPIKE | ) |
| AUTHORITY; MATTHEW J. AMORELLO, in his | ) |
| official capacity as Chairman of the | ) |
| Massachusetts Turnpike Authority; JOHN | ) |
| COGLIANO, in his official capacity as | ) |
| Commissioner of the Massachusetts | ) |
| Highway Department; and, ROBERT W. | ) |
| GOLLEDGE, in his official capacity as | ) |
| Commissioner of The Department of | ) |
| Environmental Protection. | ) |
|     Defendants. | ) |

GERTNER, D.J.:

## MEMORANDUM AND ORDER RE: MOTIONS TO DISMISS
### March 20, 2006

I. **INTRODUCTION**

The Conservation Law Foundation has brought a Clean Air Act

citizen suit against three groups of defendants -- the state

defendants, the Massachusetts Bay Transportation Authority

("MBTA") defendants, and the Massachusetts Turnpike Authority

("MTA") defendants -- all of which have a role in the Central
Artery/Third Harbor Tunnel project, otherwise known as the Big
Dig.[1]

The plaintiff's claims stem from alleged delays in or non-
completion of twenty public transit projects designed to offset
the negative environmental impact of the Big Dig.  These projects
include enhancements to the existing public transit system and
construction of additional subway, bus, and rail lines.  The
twenty projects represent the defendants' end of a bargain that
allowed the Big Dig to proceed: The idea was that the Big Dig's
widened highways and increased vehicle emissions would be offset
by the public transit enhancements the defendants allegedly
committed to construct.  In failing to complete these twenty
transit projects, the plaintiff argues, the defendants have
violated the Clean Air Act's Massachusetts State Implementation
Plan and failed to fulfill their part of the Big Dig bargain.

The three sets of defendants have moved to dismiss counts
one, two and four in part, five through twelve, and seventeen
through nineteen, arguing that the transit project deadlines and

_____

[1] The state defendants include Governor Mitt Romney; Douglas I. Foy,
Secretary of the Office for Commonwealth Development and Chairman of the
Commonwealth Development Coordinating Counsel; Daniel Grabauskas, Secretary of
the Executive Office of Transportation; John Cogliano, Commissioner of the
Massachusetts Highway Department; and Robert W. Golledge, Commissioner of the
Massachusetts Department of Environmental Protection.  The MBTA defendants
include the MBTA itself, MBTA chair Daniel Grabauskas (sued in two separate
capacities), and MBTA General Manager Michael H. Mulhern.  The MTA defendants
include the MTA itself and MTA chair Matthew J. Amorello.

requirements the plaintiff relies on have not yet arrived or are unenforceable against the defendants in federal court.

For the reasons stated below, I hereby **GRANT** the defendants' motions to dismiss with respect to counts seventeen and eighteen. I **DENY** the motions to dismiss with respect to all other counts.

## II.  BACKGROUND

Congress passed the Clean Air Act ("CAA") in 1970 to "protect and enhance the Nation's air quality . . . and to encourage the development of regional pollution control programs."  Conservation Law Found. v. Busey, 79 F.3d 1250, 1256 (1st Cir. 1996).  Pursuant to the CAA, the Environmental Protection Agency ("EPA") has developed National Ambient Air Quality Standards ("NAAQS"), which establish the maximum allowable concentration levels for particular air pollutants. Each state is responsible for developing its own State Implementation Plan ("SIP"), approved by the EPA, for achieving and maintaining compliance with the NAAQS.

At the time of its passage, the task of enforcing the CAA's mandates and each state's SIP obligations fell exclusively to the EPA.  However, in 1990, seeking to remedy the "restrained" pace of government enforcement, Congress amended the Clean Air Act to allow citizens to sue for its enforcement.  42 U.S.C. § 7604.[2]

_____

[2] "Prior to the enactment of the citizen suit provision, 'government initiative in seeking enforcement under the Clean Air Act [had] been restrained.'  S. Rep. No. 91-1196, reprinted at 510 F.2d at 723.  By

This amendment, like private attorneys general provisions in other settings, extended federal court jurisdiction to private suits targeting states' SIP obligations.  <u>Id.</u> at 1257.

Yet citizen suit jurisdiction was not unlimited.  In order to bring a CAA citizen suit, a plaintiff must allege a violation of a specific "emission standard or limitation" that is "in effect under" the CAA or a state's SIP.

