UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action |
| v. ) | |
| ) | No. 05-10487-NG |
| MITT ROMNEY, in his official capacity as ) | |
| GOVERNOR OF MASSACHUSETTS, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**JOINT STATEMENT REGARDING DISCOVERY SCHEDULE
AND STIPULATIONS OF FACT**

Pursuant to the Court's Order of May 31, 2006 adopting the parties' May 23, 2006 Joint Statement Pursuant to Fed. R. Civ. P. 26(f), the parties submit this joint statement regarding stipulations of fact and a discovery schedule for factual issues.

I. STIPULATIONS

The process of negotiating stipulations has not advanced to the satisfaction of all parties. The parties may wish to recommence the process of negotiating stipulations at a later date. A joint statement will be filed with the court requesting that negotiation of stipulations recommence if appropriate.

II. PHASING OF DISCOVERY

The parties disagree on whether discovery can or should be phased in this matter. Plaintiff's position is set forth in Section IIA. Defendants' position is set forth in Section IIB.

A. Plaintiff's Position

Plaintiff believes that discovery in this case will most efficiently be completed if divided into two phases. Plaintiff seeks to designate an initial phase of discovery to be dedicated to determining liability and standing issues raised by Defendants and to bifurcate factual discovery that is directed toward issues associated with the determination of an appropriate remedy until a later phase of the case.

There are three areas of this case, CLF v. Romney, et al., which are fact driven to varying degrees: standing, liability and remedy. CLF's standing is based on facts relating to CLF's purpose and the injury suffered by CLF's members. That is not a complex inquiry and may end further inquiry by this Court. Liability in this case is based on facts relating to whether there was compliance with requirements in the approved State Implementation Plan ("SIP") and the permits issued under the approved SIP. If the Defendants were or are not in compliance with the original terms of these controlling approvals, then there is a subsequent factual question as to whether Defendants followed the appropriate procedures modifying the deadlines and other requirements of the SIP and permits under the SIP. This is, of course, a mixed fact and law question, but the facts associated with what Defendants did in the event of failing to meet a deadline are discrete and relatively narrow.

The facts associated with any remedial phase of this proceeding will be more complex and require a greater investment of resources on the part of all parties. These facts will address issues such as how quickly compliance with the SIP and permits under the SIP were achieved, Defendants' good faith efforts to achieve compliance, reasons for delay, money spent by Defendants to date on the projects at issue and other projects,

levels of harm caused to plaintiffs by the delay, factors influencing any penalties Plaintiff might seek, proposals for coming back into compliance, and the like. The issues involved in determining an appropriate remedy for this case are both numerous and more complex than the issues involved in determining liability and standing. To the degree the court first determines liability, the scope of the remedial phase of discovery will be limited only to those aspects of Plaintiff's complaint on which it prevails, saving significant resources. Furthermore, a determination of liability may facilitate settlement of this case, removing the need for further discovery on remedy.

Although there may be some overlap in the two phases of discovery, it will be far more efficient for the parties to reserve factual discovery on issues of remedy until the court has determined liability.

Plaintiff had a very positive experience with a similar division of discovery in <u>Conservation Law Foundation and Environmental Protection Agency v. Massachusetts Water Resources Authority</u>. In this case, factual inquiries related to remedy were postponed and factual inquiries related to liability were pursued in an initial phase of discovery. This greatly reduced the overall amount of discovery required, saving time for all parties and the court.

  B.  Defendants' Position

The defendants contend that there should be no artificial segmenting of the case into "phases," with issues relating to "standing" and "liability" proceeding all the way through to judicial resolution before fact development relating to "remedy" can even begin. The defendants instead maintain that fact development relating to all issues in the case -- whether categorized as standing, liability, or remedy -- should be allowed to

proceed simultaneously, so that the matter then can be resolved in its entirety once fact development is completed. In particular, given the complexity of this case, it would be highly burdensome for both the defendants and the Court to have to litigate the matter once in the context of "standing/liability" and then start all over again and relitigate it in the context of "remedy," particularly where there is a substantial overlap in the factual issues that would be addressed at each stage. Resolving this case even once will be a challenge; having to do so twice would be utterly wasteful and serve only to prolong the matter needlessly.