In the case at bar, the parties dispute whether many of the twenty transit projects and their associated requirements and deadlines satisfy the conditions for a CAA citizen suit, and therefore whether claims concerning those projects are properly in federal court.  Specifically, the parties disagree over the federal enforceability of three sets of regulations, permits, and orders, which set out the requirements and deadlines for the twenty transit projects:

    A.    The Transit Regulation, 310 CMR 7.36;

    B.    The initial and amended Vent Stack Permits, issued pursuant to the Vent Stack Regulation, 310 CMR 7.38; and

    C.    A Massachusetts Department of Environmental Protection Administrative Consent Order ("ACO"),[3] Amended ACO, and Second Amended ACO.

---

authorizing citizens to bring suit for violations of CAA standards, Congress sought to 'motivate governmental agencies charged with the responsibility to bring enforcement and abatement proceedings.'"  <u>Conservation Law Found. v. Busey</u>, 79 F.3d 1250, 1257 (1st Cir. 1996).

    [3] The initial ACO was incorporated into the amended Vent Stack Permit, and is interpreted as a part of that Permit.

Of the three, the defendants concede the federal enforceability of #1, the Transit Regulation and its transit project requirements and deadlines.  Accordingly, no defendant has moved to dismiss the counts that allege problems with Transit Regulation projects: counts three and thirteen through sixteen. The defendants also concede that the Vent Stack *Regulation*, as distinguished from the Vent Stack *Permits*, is part of the Massachusetts SIP and enforceable in federal court.[4]

The defendants deny the federal enforceability of all other transit project deadlines and requirements at issue in this case -- those drawn from the Vent Stack Permits and the ACOs -- and have moved to dismiss counts one, two and four in part, five through twelve, and seventeen through nineteen.

The defendants make three arguments for dismissal of these counts.  First, they argue that counts one, two and four in part, and seven through twelve, rely on initial and amended Vent Stack Permit deadlines that are unenforceable in federal court or that have been superseded.  Second, they argue that counts five and six, though based on federally enforceable Transit Regulation project deadlines, improperly allege prospective or anticipatory violations of those deadlines, which have not yet arrived. Third, they contend that counts seventeen through nineteen assert

---

[4] In addition, no defendant challenges count twenty, which concerns prioritization of transit project funding as required by the ACO.

supposed violations of the ACOs, which in fact contain no project deadlines at all and therefore cannot even support a claim of an anticipatory violation, much less a present one.

## III. ANALYSIS

### A.    Motion to Dismiss Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts "must accept as true the well-pleaded factual allegations of the Complaint, draw all reasonable inferences therefrom in the plaintiff's favor, and determine whether the complaint, so read, limns facts sufficient to justify recovery on any cognizable theory." LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 508 (1st Cir. 1998) (internal citation omitted). A complaint should be dismissed only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (internal citation omitted).

### B.    Counts One, Two and Four in Part, and Seven Through Twelve

In counts one, two, four, and seven through twelve, the plaintiff alleges that the defendants have failed to meet deadlines or otherwise comply with the requirements of the initial and amended Vent Stack Permits. Specifically, the plaintiff asserts that the defendants have failed to add forty-six subway cars to the Orange Line, to modernize and lengthen Blue Line subway platforms, to construct the Old Colony Greenbush

-6-

Line, to complete Silver Line Phases I and II on time, and to undertake interim mitigation efforts during project delays.

The defendants[5] contend that the project deadlines contained in the initial and amended Vent Stack Permits are not enforceable in federal court using the CAA's citizen suit provision. They claim that the initial and amended Vent Stack Permits are not "emission standard[s] or limitation[s]" as the terms are defined by the Clean Air Act, 42 U.S.C. § 7604(f); that neither is "in effect under" the Massachusetts SIP; and that the Vent Stack Permit deadlines have been superseded and amended by subsequent agreements -- the Amended and Second Amended ACO -- whose deadlines have not yet passed.

    1.   **<u>Analysis</u>**

The CAA permits federal courts to extend jurisdiction to citizen suits that target a specific "emission standard or limitation" "in effect under" the Clean Air Act or a SIP. <u>Busey</u>, 79 F.3d at 1258 (citing 42 U.S.C. § 7604(f)). The analysis of the federal enforceability of the initial and amended Vent Stack Permit deadlines at issue in counts one, two and four, and seven through twelve therefore proceeds in two steps. First, are the initial and amended Vent Stack Permits "emission standard[s] or

---

[5] All three sets of defendants have moved to dismiss counts one and seven through twelve. The MBTA and the MTA defendants have also moved to dismiss counts two and four to the extent that they allege violations of the initial and amended Vent Stack Permits rather than the concededly-enforceable Transit Regulation.

limitation[s]," as defined by the CAA?  Second, are they "in

effect under" the Massachusetts SIP?  If the answers to both

questions are "yes," then the plaintiff's Vent Stack Permit-based

counts withstand the defendants' motions to dismiss.