A major source of disagreement among the parties on the bifurcation issue is the extent and timing of the Court's consideration of the air-quality impacts of both the Central Artery/Tunnel highway project and the various mass transit projects at issue. At least some of the defendants will be arguing, quite vigorously, that the highway project standing by itself has <u>improved</u> rather than harmed regional air quality and, conversely, that some of the transit projects championed by the plaintiff would produce at best negligible air quality gains.[1] While this is a Clean Air Act case, the plaintiff curiously seeks to avoid any consideration of air-quality impact in its initial proposed "phase" of the case. It does so despite having alleged that the highway project would harm regional

---

[1] The phrase "at least some" is used because the defendant Commissioner of the Department of Environmental Protection is currently reviewing the defendant Turnpike Authority's Operating Certification for the Central Artery Tunnel project, as submitted pursuant 310 C.M.R. § 7.38(4). In that Certification and accompanying Technical Support Document, the Turnpike Authority states that the Project satisfies all of the air quality criteria set forth in 310 C.M.R. § 7.38(2) and has in fact improved air quality over the "no-build" alternative. While that review is underway, the Commissioner and those defendants with supervisory authority over the Commissioner necessarily take no position on the Project's current air quality impacts, but they reserve the right to take a position on the issue once the Department has completed its review and issued an administrative determination.

air quality and that the transit projects were necessary to "mitigate" that impact, see Complaint ¶¶ 35-36, and despite having successfully persuaded the Court to view the case, at least initially, on the basis of this assumption. See March 20, 2006 Memorandum and Order p. 2 ("The twenty projects represent the defendants' end of a bargain that allowed the Big Dig to proceed: The idea was that the Big Dig's widened highways and increased vehicle emissions would be offset by the public transit enhancements . . . .").

Air quality impacts are in fact central to this case and should be treated as such. On the issue of standing, which the plaintiff correctly concedes cannot be deferred until after "liability" is finally determined,[2] the inquiry is hardly as simple as the plaintiff maintains, and it overlaps to a very large degree with what would be central issues on remedy. Specifically, the plaintiff (an organization) has alleged air-pollution injury to its individual members from the highway's supposed "increased vehicle emissions" that the Court referenced. Memorandum and Order p. 2; Complaint ¶¶ 11-12, 33-36. The defendants do not agree with this assertion, and like any other component of standing it needs to be proven to establish the Court's subject matter jurisdiction.[3] The plaintiff faces an uphill battle in doing so, since the First Circuit has already recognized that "[s]tudies indicate that the [CA/T highway] project will reduce traffic congestion . . . and reduce area-wide carbon monoxide and hydrocarbon emissions." Sierra Club v. Larson, 2 F.3d 462, 464 (1st Cir. 1993). The plaintiff itself has made binding judicial admissions

---

[2] See, e.g., Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 94-95 (1998).

[3] See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). For the reasons previously set forth, the defendant Commissioner of the Department of Environmental Protection and those defendants with supervisory authority over the Commissioner take no position at the present time on the highway project's current air quality impacts.

in earlier federal litigation regarding this highway project that "the proposed project will . . . reduce congestion on the Artery," that "[t]he SIP analysis [for the project] will be lower in the Build case than in the No Build case," and that that analysis "assumes in both the build and the no-build scenarios that [certain transit projects] will be complete and in operation in the year 2010" (with the necessary implication that any air-quality improvement in the Build scenario when compared with the No-Build comes from the highway itself, rather than from any assumed accompanying transit projects).[4]  The plaintiff's 1992 admissions are consistent with earlier statements that its former Executive Director made to the Boston Globe that "[i]t's madness to stop the Central Artery" and that "there are two separate issues here.  There will be an inescapable number of cars that will come into Boston.  What's going to solve our automobile problems is mass transit and the Central Artery."  Peter J. Howe, "2 Environmental Groups Part with Sierra on Artery," Boston Globe, Dec. 25, 1988, at 31 (emphasis added).[5]

---

[4]    See Plaintiffs' Marked Response to State Defendants' Proposed Additional and Substitute Findings of Fact ¶¶ 9, 14, 56 in Conservation Law Foundation of New England, Inc., et al., v. Federal Highway Administration, et al., United States District Court for the District of Massachusetts Civil Action No. 91-12222-K (filed February 28, 1992) (emphasis added); see also January 23, 1992 Order in same case establishing typographical protocol for admitting or denying specific requested findings.

[5]    Even if one were to assume that the alleged air-quality "injury" could be established, the plaintiff also would need to prove that ordering a particular transit project to be built would in fact improve air quality and hence satisfy the separate "redressability" prong of the Article III standing requirement, see, e.g., Lujan, 504 U.S. at 561, and it would have to do so on a project-by-project basis.  See, e.g., Rosen v. Tennessee Comm'r, 288 F.3d 918, 928 (6th Cir. 2002) ("[i]t is black letter law that standing is a claim-by-claim issue").  This will be a highly contested factual issue with respect to some of the projects that would also bear directly on any issue of remedy, and as a question of standing it too must be reached before any final determination regarding liability.  Steel Co., 523 U.S. at 94-95.