>    **a.**   **Emission Standard or Limitation?**

The first step of the analysis asks whether the provision

the plaintiff attempts to enforce is a CAA "emission standard or

limitation."  According to 42 U.S.C. § 7604(f)(4), an "emission

standard or limitation" is:

>    1.   A schedule or timetable of compliance, emission
>         limitation, standard of performance or emission
>         standard;
>
>    2.   A control or prohibition respecting a motor vehicle
>         fuel or fuel additive;
>
>    3.   Any condition or requirement of [particular types of
>         permits not applicable here], any condition or
>         requirement under an applicable implementation plan
>         relating to transportation control measures, air
>         quality maintenance plans, vehicle inspection and
>         maintenance programs or vapor recovery requirements,
>         [fuel, fuel additives, visibility protection, ozone
>         protection, or stationary sources]; or
>
>    4.   Any other standard, limitation, or schedule established
>         under any permit issued pursuant to title V . . . or
>         under any applicable State implementation plan approved
>         by the Administrator, *any permit term or condition*, and
>         any requirement to obtain a permit as a condition of
>         operations.

42 U.S.C. § 7604(f)(1)-(4) (emphasis added).

In the case at bar, the plain language of the statute would

seem to cover the initial and amended Vent Stack Permits: the

definition of "emission standard or limitation" expressly

includes "any *permit* term or condition." 42 U.S.C. § 7604(f)(4) (emphasis added).[6]

However, while the plaintiff refers to the initial and amended Vent Stack Permits as "permits," the Vent Stack Regulation, pursuant to which the "permits" were issued, in fact speaks in terms of "certifications."[7]  The Vent Stack Regulation requires that the defendants, as a condition of receiving "preconstruction certification" for any Big Dig tunnel ventilation system or roadway, submit to the Massachusetts Department of Environmental Protection ("DEP"), among other information:

> [A]n identification and analysis of feasible pollution prevention measures designed to reduce vehicle miles traveled including identification of the available short and long-term measures, commitments to implement said measures, and a schedule for implementing said measures.

---

[6] The defendants argue that the CAA citizen suit provision limits enforcement of "permits" to those that are "issued pursuant to title V," a statutory provision concerning stationary pollution sources not at issue in the case at bar.  42 U.S.C. § 7604(f)(4).  However, it is clear that subsection four is not so limited: the text goes on to speak of "any permit term or condition" without reference to title V.  Courts have affirmed this reading.  See Cmtys. for a Better Environment v. Cenco Ref. Co., 180 F. Supp. 2d 1062, 1082 (C.D. Ca. 2001) ("Nothing in subsection (f)(4) limits it to subchapter V permits; rather, it expressly reaches other standards and permit requirements under a SIP.").  I therefore decline to read the "any permit term or condition" language of 42 U.S.C. § 7604(f)(4) as limited to title V permits.

[7] The defendants concede that the Vent Stack Regulation, like the Transit Regulation, is enforceable in federal court as part of the Massachusetts SIP.  They contest the federal enforceability of the Vent Stack *Permits*, issued pursuant to the Vent Stack Regulation's certification process.

310 CMR 7.38(3)(a)(5).  In deciding whether to grant
preconstruction certification, DEP may require the defendants to
implement their proposed "pollution control measures."  The
public transit projects described in the initial and amended Vent
Stack Permits are just such "pollution prevention measures"
proposed by the defendants pursuant to 310 CMR 7.38(3)(a)(5) and
accepted by the DEP as conditions of preconstruction
certification.

     The question, then, is whether the Clean Air Act's reference
to "any permit term or condition" properly encompasses the
certification process outlined in the Vent Stack Regulation and
pursuant to which the Vent Stack Permits and their transit
project requirements and deadlines were issued.  The Clean Air
Act itself does not resolve this issue; the statute does not
define the term "permit."  Black's Law Dictionary, however,
equates "permit" and "certificate," defining "permit" as "a
certificate evidencing permission; a license."  Black's Law
Dictionary, 1176 (8th ed. 2004).  Moreover, the process for
approval of Big Dig tunnel ventilation and roadway projects set
out by the Vent Stack Regulation is functionally a "permitting"
process.  The Vent Stack Regulation requires that the defendants
apply for approval, submit extensive documentation of proposed
construction projects and their impact on air pollution, and
participate in a public hearing.  As a condition of receiving

preconstruction certification, the defendants commit to the construction of "pollution control measures" like the transit projects described in the Vent Stack Permits.