Air quality impacts also feature prominently among the factors relevant to remedy, which would be a very fact-intensive inquiry covering both (1) the same ground encompassed by standing and liability and (2) numerous additional considerations. Just this spring the Supreme Court reiterated that ["o]rdinarily" (i.e., absent a specific statutory command to the contrary), "a federal court considering whether to award permanent injunctive relief to a prevailing plaintiff applies the four-factor test historically employed by courts of equity," rather than just automatically issues an injunction once a statutory violation is found. eBay, Inc. v. MercExchange, L.L.C., 126 S.Ct. 1837, 1838 (2006) (holding that nothing in Patent Act alters this usual rule). The eBay Court elaborated:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion.

Id. at 1839 (citations omitted). These traditional factors apply fully upon finding a statutory violation in an environmental case. Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-13, 320 (1982) (Federal Water Pollution Control Act); Clean Air Council v. Mallory, 226 F.Supp.2d 705, 724 (E.D. Pa. 2002) ("The language of the CAA's [Clean Air Act's] citizen suit provision does not limit the Court's equitable discretion").

The four-part remedy test would put numerous issues into play here, some of which are also directly relevant to the standing inquiry as previously set forth, and some of which bear as well on "liability" under any construction of that term. Is there in fact any air pollution "harm" arising from the CA/T highway project that needs to be

remedied? If so, what is the extent of that harm? If air pollution harm does exist, would a given mass transit project in fact alleviate it by providing actual air quality benefits (and, if so, to what extent)? If air pollution harm does exist, have the substitute mitigation measures that the defendants already have implemented with respect to a particular transit project, as required by the Department of Environmental Protection, alleviated the harm to at least the same extent that the project would? What would be the fiscal impact of the requested injunction on the various defendants -- in excess of $ 1 Billion if imposed in its entirety? What other transit projects would be "pushed off the table" if the ones at issue are required to be built? What are the relative benefits of those other potential transit projects when compared with the ones the plaintiff is demanding? What nontransit projects might be jeopardized if resources are required to be devoted to the plaintiff's requested projects? This is a partial list.

   The remedial factors that relate to air quality are also plainly relevant to standing, for the reasons previously set forth. Moreover, many of the remedial factors are also necessarily intertwined with considerations relating to "liability," even under the plaintiff's crabbed reading of that term. For the Court to assess the asserted liability with respect to, e.g., the 46 new Orange Line cars, see Complaint ¶¶ 50-54, it would need to consider (among other factors) the history of that transit project, the transit-related mitigation that has already been provided with respect to it, and the extent to which the air quality impact of that already-provided mitigation equals or exceeds the air quality impact of the transit project itself for the years in question. Similarly, for the Court to determine the appropriate remedy if liability were found with respect to that transit project, it would have to consider the same factors, as well as the others set forth in the

immediately preceding paragraph above. Given these numerous factual overlaps, judicial efficiency plainly would be promoted by considering all aspects of the case at the same time, and the Court should reject the plaintiff's requested bifurcation.

III. DISCOVERY SCHEDULE

The parties have reached agreement on a schedule for expert discovery. Plaintiff shall identify experts and submit any expert reports within twenty one days after the close of factual discovery and Defendants shall identify experts and submit required reports within twenty one days after the submittal of expert reports by Plaintiff. Plaintiff shall submit any rebuttal expert reports within fourteen days after the submittal of expert reports by Defendants. All depositions of experts shall be completed within thirty days of Plaintiff's submittal of rebuttal expert reports.

The parties have also reached agreement on a schedule for filing of motions. The parties propose that motions to amend must be filed promptly upon learning of the basis for amendment but no later than the close of factual discovery. Dispositive motions must be filed no later than thirty days after the close of expert discovery.

The parties have not reached an agreement on a schedule for non-expert factual discovery. Plaintiff's position on this issue is set forth at Section IIIA and Defendants' position is set forth at Section IIIB.

A. Plaintiff's Position

If Plaintiff's proposal to phase discovery is accepted by the court, Plaintiff believes that six months will provide sufficient time for the initial phase of non-expert factual discovery, narrowly focused on liability and standing. In accordance with Defendants' request to delay depositions, Plaintiff proposes under this scenario that no depositions be

scheduled until three months after the commencement of factual discovery. Plaintiff proposes that the appropriate timeframe for the second phase of discovery, addressing remedy, be determined after the court has ruled on liability as the necessary timeframe for this phase of discovery will depend on the number of counts under which liability is established. Furthermore, to the degree there is any overlap in the two phases of discovery, a reduced timeframe may be appropriate for the second phase of discovery.