Thus, using a functional interpretation of the term, I conclude that the initial and amended Vent Stack Permits are, in fact, "permits." They impose "terms and conditions" on the DEP's certification of tunnel ventilation and roadway construction projects under the Vent Stack Regulation, fall within the statutory definition of "emission standard or limitation," and therefore satisfy the first step of the federal enforceability test.

### (1)  **"In Effect Under" the SIP?**

The public transit project requirements of the initial and amended Vent Stack Permits must also pass the second step of the analysis: they must be "in effect under" the Massachusetts SIP in order to be enforced using the citizen suit provision. Here, the phrase "in effect under" might be interpreted in two ways. First, it might refer to the reach of the SIP, the question of whether the requirements of permits or certifications issued *pursuant to* a SIP are enforceable as if they were *part of* the SIP itself. In other words, how far beyond the SIP's text does the SIP's authority reach? Are the transit project deadlines and requirements of the Vent Stack Permits "in effect under" the SIP, though they are not explicitly written into the SIP?

Second, even if the SIP's authority reaches beyond the text, the phrase might be read as a temporal limitation, allowing federal enforcement of only those regulations or requirements that have not been properly withdrawn, amended, or superseded. In this view, the question of procedure becomes relevant. If the Vent Stack Permit transit project requirements and deadlines are federally enforceable, but if they were properly amended by the ACOs, the initial set of requirements and deadlines would no longer be "in effect under" the SIP. If, however, the amendment process was procedurally deficient, the pre-amendment, Vent Stack Permit deadlines and requirements would remain presently "in effect under" the SIP and enforceable in a citizen suit.

This second reading of "in effect under" is essentially an argument in the alternative by the defendants. If I determine that the transit project requirements and deadlines contained in the initial and amended Vent Stack Permits are not federally enforceable, there is no need for an examination of the procedure used to amend those requirements and deadlines. If, however, I decide that the Vent Stack Permit requirements and deadlines *are* federally enforceable, I must then examine the procedure the defendants employed in ostensibly replacing the Vent Stack Permit deadlines with the later deadlines of the ACOs.

### (2)  **Reach of the SIP**

The Clean Air Act language confining federal jurisdiction to citizen suits that target "emission standard[s] or limitation[s]" "in effect under" a state SIP might be read as referring to the SIP's reach, i.e., to whether the authority and enforceability of a SIP extend to the requirements of permits or certifications issued pursuant to the SIP.

Addressing this question, the U.S. District Court for the Western District of Virginia rejected a CAA citizen suit alleging a violation of an emissions reduction compliance schedule not explicitly included in the text of the Virginia SIP.  Cate v. Transcontinental Gas Pipeline Corp., 904 F.Supp. 526, 533 (W.D. Va. 1995).

However, the First Circuit has declined to follow this narrow approach, and has accepted citizen suits alleging violations of requirements that are not themselves included in a SIP.  See Fed. Highway Admin., 24 F.3d at 1477 (rejecting a line of cases holding that citizen suits may target only "individual polluters or government actors that fail to comply with the specific requirements of a state or EPA implementation plan"); Busey, 79 F.3d at 1259 (reading the citizen suit provision as authorizing suits to enforce "standards, requirements, and milestones" found in not only the SIP itself, but also in the CAA and the NAAQS).

Moreover, courts in other jurisdictions have extended citizen suit jurisdiction to claimed violations of a permit or certification that was issued pursuant to a SIP, but whose requirements were not expressly written into the SIP itself. See, e.g., Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality, No. 91-13, 1992 U.S. Dist. LEXIS 14842, at *35 n.1 (D. Or. 1992, Sept. 24, 1992) (commenting regarding a permitting program required by a SIP that "[o]nce a pollution source is issued a permit by an authorized state permitting agency, the permit, and not the Clean Air Act, becomes binding upon the source.").

These interpretations of the reach of a SIP, and therefore the reach of the Clean Air Act, make sense, especially given Congress' mandate that the requirements of the Act be met "as expeditiously as practicable" and that the citizen suit provision be used to "motivate government agencies charged with the responsibility" of enforcing the Act. 42 U.S.C. § 7502(a)(2); Busey, 79 F.3d at 1258. Indeed, if I were to determine that the Vent Stack Regulation itself is enforceable in federal court as part of the Massachusetts SIP, but that conditions connected to a certification or permitting process required by the Regulation are not, enforcement of the Regulation would have to proceed in an ineffective patchwork of state and federal actions.

I therefore conclude that if "in effect under" is read as referring to the reach of the SIP, then the public transit project requirements of the initial and amended Vent Stack Permits, issued pursuant to the concededly-enforceable Vent Stack Regulation, also satisfy this second step of the analysis.