If the court determines that a phased discovery approach should not be pursued, Plaintiff requests that an aggressive eight months be allocated for all non-expert factual discovery and that depositions not be scheduled until four months after the commencement of factual discovery. Plaintiff recognizes that this is an aggressive discovery schedule but intends to dedicate additional resources and seeks to have Defendants dedicate resources on a more compressed timeframe in order to avoid significant delay of resolution of this case. Virtually all of the facts Plaintiff seeks are contained in files and documents maintained in the ordinary course of business of these agencies and should not be unduly burdensome on any of the Defendants. Plaintiff believes that an expedited discovery schedule is appropriate due to the importance of the issues in this case and the ongoing impacts of the noncompliance with the approved SIP and permits under the approved SIP that Plaintiff has alleged.

B. Defendants' Position

The defendants request that there be a 12-month period for all factual discovery, with fact depositions not commencing until 6 months into that period. The defendants' proposed 12-month period would cover all factual issues in the case, whether relating to standing, liability, or remedy. It therefore cannot be directly compared to the plaintiff's

proposed 6-month period, which would be restricted to standing and liability issues only. Indeed, because the remedy issues are particularly fact-intensive, the defendants' proposed 12-month period may well end up being shorter than the sum of the two fact-discovery periods that would occur the plaintiff's bifurcated approach.

In any event, the plaintiff's requested 6-month period is simply too short, even if limited to liability and standing alone. The burden that document production threatens to impose on the defendants is massive given the 15-year period at issue, the sheer number of agencies and officials involved, and the unavoidable complexity of both the Central Artery/Tunnel project and the individual mass transit projects. Similarly, the plaintiff's demand that they be allowed to conduct 30 depositions in the last 3 months of their 6-month period is draconian on its face. The cost of the transit projects in dispute may indeed exceed $ 1 Billion, and a 12-month period for all factual discovery is by no means unreasonable for a case of this magnitude and public importance. While the plaintiff cites the supposed "ongoing [air-quality] impacts" of the highway project as a reason for expedition, these alleged "impacts" are themselves a hotly contested issue, with prior statements by both the First Circuit and indeed the plaintiff pointing in precisely the opposite direction. See Section IIB supra.

It should be noted that the defendants have agreed to a very concentrated period for expert discovery, as set forth above. This shows that they are not attempting to "stretch out" the case in general -- they just need a reasonable period in which to comply with a daunting document-production burden and a very large number of depositions. The defendants anticipate submitting a filing early next week that spells out their document-production constraints in more detail.

IV. CHANGES TO DISCOVERY LIMITS

All parties agree that Local Rule 26.1(C)'s 25-request limit on Fed. R. Civ. P. 36 requests for admissions should not apply in this case, and that there instead should be no fixed, preset limit on the number of Rule 36 Requests that can be served. As previously noted, the parties agree that many of the factual issues in this case may still be amenable to stipulations. A fact admitted pursuant to Rule 36 is a judicial admission with the practical effect of a stipulation, and the same considerations that continue to support the possibility of stipulations also point to the potential utility of Rule 36 requests as a means of narrowing the factual matters in dispute. A preset limit on the number of Rule 36 requests thus would not advance the efficient resolution of the case.

At the same time, the parties also agree that the requests should not become an unnecessary burden on any responding party. In this regard, the parties agree that no Rule 36 requests should be served until six months after the start of the period of fact discovery. The parties also agree that each party retains the right to move for a protective order on the ground that a particular set of requests is unduly burdensome or relates to irrelevant matters, and that the fact that the party agreed here that there should be no predetermined limit on the number of requests does not constitute an implied waiver of its right to file such a motion.

The parties further agree that should the Court deny the plaintiff's request that the case be bifurcated, the cap on the number of depositions per side should be lifted from the 10 set forth in Local Rule 26.1(C) to 30. The parties disagree on whether the Local Rule's deposition cap should be lifted for the first phase alone should the Court allow the plaintiff's bifurcation request. The parties also disagree on whether Local Rule 26.1(C)'s

cap on the number of interrogatories (to 25) should be lifted in this case. The plaintiff's position is set forth in Section IVA below; the defendants' position appears in Section IVB.

   A. Plaintiff's Position

Plaintiff requests that the limit on depositions be raised to thirty in this case in order to accommodate the very large number of individuals with discoverable information, and the large number of counts each with unique factual issues, many of which will likely not be discoverable through documents.