### (3) **Temporal Limitation**

The state defendants argue for a second interpretation of the phrase "in effect under," reading it as further limiting citizen suit jurisdiction to cases enforcing requirements or deadlines that have not been superseded.  Using this interpretation, they contend that, even if the initial and amended Vent Stack Permits were "in effect under" the SIP *at the time they were issued*, they were superseded by subsequent sets of requirements and deadlines contained in the Amended ACO and Second Amended ACO.  Because those new deadlines have not yet arrived, the defendants argue that the plaintiff's Vent Stack Permit-based counts cannot stand.

The plaintiff counters that these "amendments" were never valid, as they were not made in accordance with the amendment procedures required by the Vent Stack Regulation and the Vent Stack Permit.  Specifically, the Vent Stack Regulation requires a public hearing process before the Massachusetts DEP may make a decision on "review, acceptance, or rejection of a mitigation plan in accordance with the provisions of [the Vent Stack

Regulation]." 310 CMR 7.38(11). Likewise, the Vent Stack Permit
notes:

> In the event that [the Massachusetts Department of
> Public Works] finds that one or more of these
> measures cannot be implemented on the schedule
> provided herein, the DPW shall notify the DEP and,
> within sixty (60) days of said notice, provide an
> alternative mitigation measure and/or schedule
> which achieves a reduction in vehicle miles
> traveled which is equal to, or greater than, the
> measure which could not be implemented.

(Vent Stack Permit, p. 2.) According to the plaintiff, the
defendants, in issuing the Amended and Second Amended ACOs
purporting to extend the transit project deadlines contained in
the initial and amended Vent Stack Permits, did not comply with
the public hearing requirements of the Vent Stack Regulation or
the notice and substitution requirements of the Vent Stack
Permit.[8]

Here, the defendants use their temporal reading of the "in
effect under" language as an argument in the alternative. If, as
they argue, the transit project requirements and deadlines
contained in the initial and amended Vent Stack Permits are not
federally enforceable as part of the Massachusetts SIP, then the
questions of whether the defendants replaced those deadlines with
the later deadlines of the ACOs, and whether the defendants
followed proper procedure in doing so, are irrelevant here.

---

[8] The plaintiff accepts the Amended Vent Stack Permit as a legitimate
amendment to the initial Vent Stack Permit.

However, I conclude that the Vent Stack Permit transit project deadlines and requirements *are* enforceable using the citizen suit provision. I therefore must address the defendants' argument that those deadlines have been superseded, and the plaintiff's counter argument that the defendants' purported extension of those deadlines was procedurally improper.

Given that both the Vent Stack Regulation and the Vent Stack Permits call for specific procedural steps for the enactment of mitigation plans or proposal of alternatives, it is apparent that the defendants were not entirely free to amend or supplant the Vent Stack Permit transit project deadlines at will. However, I will not address the level of procedure that was required or the question of the defendants' compliance with those procedural requirements. Whether the Vent Stack Permit transit project deadlines were properly superseded is a question of fact, the answer to which is contingent on an inquiry into the procedures the defendants used to issue the ACOs purporting to extend the Permit deadlines. In the context of a motion to dismiss, such a factual inquiry is inappropriate. It is sufficient to conclude that *some* procedure was required for amendment; the plaintiff therefore states a claim upon which relief can be granted that the defendants should be held to the transit project deadlines and requirements of the Vent Stack Permits, and that the

defendants have failed to meet those deadlines and fulfill those requirements.

Thus, if the phrase "in effect under" is interpreted as a temporal limitation, the Vent Stack Permits satisfy -- at least for the purposes of the Rule 12(b)(6) analysis -- the second step of the federal enforceability test.  The plaintiff makes a cognizable claim that the Vent Stack Permit transit project requirements and deadlines suffice as "emission standard[s] or limitation[s]" and that they come within the reach of the enforceable Massachusetts SIP.  The plaintiff has also made a colorable claim that the Vent Stack Permit deadlines were never properly superseded by the ACOs; the question of proper amendment is a factual one to be resolved at a later stage of this litigation.  Counts one, two and four in part, and seven through twelve therefore survive the defendants' motions to dismiss.