Plaintiff believes that thirty depositions is a reasonable number given the broad range of factual questions in this case and the number of parties involved. An enormous number of individuals likely to have discoverable information have been identified. Turnpike Authority Defendants have identified 17 individuals likely to have discoverable information, State Defendants have identified 106 individuals likely to have discoverable information, and Massachusetts Bay Transportation Authority ("MBTA") Defendants have identified 164 individuals likely to have discoverable information. Plaintiff seeks an opportunity to depose only a small fraction of the individuals initially identified as likely to have discoverable information.

Plaintiff believes that depositions will be an essential element of discovery in this case, particularly because plaintiff faces a burden of proving that specific procedures and requirements have not been followed. Documents are unlikely to contain proof of an absence of an event, whereas depositions will allow plaintiff to more clearly ascertain what actions and procedures did and did not occur. Furthermore, as this case includes eighteen counts, a number of transit projects, and various procedural requirements,

plaintiffs believe that thirty depositions may be necessary in order to address the full scope of factual issues adequately.

Plaintiff also requests enlargement of the discovery limits on interrogatories. Plaintiff requests the right to submit 100 additional interrogatories to the MBTA, 50 additional interrogatories to the Executive Office of Transportation, 25 additional interrogatories to the Massachusetts Highway Department, 25 additional interrogatories to the Massachusetts Turnpike Authority and 25 additional interrogatories to the Department of Environmental Protection. Due to the number of counts in this case and the unique factual issues raised in each count, plaintiff believes that these additional interrogatories are necessary in order to compile a complete record.

While Plaintiff appreciates that additional interrogatories and depositions may impose some burden on Defendants, Plaintiff believes that these enlargements of the discovery limits are necessary to address all of the factual issues in this case.

B.  Defendants' Position

While the defendants agree that thirty depositions per side is a reasonable limit for the entire case, including standing, liability, and remedy, they strongly object to a thirty deposition limit for the first phase of a bifurcated case, as the plaintiff proposes. In its discussion of the phasing of discovery, see Section II.A above, the plaintiff claims that the issues involved in the remedy stage are more numerous and more complex that the issues involved in standing and liability. If the plaintiff is allowed thirty depositions in the first phase of a bifurcated case and prevails on some of its claims, the defendants may be required to defend sixty or more depositions. That is an unreasonable burden on all the state defendants and a major obstacle to the timely resolution of this case.

The defendants also do not believe that any interrogatories are warranted beyond the "25 per side" allowed by Local Rule 26.1(C). The plaintiffs appear to seek no less than 225 additional interrogatories, for a total of 250, or 10 times the amount ordinarily permitted. In the experience of defendants' counsel, interrogatories usually serve little real value as a discovery tool. They do, however, often impose a substantial task on the party responding to them. Given the inevitable burdens that document production will be creating in this matter, there is no need to exacerbate those resource strains with a massive expansion of a separate discovery vehicle that usually has little real utility.

| For the Plaintiffs, | For the State Defendants, |
|---|---|
| /s/ Carrie Russell<br>Carrie Russell (BBO# 660442)<br>Eloise Lawrence (BBO# 655764)<br>Peter Shelley (BBO# 54434)<br>Conservation Law Foundation<br>62 Summer Street<br>Boston, MA 02110<br>(617) 350-0990<br>crussell@clf.org<br>elawrence@clf.org<br>pshelley@clf.org | THOMAS F. REILLY<br>ATTORNEY GENERAL<br><br>/s/ Pierce Cray<br>Pierce O. Cray (BBO # 104630)<br>David Hadas (BBO # 641294)<br>Assistant Attorneys General<br>Government Bureau<br>One Ashburton Place, Room 2019<br>Boston, MA 02108<br>(617) 727-2200 ext. 2084<br>Pierce.cray@ago.state.ma.us<br>David.hadas@ago.state.ma.us |
| For the Massachusetts Turnpike Defendants,<br><br>/s/ Timothy Dacey<br>Timothy Dacey (BBO # 111800)<br>Gary M. Ronan (BBO # 653899)<br>Goulston & Storrs, P.C.<br>400 Atlantic Avenue<br>Boston, MA 02110-3333<br>(617) 482-1776<br>tdacey@goulstonstorrs.com<br>gronan@goulstonstorrs.com | William L. Pardee (BBO # 389070)<br>Assistant Attorney General<br>Environmental Protection Division<br>100 Cambridge Street<br>Boston, MA 02114<br>(617) 727-2200 ext. 2419<br>Bill.pardee@ago.state.ma.us |

For the MBTA Defendants,

/s/ Dean Richlin
Dean Richlin (BBO # 419200)
Elisabeth Delisle (BBO # 658067)
Foley Hoag LLP
Seaport World Trade Center
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000
drichlin@foleyhoag.com
edelisle@foleyhoag.com


Dated: September 8, 2006