### C.    **Counts Five and Six**

Counts five and six of the Complaint allege that the defendants have failed to take necessary steps to prepare for construction of a Red-Blue Line Connector and the extension of the Green Line to Medford Hillside, projects required by the Transit Regulation and scheduled for completion by December 31, 2011.[9]

---

[9] 310 CMR 7.36: U Transit System Improvements

(1) Applicability. 310 CMR 7.36 shall apply to the Executive Office of Transportation and Construction,

-18-

The defendants do not challenge the applicability of the 2011 Transit Regulation deadline to these two projects.[10] Instead, they contend that the CAA does not allow citizen suits based on an "anticipatory violation" theory of liability, and therefore that these counts should be dismissed.[11]

## 1. **Analysis**

The two-step analysis applied above to counts one, two and four, and seven through twelve is not applicable here, as the parties agree that counts five and six concern the Transit Regulation, an enforceable "emissions standard or limitation" "in effect under" the Massachusetts SIP.  The parties' disagreement

---

hereafter referred to as EOTC.

(2) Transit System Improvement Projects. EOTC shall plan and construct and render available for public use, transit system improvement projects including the following projects in accordance with the schedules set forth in 310 CMR 7.36:

***

(h) Before December 31, 2011 construction of the following facilities shall be completed and shall be opened to full public use:

1. Green Line extension to Ball Square/Tufts University

2. Blue Line connection from Bowdoin Station to the Red Line at Charles Station.

[10] The state defendants do make an argument that the applicable final deadline is in fact December 31, 2014, as the Transit Regulation provides for a three-year deadline extension for a project determined to be "infeasible" if an additional interim mitigation project is undertaken in the meantime.  The plaintiff disputes this interpretation of the Transit Regulation.  For the purposes of the prospective/anticipatory violation analysis, however, it is irrelevant whether the correct deadline is December 31, 2011, or December 31, 2014, as neither deadline has yet arrived.

[11] All three sets of defendants move to dismiss counts five and six.

centers on a different question: whether the defendants have any
*present* obligations under the Transit Regulation, or whether
their obligations are limited to meeting the final 2011 Transit
Regulation deadline.  In other words, since the 2011 deadline has
not yet arrived, has the plaintiff nevertheless alleged a
violation of the transit project requirements and deadlines
contained in the Transit Regulation that is a proper basis for a
CAA citizen suit?

There are two ways in which the Transit Regulation might be
interpreted as imposing pre-2011 obligations on the defendants.
First, the regulation might be read as allowing me to establish
interim deadlines in order to ensure that the defendants comply
with the ultimate 2011 deadline.  In this reading, the Transit
Regulation would support a citizen suit and this Court could
exercise its authority to avoid the future impossibility of the
defendants' fulfilling the Transit Regulation's requirements.
Second, as the plaintiff states, the Transit Regulation requires
not only that the defendants complete the transit projects by
2011, but also that they "plan and construct" those projects.
Even absent interim deadlines, the defendants might be held
liable for failing to plan and construct the Transit Regulation
projects, activities that *necessarily* must occur before 2011.

My evaluation of these two interpretations centers on the
issue of specificity.  In order to withstand dismissal, a CAA

citizen suit must not only allege a violation of an "emission standard or limitation" "in effect under" a state SIP, but that standard or limitation must also be sufficiently specific.  As the First Circuit explained in Busey,

> As Congress opened the door to citizen suits . . .
> it also sought to limit that jurisdiction to
> claims that 'would not require reanalysis of
> technological or other considerations at the
> enforcement stage' and would have to meet 'an
> objective evidentiary standard.'

79 F.3d at 1258.  Responding to this fear of opening the citizen suit door too widely, "courts interpreting citizen suit jurisdiction have largely focused on whether the particular standard or requirement plaintiffs sought to enforce was sufficiently specific."  Id.  The question I must answer is whether, since the only deadline stated in the Transit Regulation is December 31, 2011, any count that requires imposition of pre-2011 interim deadlines or obligations would violate the specificity requirement.

### a.    Interim Deadlines

Neither party cites a case that squarely addresses the question of whether a court's imposition of interim deadlines, and finding a SIP violation if those deadlines are not met, in the face of a regulation listing only a final deadline runs afoul of the specificity requirement.

However, Bayview, cited by both parties, comes close.  In Bayview, the U.S. District Court for the Northern District of

-21-

California determined that the defendants had not complied with
their SIP obligations to increase public transit ridership by
fifteen percent.  As part of the remedy, the court ordered the
defendants to come into compliance within five years.  However,
the court declined to impose "interim milestones" prior to the
five-year deadline, noting:

> [The SIP] only requires that a 15% increase
> be achieved and *does not provide any
> timetable by which that increase must be
> incrementally achieved*.  Thus, in theory at
> least, [the defendant] could comply with [the
> SIP] by keeping ridership constant for the
> first four years and boosting ridership to
> the requisite levels in the fifth year.  In
> other words, *intermediate milestones are not
> required to comply with [the SIP]*, and the
> Court therefore does not include them in this
> remedial order.

212 F.Supp. 2d at 1170 n.17.[12]  Though the <u>Bayview</u> case was at
the remedy stage, that court's analysis applies here as well: the
Transit Regulation in the case at bar requires that the two
projects be complete by December 31, 2011, but "does not provide

---

[12] <u>American Lung Assoc. of New Jersey v. Kean</u>, 670 F.Supp. 1285, 1292
(D.N.J. 1987), also cited by both parties, does not conflict with <u>Bayview</u>.   In
<u>American Lung Assoc.</u>, the judge held that the defendant New Jersey was in
violation of its SIP obligations, and ordered the defendant to submit a
proposed timetable for its compliance with the SIP.  It is unclear from the
decision, however, whether the court contemplated a timetable including the
kind of "intermediate deadlines" rejected in <u>Bayview</u>, or whether the court was
concerned only with a new set of final deadlines for SIP compliance.
Moreover, a passing comment by the <u>American Lung Assoc.</u> court seems to
disapprove of claims brought prior to final SIP deadlines.  Though not making
a ruling, the court noted that "because alleged implementation deadlines for
[many] of the strategies . . . do not run until December 31, 1987 [after the
dates of the complaint and the decision], plaintiffs at this time claim
liability based on [other] alleged failures by the state . . . ."  670 F.Supp.
at 1289.

any timetable by which that [goal] must be incrementally achieved." Bayview, 212 F.Supp. 2d at 1170 n.17.

It is notable that, though the Bayview court was arguably at the peak of its power in imposing a remedy after identifying a SIP violation, it refused even then to impose the interim deadlines requested by the plaintiffs. See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad. . . .).

In contrast to Bayview, in the present case, I would need to impose interim deadlines *in order to find liability in the first place* -- a stretch, given the Bayview court's willingness to give the defendants in that case until the final deadline to come into compliance with the California SIP.

Thus, though the parties agree that the transit project requirements and deadlines contained in the Transit Regulation are enforceable as part of the SIP, I am limited by the specificity requirement in what I can read into the Regulation. Following the lead of the Bayview court, I recognize December 31, 2011 as the only *deadline* presently applicable to plaintiffs' counts five and six. If counts five and six are read to require me to impose pre-2011 deadlines on the defendants, they could not stand.

### (1) Plan and Construct

The inquiry does not end here, however.  My inability to impose pre-2011 deadlines on the defendants does not require me also to dismiss counts five and six.  Instead, I can view the Transit Regulation's requirement that the defendants "plan and construct" the two transit projects as establishing some duty to act before 2011.[13]  The terms "plan" and "construct" refer to activity that necessarily takes place prior to a project's completion.  If the defendants fail to engage in any such activity prior to 2011, they violate the Transit Regulation. While this approach is logically attractive, it must nevertheless clear the same specificity hurdle described above.

It is true that the terms "plan" and "construct" are highly ambiguous.  In similar factual circumstances, the First Circuit has warned against a court's enforcing a non-specific requirement "which may be accomplished in any number of ways depending on the technological considerations of the state or agency developing the implementation plan designed to reach the proscribed level of air quality."  Conservation Law Found. v. Fed. Highway Admin., 24 F.3d 1465, 1478 (1st Cir. 1994).

---

[13] It is true, as the defendants point out, that the Transit Regulation requires that the defendants "plan and construct" the projects at issue in counts five and six "in accordance with the schedules set forth" elsewhere in the Regulation, and that the only relevant "schedule" is the 2011 final completion deadline.  310 CMR 7.36.  However, this limitation to the 2011 "schedule" does not change my analysis, as I conclude that the 2011 final deadline is accompanied by an obligation to engage in *some* planning and constructing activity prior to 2011.

However, I do not need to weigh in on the particulars of "planning" and "constructing," which admittedly could be accomplished in "any number of ways," in order to find that the plaintiff has stated a cognizable claim of a specific SIP violation.  The plaintiff's allegation that the defendants have done *absolutely nothing* in the way of planning and constructing is sufficiently specific.  This claim does not require that I impose interim deadlines or require specific steps of the defendants.  Instead, I merely recognize that, in this context, a complete failure to act prior to December 31, 2011, might be a situation of such clarity that it satisfies the specificity requirement of the CAA citizen suit provision.

For this reason the plaintiff has stated claims in counts five and six upon which relief could be granted.

### 2.    Counts Seventeen Through Nineteen

Counts seventeen through nineteen concern the defendants' failure to construct a rail line to T.F. Green Airport in Rhode Island, to implement signalization technology to give priority to mass transit vehicles in greater Boston, and to secure federal funding by 2005 for Silver Line Phase III or make an alternative urban transit investment as allegedly required by the ACOs.

The defendants argue for dismissal of these counts on the ground that the ACOs state no performance deadlines for the

projects at issue and therefore impose no requirements capable of enforcement in a citizen suit.[14]

### 3. __Analysis__

The guiding principle here, as with counts five and six, is the specificity of the provision the plaintiff seeks to enforce. As the First Circuit and other courts have explained, Congress limited courts' citizen suit jurisdiction "to claims that would not require reanalysis of technological or other considerations at the enforcement stage and would have to meet an objective evidentiary standard." Busey, 79 F.3d at 1258.

The requirements at issue in counts seventeen and eighteen are not sufficiently specific for the purposes of the Clean Air Act. With regard to count seventeen, the ACO states only, "[The Executive Office of Transportation and Construction] will promote the use of signalization technology to give priority to mass transit vehicles over automobiles within the metropolitan-Boston area." (ACO 8.) Likewise, with regard to count eighteen, the ACO requires that the defendants, "In cooperation with the Rhode Island Department of Transportation, provide regional rail service between Boston and T.F. Green Airport in Rhode Island." (ACO 9.)

---

[14] Only the MBTA defendants make this argument. The state and MTA defendants have not moved to dismiss counts seventeen through nineteen; the MTA defendants claim that the projects at issue in those counts do not impose any obligations on the MTA.

The ACO requirements that are the subject of these counts differ from those at issue in counts five and six in that they lack *any deadline at all*.  In counts five and six, the existence of a final completion deadline creates an earlier obligation on the part of the defendants to act, at the very least, to "plan and construct."  Though I decline to impose interim deadlines or mandate particular planning and construction activities, counts five and six escape dismissal on specificity grounds because they are capable of being violated, because an allegation of complete inaction is clear enough to be specific.

Counts seventeen and eighteen give the Court no such foothold.  Because the ACOs state no project performance deadlines, the starting point and pace of work appears to be entirely within the defendants' discretion.  This is insufficiently specific, and therefore counts seventeen and eighteen fail to state a claim upon which relief can be granted.[15]

---

[15] The implications of this ruling are troubling: the defendants may be tempted to evade liability and render toothless their air pollution reduction obligations under the Massachusetts SIP by drafting the obligations using vague, deadline-less language.  Though I have no reason to suspect such bad faith on the part of the defendants, I note this possibility as a caution for all involved.  The Big Dig will certainly confer many benefits on the people of Eastern Massachusetts, but clean air is a resource we cannot afford to squander.  The public transit projects that are the subject of this lawsuit represent important steps toward accomplishing Congress' goals in passing the Clean Air Act.  See generally 42 U.S.C. § 7401 ("The Congress finds . . . that the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare . . . A primary goal of this Act is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this Act, for pollution prevention.").

With regard to count nineteen, however -- the defendants'
obligation to secure federal funding for Silver Line Phase III --
the ACO clearly states multiple deadlines.  The defendants were
to complete "preliminary design" for a portion of the transit
route sufficient for a federal funding application by December
31, 2004.  They are to "complete the connection between [transit
route sections]" by December 31, 2010, "or on a schedule
consistent with federal funding."  Finally, they are required to
submit yearly status reports to the Massachusetts DEP and, in the
event of delays, undertake interim remediation projects.  (ACO
7.)

Because the ACO was incorporated into the amended Vent Stack
Permit, its transit project requirements and deadlines are
interpreted like the requirements and deadlines of the Vent Stack
Permits.  The analysis applied above to counts one, two and four
in part, and seven through twelve therefore also applies here,
and militates against dismissal of count nineteen.  As to the
December 31, 2010, future deadline mentioned in the ACO, unlike
the Transit Regulation, the ACO does, in fact, contain interim
deadlines.  That portion of count nineteen therefore escapes
dismissal on specificity grounds as well.

IV.  <u>CONCLUSION</u>

For the reasons stated above, I find that the plaintiff has
stated cognizable claims in counts one, two and four in part,

five through twelve, and nineteen.  I find that the plaintiff has
failed to state a claim upon which relief can be granted in
counts seventeen and eighteen.  Accordingly, defendants' motions
to dismiss [#22, #25, #27] are **GRANTED** with respect to counts
seventeen and eighteen and **DENIED** with respect to all other
counts.

**SO ORDERED.**

**Dated: March 20, 2006**                    <u>**s/NANCY GERTNER, U.S.D.J.**</u>